Karim G. Kaspar
Craig Dashiell
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
(T): (973) 597-2370
(F): (973) 597-2400
kkaspar@lowenstein.com
cdashiell@lowenstein.com
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JD GLOBAL SALES, INC. and JAMES D'AMATO,<br><br>Plaintiffs,<br><br>v.<br><br>JEM D INTERNATIONAL PARTNERS, LP, JEM D. INTERNATIONAL (MICHIGAN) INC., HAROLD PAIVARINTA, JIM DIMENNA, CARLOS VISCONTI, and ABC COMPANIES 1-10, representing the fictitious names of entities that do business as RED SUN FARMS whose identities are unknown,<br><br>Defendants. | Civil Action No. 2:21-cv-19943<br><br>**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>Document Electronically Filed |

Plaintiffs JD Global Sales, Inc. ("JD Global") and James D'Amato ("Mr. D'Amato," together with JD Global, "Plaintiffs"), by way of Complaint against Defendants Jem D International Partners, LP ("Jem D International"), Jem D.

International (Michigan) Inc. ("Jem D. Michigan," together, with Jem D International, "Red Sun Farms"), Harold Paivarinta ("Mr. Paivarinta"), Jim DiMenna ("Mr. DiMenna"), and Carlos Visconti ("Mr. Visconti," together, with Red Sun Farms, Mr. Paivarinta and Mr. DiMenna, "Defendants"), allege as follows:

## NATURE OF THE ACTION

1. This is an action by Plaintiffs to recover: (i) commissions that Red Sun Farms—an international produce grower, shipper, and wholesaler—promised to pay JD Global for sales consulting services rendered pursuant to a lifetime employment agreement; (ii) punitive damages for Defendants terminating JD Global's arrangement with Red Sun Farms without cause after Mr. D'Amato reported ethical concerns about a Red Sun Farms executive and questioned the company's handling of key customer accounts with Aldi and Walmart; and (iii) damages and injunctive relief for Red Sun Farms' unauthorized use of Plaintiffs' proprietary information after Defendants prematurely ended JD Global's relationship with Red Sun Farms.

## PARTIES

2. Plaintiff JD Global is a corporation organized under the laws of New Jersey with a principal place of business at 233 Rock Road #101, Glen Rock, New Jersey 07452.

3. Plaintiff Mr. D'Amato is an individual who resides in Glen Rock, New Jersey. Mr. D'Amato founded JD Global and remains the company's sole principal.

4. On information and belief, Defendant Jem D International (a limited partnership organized under the laws of Canada with a principal place of business at 2400 Graham Side Road, Kingsville, ON N9Y 2E5), and Defendant Jem D Michigan (a corporation organized under the laws of Michigan with a principal place of business at 27915 Northline Road, Taylor, Michigan 48180) are two of several affiliated entities that form a business collective known as Red Sun Farms. At all times relevant herein, each affiliated entity within Red Sun Farms, including Jem D International and Jem D Michigan, has held itself out as "d/b/a Red Sun Farms," including in 2020 before the United States Court of International Trade. On information and belief, none of Jem D International's partners—or, to the extent any of Jem D International's partners is an unincorporated entity, its respective members, partners, or interest holders—are New Jersey citizens.

5. On information and belief, Defendant Mr. Paivarinta is an individual residing in Canada. Mr. Paivarinta is Red Sun Farms' Director of Sales for North America.

6. On information and belief, Defendant Mr. DiMenna is an individual residing in Canada or Florida. Mr. DiMenna is Red Sun Farms' President.

7. On information and belief, Defendant Mr. Visconti is an individual residing in Michigan. Mr. Visconti is Red Sun Farms' Chief Executive Officer.

8. Defendants ABC Companies 1-10 are the remaining entities encompassed within and operating as Red Sun Farms, whose identities are unknown to JD Global at this time. On information and belief, none of the ABC Companies—or, to the extent any of the ABC Companies is an unincorporated entity, its respective members, partners, or interest holders—are New Jersey citizens.

**JURSIDICTION AND VENUE**

9. The amount in controversy in this Complaint exceeds the sum of $75,000, exclusive of interest and costs, and Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) (action between a citizen of New Jersey and citizens of foreign States).

10. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the Complaint took place in this District.

11. The Court has personal jurisdiction over Defendants pursuant to N.J.S.A. 2A:61A-1 et seq. and under the common law because Red Sun Farms solicited the services of JD Global, a New Jersey sales representative that maintains its principal place of business in this State, and regularly interacted with JD Global within the forum, including by negotiating and forming multiple contracts with JD Global that resulted in significant revenues for Red Sun Farms pursuant to long-term relationships between the parties. Pursuant to those contracts, Red Sun Farms

received revenues from nationally-known retail chains, wholesalers, and supermarkets that have operations within this State. On information and belief, Red Sun Farms is registered and/or authorized to conduct business in the State of New Jersey and derives substantial revenue in interstate and/or international commerce from business conducted in this State. Additionally, the individual Defendants named herein personally and willfully directed Red Sun Farms' past and ongoing actions, including the unlawful conduct set forth in this Complaint. Specifically, Defendants' retaliation against, and wrongful termination of, JD Global and breach of Red Sun Farms' current contract with JD Global relates to their contacts with this State and relationship with JD Global, and has caused, and continues to cause, damage to JD Global in this State.

## FACTS COMMON TO ALL COUNTS

12. JD Global is a sales contractor that specializes in selling produce to retail suppliers. JD Global has a single employee and principal, Mr. D'Amato. At all times relevant herein, JD Global and Mr. D'Amato have operated from New Jersey.

13. Red Sun Farms is a business-to-business produce supplier that maintains greenhouses throughout North America. Red Sun Farms' clients are groceries and other retailers that sell produce directly to customers. Red Sun Farms maintains distribution centers and growing facilities in the United States.

***Red Sun Farms hires JD Global***

14. In 2013, Messrs. DiMenna and Visconti, top executives at Red Sun Farms, entered into talks with Mr. D'Amato about retaining JD Global's services. Messrs. DiMenna and Visconti had several rounds of discussions with Mr. D'Amato, representing JD Global, over the phone and through email, but the parties could not come to terms on an agreement, which resulted in Mr. D'Amato rejecting an employment offer for JD Global from Red Sun Farms.

15. On November 13, 2014, after Mr. D'Amato rejected Red Sun Farms' employment offer, Mr. DiMenna, representing Red Sun Farms, flew to New Jersey to meet with Mr. D'Amato in-person about the parties working together. The meeting took place at a Marriott hotel near Newark Airport, and the parties discussed the value JD Global could bring to Red Sun Farms, as well as Red Sun Farms' desire to retain JD Global's services.

16. After that meeting, the parties continued their dialogue over the phone, and shortly thereafter reached an oral understanding about JD Global's employment, with Messrs. DiMenna and Visconti representing to Mr. D'Amato that they had authority to bind Red Sun Farms and obtain employment for JD Global. The parties agreed that JD Global would sell Red Sun Farms' produce on a trial basis as an independent contractor, and that the parties would mutually explore a more permanent relationship if JD Global was satisfied that Red Sun Farms could satisfy

customers' expected service levels, and if Red Sun Farms was pleased with the volume of sales that JD Global generated.

17. On November 26, 2014, the parties reduced their agreement to writing, and JD Global executed an Agreement for Services (the "Agreement") with Red Sun Farms—specifically, the Jem D Michigan entity within Red Sun Farms.

18. Under Paragraph 2 of the Agreement, the parties "agree[d] to review [JD Global's] performance . . . semi-annually," with each party reserving the right to terminate the Agreement on 30 days' notice to the other party. The Agreement set JD Global's compensation at $140,000 per year, with the opportunity to earn an incentive bonus of up to 25% of that compensation.

19. After JD Global signed the Agreement, Mr. D'Amato was issued a "@redsunfarms.com" email address. Mr. D'Amato's direct reports at Red Sun Farms were Messrs. DiMenna and Visconti.

20. In December 2014, at Red Sun Farms' request, Mr. D'Amato provided Red Sun Farms with a forecast of the number of cases of Red Sun Farms' produce JD Global anticipated being able to sell through the end of 2015.

21. In February 2015, after having an opportunity to assess Red Sun Farms' distribution capabilities, Mr. D'Amato revised JD Global's sales forecast down. Mr. D'Amato also began working to streamline certain structural inefficiencies he

identified in Red Sun Farms' reporting and distribution processes that impacted Red Sun Farms' ability to satisfy customer orders.

***Red Sun Farms and JD Global Enter Into the Commission Agreement***

22. On February 28, 2015, Mr. D'Amato, on behalf of JD Global, met with Messrs. DiMenna and Visconti at a Southeast Produce Council trade show in Florida to discuss JD Global's revised sales forecast. During that meeting, Messrs. DiMenna and Visconti asked Mr. D'Amato to shift JD Global's focus from internal company operations to developing new business for Red Sun Farms, specifically, bringing in new large retail clients. Messrs. DiMenna and Visconti expressed that they were receiving pressure to show company growth, and that Red Sun Farms' salesforce was not performing at expected levels.

23. During that meeting, Mr. D'Amato offered Messrs. DiMenna and Visconti two proposals for JD Global's continued work on behalf of Red Sun Farms. For one scenario, Mr. D'Amato proposed that JD Global continue under the terms of its Agreement and focus on meeting its revised sales forecast numbers. In the alternative, Mr. D'Amato proposed that the parties abandon their initial Agreement and that JD Global work to retain new customers for Red Sun Farms. Under this latter arrangement, Mr. D'Amato proposed that JD Global would be paid a commission on every case of produce Red Sun Farms sold to those new customers instead of receiving a base salary and without Red Sun Farms having to pay for JD

Global's expenses or healthcare, and that this arrangement would continue until Mr. D'Amato chose to retire from working with Red Sun Farms and would be terminable only for cause (the "Commission Agreement"). Mr. D'Amato also stated that given the proposed "marriage" between the parties, if Red Sun Farms terminated JD Global without cause prior to JD Global withdrawing from the relationship, Red Sun Farms would have to buy out JD Global for the duration of the Commission Agreement.

24. Mr. D'Amato made clear during the meeting that JD Global would not devote its efforts to engaging new retail clients on Red Sun Farms' behalf unless Red Sun Farms elected to proceed under Commission Agreement.

25. Historically, in the produce industry, obtaining new retail business is one of the most difficult things to do, given that retailers usually become entrenched with a given supplier. This was compounded because the "Jem D" companies operating under the Red Sun Farms umbrella historically had been suppliers, not growers, in the industry, and thus there was a stigma in the market that entities affiliated with Red Sun Farms did not own their own product—meaning increased costs and risk for potential customers. Accordingly, JD Global would have to devote significant time and effort to building a relationship with a retailer sufficient to entice it away from its existing supplier relationships.

26. Mr. D'Amato also informed Messrs. DiMenna and Visconti that if Red Sun Farms did not accept the Commission Agreement, JD Global would have to look for work outside its existing Agreement to supplement its income. Messrs. DiMenna and Visconti were aware at the time Red Sun Farms hired JD Global that it was working to sell produce on behalf of several other companies and generating tens of thousands of dollars annually from those arrangements. At or around the time the parties entered into the Commission Agreement, JD Global had received an offer to become more involved in one of those operations.

27. Messrs. DiMenna and Visconti unequivocally told Mr. D'Amato that Red Sun Farms would proceed with the terms of the Commission Agreement, to be effective as of January 1, 2016, and that they would supply JD Global with whatever it needed to bring in large retail clients for Red Sun Farms. Thus, the parties formed a binding agreement, whereby JD Global would devote 100% of its time to developing new business for Red Sun Farms with large retailers. In exchange, Red Sun Farms would pay JD Global a sales commission for as long as Red Sun Farms sold produce to any customer JD Global obtained for Red Sun Farms after February 27, 2015 up until Mr. D'Amato chose to retire from working with Red Sun Farms, or until Red Sun Farms stopped selling produce to that customer, whichever came first, with this arrangement only being terminable for cause.

28. The parties agreed that JD Global would operate under the original Agreement's payment terms through the end of 2015 for accounting purposes. Messrs. DiMenna and Visconti informed Mr. D'Amato that they would draw up paperwork to memorialize the deal structure of the Commission Agreement, the same way they had done for the prior Agreement.

29. JD Global wound down its existing arrangements with other suppliers and forewent other employment opportunities as a result of the Commission Agreement.

30. From March to August 2015, JD Global obtained new major retail accounts for Red Sun Farms with Walmart, Aldi, Ahold, Fresh Market, John Cerasulo, and BJ's Wholesale Club, thereby honoring its promises under the Commission Agreement to obtain large retail clients for Red Sun Farms, and generating tens of millions of dollars of revenue for Red Sun Farms.

31. On January 15, 2016, Messrs. DiMenna and Visconti held a review process meeting for JD Global. Mr. D'Amato attended that meeting on behalf of JD Global. During the meeting, Messrs. DiMenna and Visconti attempted to offer JD Global a base salary increase from the parties' original Agreement. Mr. D'Amato reminded them that the parties had entered into the Commission Agreement the past year, and, after a few hours of discussions, Messrs. DiMenna and Visconti ratified the Commission Agreement. Specifically, Messrs. DiMenna and Visconti accepted

that JD Global would be paid on a per case or percentage of sales basis for produce Red Sun Farms sold to customers that JD Global obtained for Red Sun Farms for as long as Red Sun Farms continued to sell to that customer, and that this arrangement would continue until JD Global ended its relationship with Red Sun Farms, terminable only for cause.

32. Messrs. DiMenna and Visconti reiterated that they would draw up paperwork to memorialize the Commission Agreement, and asked Mr. D'Amato to facilitate face-to-face introductions with the retail clients JD Global had obtained for Red Sun Farms and to visit a distribution facility in Pharr, Texas. Mr. D'Amato complied with these requests, flying to Red Sun Farms' distribution center four days after the meeting, and later making introductions to Aldi and Walmart.

33. On March 4, 2016, Mr. D'Amato met with Red Sun Farms' ownership group to discuss the specific commission JD Global would be paid under the Commission Agreement. Based on the lifetime duration of the Commission Agreement and in exchange for the protection from termination that the Commission Agreement offered, Mr. D'Amato proposed to Red Sun Farms ownership that JD Global be paid 1% of delivered Canadian dollars per case (exclusive of freight costs Red Sun Farms charged for that produce)—well below market average for commission arrangements in the produce industry, which typically range from 2% to 10% and also are based on the total cost of the produce a supplier delivers.

34. Red Sun Farms countered JD Global's proposal with a 0.85% commission rate based on the cost of produce Red Sun Farms sold, "freight on board Pharr, Texas," and in U.S. dollars.

35. On April 27, 2016, Mr. Visconti invited Mr. D'Amato to meet in Dublin, Virginia to further discuss JD Global's work for Red Sun Farms and the 0.85% commission structure for the Commission Agreement. During that meeting, Mr. D'Amato reiterated that if JD Global was going to accept a below market commission (and indeed, one that was significantly lower than the already discounted 1% rate that Mr. D'Amato proposed to Red Sun Farms) that it would be a lifetime employment arrangement, that JD Global could not be terminated without cause, and that there would be no cap on the commissions JD Global would receive. Mr. Visconti accepted and ratified these terms and the Commission Agreement for a second time, and also agreed to supply JD Global with the day-to-day sales and administrative staff necessary to support JD Global. Mr. Visconti asked Mr. D'Amato to draft an agreement memorializing the Commission Agreement.

36. The next day, on April 28, 2016, Mr. Visconti emailed Mr. D'Amato a summary of various points of the Commission Agreement to enable JD Global to start receiving payment under the Commission Agreement. At that time, year to date, JD Global had not received any payments from Red Sun Farms for the accounts it generated for Red Sun Farms and other work it provided to Red Sun Farms.

***Red Sun Farms Pressures JD Global to Limit the Term of the Commission Agreement***

37. On May 12, 2016, JD Global sent Red Sun Farms a draft agreement memorializing the terms of the Commission Agreement, including its perpetual duration and nontermination protections. Later that month, Red Sun Farms sent back revisions proposing, among other things, to limit the Commission Agreement's term to three years. JD Global rejected that provision as it had been promised lifetime employment by Red Sun Farms' top executives on multiple occasions. Red Sun Farms continued to withhold commission payments from JD Global during this time.

38. Mr. DiMenna told Mr. D'Amato months later, in person during a Produce Marketing Association conference in Orlando, Florida, that Red Sun Farms' payment freeze was a negotiation tactic deployed by Mr. Visconti to see if financial pressure would cause JD Global to limit the term of the Commission Agreement. Mr. Visconti's attempts to shorten the Commission Agreement were contrary to the multiple oral understandings the parties had reached.

39. On June 1, 2016, Mr. D'Amato informed Mr. Visconti that JD Global would only sign an agreement that accurately memorialized the Commission Agreement (*i.e.*, the draft terms JD Global sent to Red Sun Farms on May 12, 2016 concerning duration and termination protections). The next day, June 2, 2016, Red Sun Farms made a retroactive payment to JD Global for commissions it was owed

at the 0.85% rate, and promised Mr. D'Amato that a signed agreement would be forthcoming.

40. However, all that followed were continued attempts by Red Sun Farms to induce JD Global to retract the Commission Agreement and agree to an arrangement of shorter duration.

41. In October 2017, Mr. D'Amato met with representatives of Red Sun Farms in Anaheim, California, including Messrs. DiMenna and Visconti and Roberto Saldana Castillo, one of the principal owners of Red Sun Farms, to discuss the parties' inability to reduce the Commission Agreement to writing. At the conclusion of that meeting, Mr. Castillo directed Messrs. DiMenna and Visconti to provide JD Global with another draft of the Commission Agreement. Messrs. DiMenna and Visconti promised Mr. D'Amato that a draft would be forthcoming that would be acceptable to JD Global.

42. The parties continued to work together under the Commission Agreement without incident, until October 2018 when Mr. Visconti discussed removing JD Global from the Walmart account.

43. During a trade show in Florida that month, Mr. Visconti and Mr. D'Amato met with a Walmart vegetable buyer. Mr. Visconti and the Walmart representative had a conversation in Spanish away from Red Sun Farm's booth at the trade show, without Mr. D'Amato.

44. After the conversation, Mr. Visconti told Mr. D'Amato that the Walmart buyer would not continue to do business with Red Sun Farms if Mr. D'Amato remained on the account, for personal reasons.

45. Mr. D'Amato, Mr. Visconti, and Mr. DiMenna later convened a call, with Mr. D'Amato stating that he would need to receive 100% of his commission on the Walmart sales even if Red Sun Farms removed him from managing that account, and that the Commission Agreement would need to be amended to reflect this arrangement. Red Sun Farms decided to leave Mr. D'Amato in place as the Walmart account manager.

46. And while Red Sun Farms eventually confirmed, in writing in 2021 that the Commission Agreement had an indefinite duration, it continued, however, in various draft agreements sent to JD Global, to attempt to repudiate the non-termination provisions of the Commission Agreement that its executives had previously accepted.

***JD Global Develops a Proprietary Vendor Management Program***

47. Towards the end of 2015, JD Global developed a proprietary Vendor Management Inventory sales modeling system for predicting and servicing Red Sun Farms' customers' needs (the "VMI Model").

48. Mr. D'Amato created the model for JD Global out of necessity because Aldi had sent Red Sun Farms purchase orders on short notice that the company was

unable to satisfy. Rather than continuing to scramble to find produce to satisfy Aldi's demands (and ultimately failing), thereby threatening Red Sun Farms' relationship with Aldi, JD Global believed that Red Sun Farms needed to anticipate its customer's needs so that sufficient produce was available to satisfy its purchase orders. There was no existing system in place to accomplish this task, so Mr. D'Amato created one.

49. The VMI Model was based in Microsoft Excel, and the spreadsheet JD Global created to implement the model relied on formulas to calculate customers' future produce needs based on historical ordering, supply chain availability, and truck lane optimization. The VMI Model updated itself every day, and based on the outputs it generated, Red Sun Farms' sales coordinators could direct Red Sun Farms when and where to deliver produce, as well as what quantity and type of produce should be delivered.

50. Mr. D'Amato pitched JD Global's VMI Model to Aldi, and Aldi agreed to let JD Global mange Aldi's inventory using the model. JD Global tweaked the VMI Model over the next six years.

51. Mr. D'Amato trained the Red Sun Farms sales representatives and coordinators JD Global worked with on how to utilize the VMI Model and input the correct data points.

52. Utilizing the VMI Model, JD Global was able to fill Aldi purchase orders at a rate well above the service levels Aldi received from its other suppliers. Red Sun Farms also used the VMI Model for predictive ordering for Walmart, even though Walmart managed its own inventory.

53. Because the VMI Model allowed Red Sun Farms to service Aldi at rates above that provided by Red Sun Farms' competitors, Aldi awarded Red Sun Farms additional yearly contracts.

***Mr. D'Amato Questions Red Sun Farms Business Practices***

54. As part of Walmart's arrangement with Red Sun Farms, Walmart required Red Sun Farms to put Product Traceability Initiative ("PTI") labels on all crates of produce that Red Sun Farms sold to Walmart.

55. PTI labels are used, among other things, to track where produce originated and establish a clear supply chain for given produce.

56. In or around 2017 or 2018, Walmart began requiring that Red Sun Farms require that a pack date be included on its PTI labels. The pack date refers to the date that the produce in question was packaged for retail sale.

57. After Walmart implemented this requirement, Ernesto Sanabria, Red Sun Farms' Director of Operations, contacted Mr. D'Amato to discuss the appropriate pack date for Red Sun Farms' produce.

58. During his discussion with Mr. Sanabria, Mr. D'Amato stated that the PTI label date should reflect the date that Red Sun Farms harvested and processed its produce. Mr. Sanabria replied that Mr. Visconti did not want to list that date because Walmart would take issue with the length of time between certain produce being shipped from Mexico and arriving at Walmart's warehouse, and would potentially reject produce on arrival for being out of specification for age.

59. Mr. D'Amato responded that accurate information should be provided on the label so as to not mislead the customer.

60. Later in 2019, during a meeting with Walmart at the Agricola El Rosal growing facility Red Sun Farms maintains in Michoacan, Mexico, Mr. D'Amato toured the packing line and warehouse with representatives from Walmart and Red Sun Farms. Mr. Visconti was present during this tour.

61. During the tour, the Walmart food safety representative inquired why the PTI labels on the produce crates at the facility did not have a pack date. Mr. D'Amato referred the Walmart employee's question to Mr. Visconti, who replied that he would look into it.

62. After the tour that same day, Mr. Visconti informed Mr. D'Amato that pack dates were not added to Red Sun Farms PTI labels for produce processed at the Agricola facility until that produce was ready to be shipped from Red Sun Farms'

warehouse in Pharr, Texas. The pack date for the produce was then made to be the date the produce was shipped from the Pharr facility.

63. Mr. D'Amato believed this practice defrauded Walmart, and told Mr. Visconti that the pack date should reflect when produce was processed at Red Sun Farms' growing operations, not when it was ready to be shipped. Mr. D'Amato asked Mr. Visconti to address this issue immediately. Mr. Visconti did not say anything in response; he appeared angry and walked away.

64. Beginning in December 2020, Red Sun Farms began downgrading the produce supply sent to Aldi and Walmart such that it was no longer satisfying Aldi's and Walmart's purchase orders to acceptable customer expectations. Mr. D'Amato warned Red Sun Farms that it would lose business if it did not maintain Aldi's and Walmart's expected service levels, and asked for assistance, on multiple occasions, with fulfilling Aldi's and Walmart's purchase orders.

65. Despite, this, Red Sun Farms did nothing to raise the service levels for Aldi or Walmart. Eventually, Aldi awarded certain business for summer 2021 and winter 2022 to other suppliers, resulting in a loss of sales to Red Sun Farms and sales commissions to JD Global. Walmart also removed several items from Red Sun Farms' supply contract for 2021.

66. In addition, Mr. D'Amato learned that Red Sun Farms had been routinely supplying Aldi and Walmart with produce from outside vendors to satisfy

Aldi's and Walmart's produce demand. This violated Red Sun Farms' supply agreements with Aldi and Walmart—which required Red Sun Farms to supply Aldi and Walmart with only Red Sun Farms-gown products, save for exceptions such as when those retailers' increased their demand due to a sale offering. When Mr. D'Amato raised this issue with Mr. Visconti and Mr. Paivarinta and questioned the origin of the produce Red Sun Farms was sending to Aldi and Walmart, he received no reply.

***Mr. D'Amato Reports the Hostile Work Environment a Red Sun Farms Executive Created on Virtual Sales Calls***

67. In early 2020, Red Sun Farms began requiring its sales personnel to participate in extended virtual sales calls on MS Teams run by Mr. Paivarinta, who serves as Director of Sales for North America. The stated purpose of the calls, in addition to discussing items of business, was to foster relationships amongst employees who were now isolated at home as a result of the COVID-19 pandemic.

68. JD Global remained an independent contractor of Red Sun Farms and thus Mr. D'Amato had no obligation to attend company meetings as this was never negotiated as part of any agreement between Red Sun Farms and JD Global. Nor had Mr. D'Amato ever reported to Mr. Paivarinta. Nonetheless, as a showing of good faith, Mr. D'Amato participated in Mr. Paivarinta's sales calls on behalf of JD Global.

69. The majority of the participants on the sales call, except for Mr. D'Amato, were hired by Mr. Paivarinta and reported directly to him. Mr. Paivarinta abused this position of power over those sales employees. During sales calls, Mr. Paivarinta repeatedly used sexual profanity and made other vulgar comments that Mr. D'Amato found offensive.

70. Mr. Paivarinta also bullied and badgered the other call participants. Mr. Paivarinta would specifically single out Mark Wehby, a Red Sun Farms procurement manager, for verbal abuse, making fun of Mr. Wehby's intellect and the way he pronounced words. Mr. Paivarinta also made fun of other sales employees, such as Ray Mason and Tom Coufel for their weight and supposed drinking, and Rob Jackson and Mr. D'Amato for being bald. Mr. Paivarinta also singled Kyle Moynaham out for abuse, making fun of his marriage and him being vegan.

71. Mr. Paivarinta also generally dismissed what younger sales staff had to say during the sales calls because they supposedly lacked experience. Kevin Pedriera, as the most junior sales person on the calls, received the brunt of the abuse Mr. Paivarinta directed towards the junior sales staff.

72. Mr. D'Amato believed that Mr. Paivarinta's conduct crossed the line for appropriate workplace behavior in violation of anti-discrimination laws, and also violated Red Sun Farms' Code of Conduct. On the few occasions when Red Sun Farms' management attended the calls, Mr. Paivarinta conducted himself differently

by "cleaning up" his act. When, however, it was the core sales team without management, Mr. Paivarinta reverted back to his offensive conduct.

73. Mr. D'Amato felt disgusted by Mr. Paivarinta's conduct on the sales calls and distressed to witness the abuse his colleagues suffered, and felt uncomfortable participating in Mr. Paivarinta's sales calls.

74. Because of Mr. Paivarinta's conduct, as of February 10, 2021, Mr. D'Amato stopped attending the sales calls and instead relied on briefings from the sales coordinators, Nicole Solis, Allison Gray, and Mr. Pedriera, that he worked closely with at Red Sun Farms and who regularly participated in those calls. Ms. Solis, Ms. Gray, and Mr. Pedriera were the sales coordinators for Red Sun Farms' Aldi and Walmart accounts, and would answer Mr. Paivarinta's questions about those customers. If they were ever unable to do so, they would bring in Mr. D'Amato. Ms. Solis, Ms. Gray, and Mr. Pedriera also provided Mr. D'Amato with daily recaps of the sales calls.

75. Mr. D'Amato subsequently had conversations with other sales call participants about the way Mr. Paivarinta handled the sales calls. They shared Mr. D'Amato's opinion that Mr. Paivarinta's conduct crossed the line, and expressed that they did not like the way Mr. Paivarinta treated them.

76. Mr. Paivarinta, however, demanded that Mr. D'Amato resume attending his sales calls.

77. On February 16, 2021, Mr. D'Amato had a conversation with Mr. Visconti about Mr. Paivarinta's conduct and the impact it had on Mr. D'Amato and the virtual workplace in general, as well as the reasons Mr. D'Amato was relying on briefings instead of personally attending Mr. Paivarinta's sales calls.

78. Mr. D'Amato also expressed concerns that the increased friction between himself and Mr. Paivarinta could impact JD Global's employment with Red Sun Farms. Mr. Paivarinta had previously gotten into a dispute with a former Red Sun Farms Sales Director, Ugo Dicarlo, after Mr. Dicarlco complained about the way Mr. Paivarinta treated him. Mr. Paivarinta's interactions with Mr. Dicarlo reached the point where Mr. Dicarlo refused to go into the office. The end result was that Red Sun Farms terminated Mr. Dicarlo. Mr. D'Amato did not want the same thing to happen to JD Global.

79. During Mr. D'Amato's call with Mr. Visconti, Mr. Visconti did not promise to take any action to correct or address the issues Mr. D'Amato raised about Mr. Paivarinta's conduct, and attributed Mr. Paivarinta's actions to the way Mr. Paivarinta generally conducted himself. Instead, the parties discussed Mr. D'Amato being excused from the calls and only being added in if his specific input was needed on sales items.

80. The sales team subsequently dialed Mr. D'Amato into sales calls in this manner several times, including on February 17 and March 3, 2021. Mr. D'Amato

otherwise relied on briefings and made independent inquiries of other Red Sun Farms employees to inform himself about the company's supply chain, sales, and distribution needs.

81. On March 26, 2021, Mr. Paivarinta sent Mr. D'Amato an email demanding that he permanently rejoin the sales calls.

82. Later that same day, Mr. D'Amato called company President, Mr. DiMenna, to reiterate his concerns about Mr. Paivarinta's conduct on the sales call, the impact it had on him personally, and the potential adverse consequences his dispute with Mr. Paivarinta might have on JD Global's employment with Red Sun Farms. Mr. D'Amato asked Mr. DiMenna to intervene with Mr. Visconti or Mr. Paivarinta to correct the issue, and told Mr. DiMenna that he was no longer attending the calls because it was affecting him emotionally.

83. Like Mr. Visconti, Mr. DiMenna attributed Mr. Paivarinta's conduct to his personality, and told Mr. D'Amato not to worry.

***Mr. D'Amato Raises Concerns About Payments Red Sun Farms Owed to Aldi***

84. In May 2021, Mr. D'Amato conducted a historical review of Red Sun Farms' sales to Aldi.

85. Based on his analysis, Mr. D'Amato realized that Red Sun Farms had increased the prices Aldi paid Red Sun Farms by 9.5% from June 2019 to August 4,

2019 to help offset a duty the Federal Government had imposed on the import of tomatoes from Mexico.

86. At Red Sun Farms' request, Mr. D'Amato had persuaded Aldi to increase the price it paid Red Sun Farms for tomatoes on the basis of the strong relationship JD Global developed with Aldi and the value that the VMI Model gave to Aldi. Red Sun Farms, however did not notify Mr. D'Amato when the Suspension Agreement on the importation of tomatoes from Mexico had been settled and Red Sun Farms was reimbursed for the duty payments it made. Red Sun Farms did not reimburse Aldi for any of the increased payments it made to offset that duty, resulting in Aldi overpaying Red Sun Farms by hundreds of thousands of dollars.

87. When Mr. D'Amato realized this discrepancy, he asked around the industry and learned that other suppliers had reimbursed their customers. Mr. D'Amato then asked Mr. Visconti and Steve Macchio, Red Sun Farms' Chief Financial Officer, to reimburse Aldi for the overpayment. They did not respond favorably to the request.

***Red Sun Farms Unlawfully Terminates JD Global's Employment***

88. On information and belief, in 2021, Aldi notified Red Sun Farms that it would resume managing its own inventory instead of relying on JD Global's VMI Model.

89. On information and belief, Red Sun Farms determined that Aldi's decision meant that Red Sun Farms no longer needed JD Global to facilitate that customer relationship.

90. On July 27, 2021, Mr. D'Amato received notice from Red Sun Farms' counsel that Red Sun Farms was immediately terminating JD Global's employment, purportedly for cause.

91. Later that day, Mr. D'Amato sent Red Sun Farms a notice demanding that it immediately delete all excel and other proprietary files JD Global provided to the company while employed as an independent contractor, which Red Sun Farms continued to host on MS Teams.

**<u>COUNT I</u>**
**(Breach of Contract – Against Red Sun Farms)**

92. Plaintiffs repeat, reallege, and incorporate by reference all of the allegations in the preceding paragraphs as if set forth here at length.

93. The Commission Agreement is a valid, enforceable, and binding contract supported by the mutual exchange of promises between Red Sun Farms and JD Global, in which Red Sun Farms has continuing obligations.

94. The Commission Agreement was formed by an exchange of oral promises on February 28, 2015 between Red Sun Farms executives Messrs. DiMenna and Visconti, and Mr. D'Amato, on the other hand. Per the agreement, Red Sun Farms promised JD Global lifetime employment (measured by Mr.

D'Amato's desire to continue working with the company), commission payments on sales to new retail customers generated by JD Global, and protection from termination without cause. JD Global promised to devote all its efforts to obtaining new large retail clients for Red Sun Farms.

95. JD Global honored and performed its promises under the Commission Agreement. JD Global obtained new major retail accounts for Red Sun Farms.

96. JD Global also made various concessions in exchange for the security of lifetime employment that the Commission Agreement offered.

97. In addition to agreeing to a below market commission rate, JD Global forewent payment under the Commission Agreement from January 2016 to June 2016, to invest in the structure of that deal.

98. During JD Global's dealings with Reds Sun Farms, Red Sun Farms executives twice ratified the Commission Agreement by further verbal acceptances.

99. On July 27, 2021, Red Sun Farms purported to terminate JD Global in violation of the Commission Agreement.

100. Red Sun Farms' grounds for terminating JD Global were pretextual. Red Sun Farms did not have actual cause to terminate JD Global, and JD Global was ready, willing, and able to work for Red Sun Farms.

101. As a result of Red Sun Farms' breach of the Commission Agreement, JD Global was damaged in an amount to be proven at trial.

**COUNT II**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing – Against Red Sun Farms)**

102. Plaintiffs repeat, reallege, and incorporate by reference all of the allegations in the preceding paragraphs as if set forth here at length.

103. The Commission Agreement is a valid, enforceable, and binding contract supported by the mutual exchange of promises between Red Sun Farms and JD Global, in which Red Sun Farms has continuing obligations.

104. JD Global honored and performed its promises under the Commission Agreement.

105. The Commission Agreement contains an implied covenant of good faith and fair dealing that Red Sun Farms was required to adhere to in performing its contractual duties. Specifically, the Commission Agreement contains an implied covenant by Red Sun Farms that Red Sun Farms would not take any action to deprive JD Global of the benefit of its bargain or preclude JD Global from realizing the intended purpose of the Commission Agreement.

106. Red Sun Farms breached the covenant of good faith and fair dealing by refusing, in bad faith, and with malicious intent to harm JD Global, to memorialize the Commission Agreement pursuant to the multiple oral agreements Red Sun Farms' executives reached with Mr. D'Amato about the termination protections and lifetime duration afforded to JD Global under the Commission Agreement.

107. Red Sun Farms also breached the covenant of good faith and fair dealing by refusing to compensate JD Global for sales Red Sun Farms made to Ahold, Fresh Market, and John Cerasulo—clients that were first onboarded by JD Global and that generated tens of millions of dollars in revenues for the company. JD Global was the point of contact that obtained vendor numbers for each of those companies, which allowed Red Sun Farms to quote those companies prices on produce.

108. Specifically, in July 2015, Red Sun Farms informed JD Global that it was removing JD Global from the Ahold account because of a supposed sales realignment, and assigned another account manager to handle the account.

109. As for Fresh Market and John Cerasulo, after JD Global obtained vendor numbers for those clients, Red Sun Farms and the companies took a break from discussing their potential supply relationship. Red Sun Farms later independently resumed talks with those companies without JD Global, and eventually both Fresh Market and John Cerasulo began buying produce from Red Sun Farms. On information and belief, the reason talks resumed between Red Sun Farms and those companies was because of the relationship JD Global built in the first instance and because JD Global was able to obtain vendor numbers for those companies, which facilitated further discussions between the companies and Red Sun Farms. Red Sun Farms, however, refused to recognize JD Global's

contributions in procuring vendor numbers for those companies, and did not compensate JD Global under the Commission Agreement for sales Red Sun Farms made to Fresh Market or John Cerasulo.

110. Red Sun Farms further breached the covenant of good faith and fair dealing by directing JD Global in 2018, to work towards becoming Aldi's primary supplier. Based on this instruction, JD Global invested time cultivating the relationship with Aldi, and eventually obtained a meeting between Red Sun Farms and Aldi, where Aldi offered Red Sun Farms an exclusive sales opportunity for the eastern region of the United States. Red Sun Farms, however, refused the offer, and thereafter Aldi reduced the volume of produce it purchased from Red Sun Farms, including by removing Red Sun Farms from supplying its stores in the eastern region of the United States. This drastically decreased JD Global's commissions. Had Red Sun Farms not directed JD Global to work towards becoming Aldi's primary supplier, JD Global would have worked to secure other sales opportunities with Aldi.

111. As a direct and proximate result of Defendants' actions and conduct, JD Global was denied the employment security afforded by Commission Agreement, forewent the opportunity to obtain alternative employment prior to entering into the Commission Agreement, and was not appropriately compensated under the Commission Agreement. JD Global has suffered substantial damages, in an amount to be proven at trial.

**COUNT III**
**(Promissory/Equitable Estoppel – Against Red Sun Farms)**

112. Plaintiffs repeat, reallege, and incorporate by reference all of the allegations in the preceding paragraphs as if set forth here at length.

113. Mr. D'Amato presented Messrs. Visconti and DiMenna with the terms for Red Sun Farms to engage JD Global under the Commission Agreement.

114. At various times, including on February 28, 2015, January 15, 2016, April 27, 2016, Messrs. Visconti and DiMenna, represented that Red Sun Farms would supply JD Global with lifetime employment (measured by when Mr. D'Amato chose to retire from working for Red Sun Farms), commission payments on accounts JD Global obtained for Red Sun Farms during the term JD Global worked for Red Sun Farms, and protections from being terminated without cause, so long as JD Global obtained large retail clients for Red Sun Farms.

115. Messrs. Visconti and DiMenna were acting in their capacity as officers of Red Sun Farms when they made those representations to Mr. D'Amato.

116. Red Sun Farms made those representations to JD Global with the reasonable expectation that JD Global would rely on them.

117. JD Global reasonably relied on Red Sun Farms' representations to its detriment because it forewent other employment opportunities based on the promise of lifetime employment, agreed to a below market-rate for its commission payments,

agreed to pay its own out-of-pocket and healthcare costs, and invested all of its time in developing and maintaining large retail accounts for Red Sun Farms.

118. As a result of Red Sun Farms' representations, JD Global has been damaged, and will continue to be damaged, in an amount to be proved at trial.

**COUNT IV**
**(Violation of the Conscientious Employee Protection Act - Against all Defendants)**

119. Plaintiffs repeat, reallege, and incorporate by reference all of the allegations in the preceding paragraphs as if set forth here at length.

120. JD Global is a one-person entity with Mr. D'Amato acting as its sole principal and representative. As JD Global's sole principal and representative, Mr. D'Amato alone is responsible for carrying out JD Global's business. Mr. D'Amato, among other things, oversees JD Global's day-to-day operations, manages JD Global's financials and client relationships, and enters into contractual agreements on JD Global's behalf.

121. Under the Commission Agreement, Red Sun Farms hired JD Global as an independent contractor until such time Mr. D'Amato chose to retire from working with Red Sun Farms. Pursuant to this arrangement, Mr. D'Amato (as JD Global's sole principal and representative), among other things, developed new business for Red Sun Farms with large retail customers, obtained new major retail accounts for Red Sun Farms, developed the VMI sales modeling system for predicting and

servicing Red Sun Farm's customers' needs, and attended and participated in sales and business calls, networking events, and other Red Sun Farms meetings. Mr. D'Amato's services on behalf Red Sun Farms were an integral part of Red Sun Farms' business.

122. In exchange for the skilled services Mr. D'Amato provided under the Commission Agreement, Red Sun Farms paid JD Global a sales commission for produce Red Sun Farms sold to customers Mr. D'Amato obtained for Red Sun Farms. This payment arrangement began on February 28, 2015 and was supposed to continue until Mr. D'Amato chose to retire from working with Red Sun Farms, or until Red Sun Farms stopped selling produce to the customer or customers Mr. D'Amato obtained, whichever came first.

123. Because JD Global forwent other employment opportunities to work on behalf of Red Sun Farms, Mr. D'Amato was economically dependent on Red Sun Farms. Mr. D'Amato also carried out specific actions requested by Red Sun Farms, including facilitating introductions between Red Sun Farms executives and key client contacts, and visiting Red Sun Farms growing operations to familiarize himself with Red Sun Farms' capabilities.

124. Mr. D'Amato, as JD Global's sole principal and representative, who acted on JD Global's behalf to carry out its obligations under the Commission

Agreement, is protected under New Jersey's Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq. ("CEPA").

125. While working for Red Sun Farms, Mr. D'Amato participated in Red Sun Farms' sales calls run by Mr. Paivarinta on behalf of JD Global.

126. During those calls, Mr. Paivarinta berated Red Sun Farms employees on the grounds of their speech and intelligence, used sexual remarks and other vulgar language, and bullied sales employees, thereby creating a hostile work environment for Mr. D'Amato.

127. Mr. D'Amato found Mr. Paivarinta's conduct to be offensive and experienced emotional distress as a result of Mr. Paivarinta berating and bullying Red Sun Farms employees during sales calls to the point where he found it unbearable to participate in Mr. Paivarinta's sales calls. Mr. D'Amato stopped attending sales calls because of Mr. Paivarinta's conduct.

128. Mr. D'Amato reported Mr. Paivarinta's conduct and the hostile work environment Mr. Paivarinta created to his direct reports at Red Sun Farms—*i.e.*, Messrs. DiMenna and Visconti—on February 16 and March 26, 2021.

129. Messrs. DiMenna and Visconti are part of Red Sun Farms' executive team, and, on information and belief, they shared Mr. D'Amato's reports about Mr. Paivarinta's conduct with other members of Red Sun Farms' management. Neither

Messrs. DiMenna and Visconti nor any other person at Red Sun Farms with authority over Mr. Paivarinta did anything to correct Mr. Paivarinta' behavior.

130. On information and belief, Messrs. DiMenna and Visconti or other members of Red Sun Farms management informed Mr. Paivarinta that Mr. D'Amato had complained about Mr. Paivarinta's behavior.

131. On information and belief, Mr. Paivarinta retaliated against Mr. D'Amato as a result of Mr. D'Amato's complaints against Mr. Paivarinta in violation of CEPA by lobbying Red Sun Farms' management to fire JD Global, under the pretext that Mr. D'Amato's absence from company sales calls was impacting the company's business.

132. On information and belief, Red Sun Farms' management, including Messrs. DiMenna and Visconti, sided with Mr. Paivarinta and participated in his efforts to retaliate against Mr. D'Amato in violation of CEPA by authorizing Red Sun Farms to terminate JD Global's employment.

133. On information and belief, Red Sun Farms' willingness to terminate its working relationship with JD Global was also influenced by Red Sun Farms' management's frustration that Mr. D'Amato questioned multiple Red Sun Farms business practices that he believed misled or harmed Red Sun Farms' customers, including Mr. D'Amato (i) reporting to Mr. Visconti that Red Sun Farms' practice of using shipping dates as pack dates on PTI labels was misleading, (ii) reporting to

management that Red Sun Farms had an obligation to refund Aldi for increased payments it made to Red Sun Farms to offset the tomato duty, and (iii) demanding to know from management the source origin of produce Red Sun Farms sold to Aldi and Walmart due to Mr. D'Amato's concerns about Red Sun Farms misrepresenting the characteristics of that produce to Aldi and Walmart in breach of its supply agreements. Red Sun Farms' management's decision to fire Mr. D'Amato for raising concerns about its business practices violated CEPA.

134. Red Sun Farms sent Mr. D'Amato a letter dated July 27, 2021 immediately terminating its working relationship with JD Global on the pretext that Mr. D'Amato's absence from sales calls impacted the company's business.

135. At the time of termination, Mr. D'Amato continued to satisfy JD Global's obligations to Red Sun Farms, and remained willing to work for Red Sun Farms. Prior to termination, Mr. D'Amato made several proposals to address Red Sun Farms' purported desire for him to weigh in on certain sales topics without having to participate in Mr. Paivarinta's sales calls.

136. Red Sun Farms had no basis for terminating its working relationship with JD Global for cause, and instead, on information and belief, based its decision, in whole or in part, on Mr. Paivarinta's desire to terminate JD Global and Mr. D'Amato's employment for personal reasons and because Mr. D'Amato reported

what he believed were Red Sun Farms' questionable business practices, in violation of CEPA.

137. JD Global's termination was unjustified and pretextual, and thus without cause.

138. As a result of JD Global's wrongful termination, Mr. D'Amato suffered emotional distress and other damages in an amount to be proven at trial, and is also entitled to an award of punitive damages.

**COUNT V**
**(Violation of New Jersey Sales Representatives' Rights Act – Against Red Sun Farms)**

139. Plaintiffs repeat, reallege, and incorporate by reference all of the allegations in the preceding paragraphs as if set forth here at length.

140. Under New Jersey's Sales Representatives' Rights Act, N.J.S.A. 2A:61A-1 et seq. (the "Act"), a principal is required to pay its sales representative all commissions and other compensation owed within 30 days of terminating an agreement between the principal and the sales representative for soliciting orders.

141. Red Sun Farms is a principal and JD Global is a sales representative within the meaning of the Act, in that, under the Commission Agreement, Red Sun Farms contracted to have JD Global solicit orders for Red Sun Farms produce and agreed to pay JD Global a commission for its services.

142. Pursuant to the Commission Agreement, JD Global was entitled to be paid a 0.85% commission on produce sold to clients JD Global obtained for Red Sun Farms, with such commissions to be paid until Mr. D'Amato chose to retire from Red Sun Farms.

143. Red Sun Farms purported to terminate the Commission Agreement immediately on July 27, 2021.

144. Red Sun Farms' purported termination of the Commission Agreement was unjustified, pretextual, and without cause. At the time of termination, JD Global was ready, willing, and able to work for Red Sun Farms.

145. Pursuant to the Commission Agreement, JD Global demanded that Red Sun Farms pay it the commissions owed for the duration of the Commission Agreement.

146. Red Sun Farms has paid JD Global commissions up through August 26, 2021, but has refused to make any further commission payments owed to JD Global.

147. Red Sun Farms owes JD Global commission payments for the duration of the Commission Agreement.

148. Red Sun Farms' failure to pay JD Global the commissions it is owed under the Commission Agreement has damaged JD Global's business in an amount to be proven at trial, and entitles JD Global to recover treble damages against Red Sun Farms for those unpaid commissions.

**COUNT VI**
**(Fraudulent Inducement – Against Red Sun Farms/Mr. Visconti/ Mr. DiMenna)**

149. Plaintiffs repeat, reallege, and incorporate by reference all of the allegations in the preceding paragraphs as if set forth here at length.

150. Red Sun Farms and Messrs. Visconti and DiMenna are liable for fraudulently inducing JD Global to accept the Commission Agreement and continue to work for Red Sun Farms at below market commission rate.

151. Messrs. Visconti and DiMenna, as company executives, had actual authority from Red Sun Farms, whether express or implied, to enter into the Commission Agreement, and provide assurances to Mr. D'Amato that Red Sun Farms would honor their promises to JD Global. At all relevant times, Messrs. Visconti and DiMenna were acting at the direction and control of Red Sun Farms. Alternatively, Red Sun Farms cloaked Messrs. Visconti and DiMenna with apparent authority, and JD Global reasonably relied on their authority as company officers.

152. On February 28, 2015, Messrs. Visconti and DiMenna promised Mr. D'Amato that Red Sun Farms would supply JD Global with lifetime employment on a commission basis in exchange for JD Global obtaining large retail clients for Red Sun Farms. Messrs. Visconti and DiMenna promised to make this arrangement effective on January 1, 2016.

153. Messrs. Visconti and DiMenna made these representations to Mr. D'Amato for the express purpose of inducing JD Global to obtain new large retail clients for Red Sun Farms.

154. These statements were false or, at best, half-truths. Messrs. Visconti and DiMenna knew that once Red Sun Farms had developed a relationship with the retailers that JD Global obtained, Red Sun Farms had no intention of continuing to partner in good faith with JD Global. Messrs. Visconti and DiMenna knew that once JD Global invested the time to develop those customer relationships it would not walk away from Red Sun Farms, and that Red Sun Farms could continue to benefit from the relationship's JD Global developed while at the same time denying JD Global the job security they promised Mr. D'Amato in the Commission Agreement.

155. Mr. Visconti later ratified the Commission Agreement on April 27, 2016 and told Mr. D'Amato he would pay JD Global a 0.85% commission on sales JD Global generated in exchange for lifetime job security to JD Global under the Commission Agreement.

156. This statement was false. Mr. Visconti knew that by appeasing Mr. D'Amato's employment concerns he would get JD Global to continue to invest in Red Sun Farms, including by improving Red Sun Farms' infrastructure and strengthening Red Sun Farms' customer relationships, but that Red Sun Farms had

no intention of honoring the duration or termination protections of the Commission Agreement.

157. Upon information and belief, Messrs. Visconti and DiMenna gave their false and misleading representations with the approval of Red Sun Farms, and for the company's benefit. Messrs. Visconti and DiMenna acted with scienter, knowing that Mr. D'Amato would rely on their statements and that their statements would impact the services JD Global delivered to Red Sun Farms. Messrs. Visconti and DiMenna thus repeatedly misled JD Global about the purported relationship between JD Global and Red Sun Farms.

158. JD Global reasonably relied on Messrs. Visconti and DiMenna's material misrepresentations and omissions to its detriment, based, in part, on the parties' prior course of dealing. When entering into the original Agreement, Messrs. Visconti and DiMenna had first reached an oral agreement with Mr. D'Amato about engaging JD Global, and then followed through with delivering a written contract that memorialized the parties' deal, consistent with their promises. But for Messrs. Visconti and DiMenna's material representations and omissions, JD Global would not have agreed to devote all of its time and efforts to obtaining new large retail clients for Red Sun Farms or agreed to a below-market commission payment.

159. As a direct and proximate result of Messrs. Visconti and DiMenna's conduct, JD Global has suffered substantial harm and damages in an amount to be

proven at trial, including the actual value of the services JD Global provided to Red Sun Farms, and all out-of-pocket costs JD Global incurred in connection with the Commission Agreement. Defendants' conduct also entitles JD Global to recover punitive damages.

**COUNT VII**
**(Unjust Enrichment/Quantum Meruit – Against Red Sun Farms)**

160. Plaintiffs repeat, reallege, and incorporate by reference all of the allegations in the preceding paragraphs as if set forth here at length.

161. Messrs. Visconti and DiMenna requested that JD Global obtain retail clients for Red Sun Farms on a commission basis.

162. JD Global rendered sales services to Red Sun Farms on a below market basis based on the Commission Agreement.

163. JD Global would not have agreed to the commission rate under the Commission Agreement had Messrs. Visconti and DiMenna represented that Red Sun Farms would only retain JD Global for a limited term.

164. JD Global would not have obtained large retail clients for Red Sun Farms and devoted its entire time to working for Red Sun Farms, and would have instead supplemented its income from Red Sun Farms with alternative employment (or sought alternative employment in full) had Messrs. Visconti and DiMenna not promised to extend JD Global lifetime employment.

165. Red Sun Farms' failure to provide JD Global with the job security and duration of employment promised to it by the company's executives has conferred a substantial benefit on Red Sun Farms for which it has not compensated JD Global.

166. As a result of JD Global's work, Red Sun Farms obtained large retail customers that it previously had no relationship with that have generated nearly $500 million in revenue for the company.

167. In addition to Red Sun Farms obtaining sales services at a below market rate, Red Sun Farms also profited from work JD Global performed for the business for which JD Global was not appropriately compensated.

168. JD Global assisted Red Sun Farms in developing new product lines that were not sold prior to JD Global working for the company. JD Global researched, designed, and procured special packaging—the Grab-N-Go 1lb bag—that Red Sun Farms then used to package Roma tomatoes, mini cucumbers, and other items. JD Global also developed other product lines that Red Sun Farms never grew before: the 12/1lb Roma Bag Conventional and Organic, Roma 25lb Conventional and Organic, 12/1lb Mini Cucumber Conventional and Organic, 12/1lb Mini Sweet Peppers Conventional and Organic, 12/2ct Organic Bell Peppers, 10/12oz Medley Tomato Top Seal, and 10/14oz Long Sweet Peppers. These products generated significant revenues for Red Sun Farms.

169. JD Global also negotiated a freight loss recoupment with Aldi, after Red Sun Farms projected that it would lose $1.3 million for the fourth quarter of 2017 on its freight budget. The net result of JD Global's efforts was a $1 million profit for Red Sun Farms instead of its predicted loss—a $2.3 million turnaround from the initial freight budget projections.

170. In addition, Red Sun Farms benefitted from a "halo effect" created by JD Global's work for Red Sun Farms. On information and belief, after learning that Walmart and Aldi were purchasing produce from Red Sun Farms, various retail and wholesale customers contacted Red Sun Farms about doing business. For example, in 2016 a Lidl representative approached Mr. D'Amato and Mr. DiMenna at a produce show in New York City and said that Lidl wanted to do business with Red Sun Farms because Red Sun Farms supplied produce to Aldi stores throughout the Southeast where Lidl was planning to open its first stores. JD Global secured the Aldi account for Red Sun Farms, which facilitated an introduction to Lidl, resulting in Lidl purchasing in excess of $100 million worth of produce from Red Sun Farms. JD Global did not receive any compensation for those sales.

171. As a direct and proximate result of this inequitable conduct, JD Global has been, and will continue to be, damaged in its business.

## COUNT VIII
## (Misappropriation of Business Information - Against Red Sun Farms)

172. Plaintiffs repeat, reallege, and incorporate by reference all of the allegations in the preceding paragraphs as if set forth here at length.

173. Mr. D'Amato developed a proprietary VMI Model for JD Global for forecasting customer sales needs and ensuring that proper produce supply was in place to meet that demand.

174. The presentation of, and formulas in, the VMI Model are highly specific and developed by Mr. D'Amato based on his decades of experience working in the produce sales industry.

175. Mr. D'Amato trained Red Sun Farms sales representatives and coordinators on how to populate the data fields in the VMI Model.

176. JD Global did not license Red Sun Farms to use or distribute copies of the VMI Model.

177. The day Red Sun Farms purported to unlawfully terminate JD Global's employment, Mr. D'Amato requested the return and destruction of all spreadsheets containing the VMI Model and other proprietary documents JD Global shared with Red Sun Farms that are hosted on Red Sun Farms' MS Teams platform.

178. To date, Red Sun Farms has not provided Mr. D'Amato with proof that it deleted all VMI Model spreadsheets in its system. Nor has it returned any of JD Global's proprietary documents.

179. On information and belief, Red Sun Farms continues to use JD Global's VMI Model and other proprietary documents in Canada for its own benefit to facilitate sales and inventory tracking for its other clients.

180. On information and belief, Red Sun Farms continues to use JD Global's VMI Model and other proprietary documents for its own benefit with clients abroad, including in Canada and Mexico, in direct competition with the services JD Global offers to produce purchasers.

181. As a direct and proximate cause of Red Sun Farms' use of this proprietary information, JD Global has suffered, and will continue to suffer, substantial damages and irreparable harm.

**PRAYER FOR RELIEF**

WHEREFORE, judgment should be entered in favor of Plaintiffs and against Defendants for one or more of the following forms of relief or some combination of them:

A. On Count I, an award of damages against Red Sun Farms in an amount sufficient to compensate JD Global for all losses it suffered and will continue to suffer as a result of Red Sun Farms prematurely terminating the Commission Agreement without cause and depriving JD Global of lifetime commission payments;

B. On Count II, an award of damages against Red Sun Farms in an amount sufficient to compensate JD Global for all losses it suffered and will continue to suffer as a result of Red Sun Farms depriving JD Global of the benefit of the bargain it struck under the Commission Agreement;

C. On Count III, an award of damages against Red Sun Farms in an amount sufficient to compensate JD Global for all losses it suffered and will continue to suffer as a result of Red Sun Farms breaching the promises it made to JD Global, including damages JD Global suffered as a result of relying on Red Sun Farms promises and damages sufficient to compensate JD Global for the economic benefits that Red Sun Farms promised to it and then withheld;

D. On Count IV, an award of damages against Defendants in an amount sufficient to compensate Mr. D'Amato for Defendants unlawfully retaliating against Mr. D'Amato and terminating JD Global without cause, including a punitive damages award;

E. On Count V, an award of damages against Red Sun Farms in an amount sufficient to compensate JD Global for the unpaid commissions it is owed under the Commission Agreement, including an award of treble damages for those unpaid commissions;

F. On Count VI, an award of damages against Red Sun Farms, Mr. Visconti, and Mr. DiMenna in an amount sufficient to compensate JD Global for all

losses it suffered and will continue to suffer as a result of Defendants' fraudulent inducement, including an award of punitive damages;

G. On Count VII, an award of damages against Red Sun Farms in an amount to be determined at trial, for the benefit JD Global conferred on Red Sun Farms from January 1, 2016 to the present and for which JD Global has not been appropriately compensated;

H. On Count VIII, an injunction requiring Red Sun Farms to turn over and destroy all proprietary information that JD Global provided to Defendants during the term JD Global was employed by Red Sun Farms, including JD Global's VMI Model, and damages compensating JD Global for Red Sun Farms' unauthorized use of JD Global's proprietary materials after Red Sun Farms unlawfully terminated JD Global's employment;

I. An award of costs of suit and attorneys' fees;

J. An award of pre-judgment interest at the maximum legal rate; and

K. Any such other and further relief as the Court may deem just and proper.

Dated: August 31, 2022

By: s/ Karim G. Kaspar
Karim G. Kaspar
Craig Dashiell
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive

Roseland, New Jersey 07068
(T): (973) 597-2370
(F): (973) 597-2400
kkaspar@lowenstein.com
cdashiell@lowenstein.com
*Attorneys for Plaintiffs*

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38, Plaintiffs hereby demand a trial by jury of any issue triable of right by a jury.

**CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2**

The undersigned certifies that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Dated: August 31, 2022

By: s/ Karim G. Kaspar

Karim G. Kaspar
Craig Dashiell
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
(T): (973) 597-2370
(F): (973) 597-2400
kkaspar@lowenstein.com
cdashiell@lowenstein.com
*Attorneys for Plaintiffs*