# FOLDERS 1–4: CLAIMS MAP AND LEGAL SIGNIFICANCE

*Contemporaneous Evidence vs. Defendants' Representations to the Court*

Prepared by James D'Amato, Pro Se Plaintiff

## I. WHAT THIS DOCUMENT PROVES

Defendants' counsel has repeatedly told this Court that Plaintiff's claims lack factual support and that "no evidence has been forthcoming." These 517 pages—prepared in real time, ***before litigation commenced***—prove the opposite. Every claim Plaintiff seeks to add in the Motion to Amend is supported by contemporaneous documentary evidence that three successive attorneys and opposing counsel all possessed but none introduced into the record.

## II. WHAT DEFENDANTS' COUNSEL TOLD THE COURT vs. WHAT THESE FOLDERS PROVE

| Tringali's Representation to Court | What Folders 1–4 Actually Prove |
|---|---|
| *"No evidence has been forthcoming" to support substantive claims.* | **517 pages of contemporaneous evidence documenting every claim—sent to Tringali via FedEx (tracking no. 774623491130) on August 25, 2021, before the complaint was filed.** |
| *Claims are "inappropriate" and "without factual basis."* | Folder 1: Three documented whistle-blows with phone records. Folder 2: 21 unanswered emails to ownership. Folder 4: Complete contract timeline with contemporaneous text messages. |
| *JDGS "refused to participate in required sales meetings." (Termination letter, Jul. 27, 2021)* | Folder 1: JDGS stopped attending due to hostile work environment—sexual profanity, vulgar comments by HP—reported to ownership twice (Feb. 16 and Mar. 26, 2021). Folder 2: Sales Coordinators briefed JDGS twice daily; zero business disruption since Feb. 10, 2021. |
| *Only change to the Nov. 19, 2014 Agreement "related to JDGS' commission structure."* | Folder 4: Complete verbal agreement timeline—Feb. 28, 2015 (SEPC Florida), Apr. 27, 2016 (Dublin VA)—with text messages, emails, the May 12, 2016 written memorialization, and June 2, 2016 retroactive payment confirming acceptance. |
| *"JDGS' failure to attend meetings has resulted in material losses."* | Folder 2: 21 exhibits proving RSF's own failures caused the losses—unanswered calls for help Dec. 2020–Jul. 2021, prorate policy changes, HP sabotaging Walmart calls. No reply from ownership on any. |
| *Sanctions requested against Plaintiff for filing "frivolous" claims.* | **Tringali received these 517 pages on Aug. 25, 2021—before the original complaint was filed. He has told the Court claims lack factual basis while possessing the evidence that proves them.** This is the same attorney who orchestrated the July 27, 2021 termination—"We are pulling the trigger in 15 min"—and now seeks sanctions for Plaintiff's response to that termination. |

## III. FOLDER 1: PROTECTED ACTIVITIES (46 Pages, Exhibits A–I)

*Subject: "Events that were involved with the Sales Call absence of attendance"*

**What It Documents:**

Mr. D'Amato's three protected activities under the New Jersey Conscientious Employee Protection Act ("CEPA"). The narrative describes RSF's daily Microsoft Teams sales calls—lasting 2–3 hours, twice daily—where Sales Director Harold Paivarinta made sexual profanity and vulgar comments toward five female Sales Coordinators. Mr. D'Amato reported this conduct to ownership on two occasions with documented phone records: **34 minutes to COO Visconti on Feb. 16, 2021** and **66 minutes to President DiMenna on Mar. 26, 2021**. RSF responded with a Teams recording ban (May 5, 2021) to prevent documentation of the misconduct.

| Exhibit | Content | Legal Significance |
|---|---|---|
| **A** | May 5, 2021 Teams recording ban policy | Issued AFTER D'Amato's complaints. Proves RSF knew of misconduct and chose to suppress evidence rather than address it. |
| **C** | RSF Code of Conduct signed Dec. 16, 2016 | RSF's own policy HP violated daily. D'Amato's complaints were based on company's own standards. |
| **D–F** | HP's harassing emails demanding sales call attendance; D'Amato's responses | Documents the pretext for termination. HP couldn't articulate why attendance was required; D'Amato was fully connected to business. |
| **E** | Phone record: 34-min call to CV, Feb. 16, 2021 (Whistle Blow #1) | CEPA protected activity. Reported sexual harassment on company calls to COO. CV laughed: "HP is HP, you can handle it." |
| **G** | Phone record: 66-min call to JD, Mar. 26, 2021 (Whistle Blow #2) | CEPA protected activity. Reported to President. JD's conversation "slowed as if being coached." CV sent email 3 minutes after call ended. |
| **H–I** | Email exchanges Apr. 13 and Apr. 29, 2021 | HP's continued harassment after whistle-blows. RSF failure to respond to D'Amato's legitimate business needs. |

**Claims Supported:** CEPA retaliation (individual, per *D'Annunzio* framework); hostile work environment; breach of implied covenant of good faith and fair dealing.

**What Counsel Failed to Do:** Lowenstein pled CEPA under JDGS (corporate) instead of JDA (individual), the wrong entity under controlling law. Neither Lowenstein nor Caruso cited these phone records or the recording ban policy in any pleading.

## IV. FOLDER 2: EVENTS LEADING TO TERMINATION (139 Pages, Exhibits A–V)

*Subject: "Events that led up to termination of JDGS on July 27, 2021"*

**What It Documents:**

Twenty-one exhibits spanning December 30, 2020 through July 26, 2021—the seven-month deterioration of RSF's support for Mr. D'Amato's accounts. Each exhibit is a contemporaneous email exchange with ownership or management. The defining pattern: **Mr. D'Amato sent repeated calls for help on Aldi and Walmart service levels. Ownership did not reply to any of them.** Every warning D'Amato made came true. Every loss he predicted occurred.

| Exhibit | Content | Legal Significance |
|---|---|---|
| **A** | Dec. 30, 2020: Warning on Aldi fill rates during "Healthy Living" period | D'Amato warned RSF would lose business. No reply. Everything warned came true—RSF lost 4 Denton TX items, 4K cases/week, $2M sales, $17.7K commission. |
| **B–D** | Jan.–Feb. 2021: Emails pleading for help on prorates and service levels | RSF changed fundamental fill-rate policy without notice. No reply to any of D'Amato's requests. |
| **F** | Apr. 13 / May 4, 2021: Request to confirm which items were procured vs. company-grown | RSF was having D'Amato negotiate Aldi contracts for products not 100% company-grown—a breach of responsibility between Aldi and supplier. No reply. |
| **H** | May 4–5, 2021: $365,000 Aldi duty reimbursement request (Protected Activity #3) | D'Amato demanded RSF repay Aldi's $365K duty overpayment. RSF tried to blame D'Amato. "I could be terminated from this request." Aldi said "they had JDGS back." Termination followed within 83 days. |
| **J–N** | May–Jun. 2021: Five emails to ownership on Walmart service failures | No reply to any. Pattern of deliberate non-responsiveness designed to create pretext for termination while sabotaging D'Amato's accounts. |
| **P** | Jun. 15, 2021: Email documenting HP sabotaging Walmart call | HP actively undermined D'Amato's customer relationships. No reply from ownership. |
| **Q** | Jun. 19–Jul. 26: Daily sales call recaps from Sales Coordinators | Destroys the "disconnected from business" pretext. D'Amato was briefed twice daily. Zero business disruption since Feb. 10, 2021. |
| **R** | Jul. 6, 2021: Email to CV re: HP false accusations | HP's false claim that D'Amato was "not connected to the business." Refuted by daily SC recaps and D'Amato's own daily communications. |

**Claims Supported:** Breach of contract (RSF failed to maintain service levels per verbal agreements); tortious interference with business relationships (Aldi, Walmart); CEPA retaliation (termination following protected activity #3—the $365K duty demand); breach of implied covenant.

**What Counsel Failed to Do:** Neither Lowenstein nor Caruso cited a single one of these 21 exhibits. The "no reply from ownership" pattern—documented in D'Amato's own contemporaneous words—was never presented to the Court.

## V. FOLDER 3: DAMAGES AND COMMISSION ANALYSIS (184 Pages, Exhibits A–B)

*Subject: "Commission Buyout of Career Retirement time frame for the Services and Value that JDGS has created and provided RSF Since 2015"*

**What It Documents:**

Mr. D'Amato's contemporaneous damages calculation projecting commission income from 2021 through retirement age (2047), based on average U.S. dollar sales for 2018–2020 for Aldi and Walmart. Includes **complete commission reports for January 2016 through June 2021** (Exhibit B)—the actual payment records proving the agreement was performed for five-and-a-half years.

| Element | Legal Significance |
|---|---|
| **0.85% Rate** | Industry standard for produce sales contractors is 2–10%. D'Amato accepted 0.85% ONLY in exchange for lifetime terms with no termination clause—the trade-off that makes the verbal agreement commercially reasonable. |
| **$635,956/year** | Projected annual commission based on average of 2018–2020 actual sales ($74.8M/year). Conservative—does not account for expected growth. |
| **2021–2047** | Retirement-age framework referenced Douglas Grabosky, independent sales contractor still working at 80. Industry standard is lifetime engagement. |
| **Exhibit B** | Complete commission reports Jan. 2016–Jun. 2021. These are RSF's own payment records—irrefutable proof that RSF performed under the verbal agreement for 5.5 years, confirming ratification. |
| **IP Valuation** | D'Amato's 25 distinct services (A–Y) including VMI, packaging IP, customer management systems. At 10% industry standard, RSF owes $38.9M—minus $2.66M paid = $36.3M shortfall for performance period alone. |

**Claims Supported:** Breach of contract (lifetime agreement); unjust enrichment; quantum meruit; trade secret misappropriation (VMI system); copyright infringement (VMI Excel Model, Canadian Reg. No. 1181404).

**What Counsel Failed to Do:** Lowenstein confirmed VMI copyright viability ("We can use the Berne Convention") but inexplicably withdrew the claim. Neither firm presented the industry benchmarking that proves the 0.85% rate was a lifetime-term trade-off.

## VI. FOLDER 4: CONTRACT HISTORY AND TERMINATION (148 Pages, Exhibits A–Z)

*Subject: "Contract Discussions Timeline 2013–2021"*

**What It Documents:**

The most comprehensive folder. Pages 2–7 contain Mr. D'Amato's detailed chronological narrative of every contract discussion from June 15, 2013 through July 27, 2021, supported by 26 lettered exhibits. This folder alone destroys the defense theory that "no meeting of the minds" occurred. **The contemporaneous documents prove not just one verbal agreement but a continuing course of performance ratified by five-and-a-half years of monthly payments.**

| Exhibit | Content | Legal Significance |
|---|---|---|
| **A** | May 8, 2014: JD email re: "letter of employment" | RSF pursued D'Amato—not the reverse. D'Amato declined the employment offer; insisted on independent contractor. |
| **B** | Nov. 19, 2014 Agreement for Services (signed Nov. 26) | The "as prescribed by COO" condition precedent that was NEVER satisfied. D'Amato prescribed TO RSF, not the reverse—proven by Jun. 2015 pricing email. |
| **E** | Feb. 25, 2015: Revised forecast down to 283,240 cases | Triggered the Feb. 28 SEPC meeting. D'Amato presented Option 1 vs. Option 2; JD/CV chose Option 2 (lifetime, no cap, full commission). |
| **H** | Feb. 9, 2016: CV email on ownership approval | "We reviewed your case with Roberto and Luis Manuel and we believe we came with a good proposal." Board-level engagement confirms the deal's significance. |
| **K** | Apr. 4–14, 2016: Text messages CV & JDGS | CV working on "gaining ownership/board approval." Proves CV made a deal he couldn't get the board to approve—but performed anyway. |
| **M** | Apr. 28, 2016: CV email "win to win deal" | Contemporaneous confirmation of Dublin VA meeting terms. "Please remember that this new method of payment will be retroactive to January 1, 2016." |
| **N** | May 12, 2016: JDGS written memorialization | 7-page contract sent by D'Amato memorializing the Feb. 28, 2015 and Apr. 27, 2016 verbal agreements. Includes Corporate Guarantee, non-circumvent, NJ governing law. |
| **O** | May 26, 2016: RSF Red Line adding 3-year term | RSF's own redline proves they tried to ADD a termination clause to an agreement that didn't have one. You don't add what already exists. |
| **P** | Nov. 25, 2016: Van Epps / MacKinnon exchange (night before Thanksgiving) | RSF's own attorney (MacKinnon) identified 8 "open business issues"—proving no written agreement existed and the verbal agreement controlled. |
| **Q** | May 25, 2018: CowanPerry letter denying lifetime agreement | RSF's third law firm's denial. But the letter itself proves extensive negotiations over the "term"—confirming D'Amato consistently demanded lifetime terms. |
| **R–T** | Apr. 5 – Jun. 11, 2021: Tringali's pre-termination letters | The pretext construction. Tringali's letters build the "refusal to attend meetings" narrative while ignoring the hostile work environment D'Amato reported. |
| **U–V** | Jun. 15–Jul. 2, 2021: D'Amato's | Tringali told D'Amato "RSF wants to work it out." |

| | | |
|---|---|---|
| | direct negotiation with Tringali and Red Line response | D'Amato submitted Red Line by Jul. 2 deadline. RSF terminated 25 days later. |
| **X** | Jul. 27, 2021: Termination letter | The "trigger" orchestrated via WhatsApp: "Everybody is in front of their computers waiting for Joe to send the email." Tringali is "Joe." |
| **Y** | Jul. 27, 2021: D'Amato demand to return copyrighted files | Same-day demand for return of "authored and copyrighted excel and other files." Copyright claim established from day one. RSF never complied. |
| **Z** | Apr. 6, 2018: Lowenstein (Kaspar) letter to RSF | Lowenstein confirmed the "oral agreements the parties reached on February 28, 2015 and April 27, 2016" and D'Amato's "lifetime contract." Lowenstein knew the claims—and still failed to plead them. |

**Claims Supported:** Breach of contract (lifetime verbal agreement); condition precedent failure (Nov. 2014 agreement inoperative); quantum meruit; unjust enrichment; copyright infringement (Jul. 27 demand); trade secret misappropriation; Sherman Act (Aldi exclusive channel); tortious interference.

**What Counsel Failed to Do:** Lowenstein characterized this as a "trade secret lawsuit" to NJLJ but pled zero trade secret counts. Caruso referred to Plaintiff as the e-discovery expert before the Court—without disclosing to Plaintiff, in the Legal Services Agreement or otherwise, that he had no e-discovery knowledge or experience—yet never accessed case files for eight months. Neither firm cited the May 12, 2016 memorialization, the redline negotiations, or the Thanksgiving-eve exchange in any pleading.

## VII. INDEPENDENT CORROBORATION: VERIZON CARRIER RECORDS

The narratives in Folders 1 and 4 are independently corroborated by Verizon Wireless call detail records ("CDR")—third-party carrier business records with no litigation motive. The dates, times, phone numbers, and durations documented by Mr. D'Amato in his contemporaneous narratives match the carrier records exactly.

### A. March 26, 2021 — Whistle Blow #2: The Complete Verizon Timeline

| Time | Number / Party | Duration | Significance |
|---|---|---|---|
| 3:25 PM | 313.460.4101 (CV mobile) → Voicemail | Missed | COO Visconti tries to reach D'Amato. Call goes to voicemail. |
| 3:26 PM | D'Amato → 519.819.8347 (Mark Wehby, RSF Procurement) | 12 min | D'Amato calls Wehby—the employee he will tell JD that HP bullies daily. Consistent with confirming HP's ongoing conduct before escalating to the President. |
| **4:11 PM** | **D'Amato → 519.818.2337 (JD mobile)** | **66 min** | **WHISTLE BLOW #2.** Folder 1 states: "JDGS called Jim DiMenna on his mobile # @ 4:11PM for 66 Minutes, call ended @ 5:17PM." Verizon confirms: **exact number, exact time, exact duration.** |
| 5:18 PM | 313.460.4101 (CV mobile) → Voicemail | Missed | **CV emailed D'Amato three minutes after the JD call ended**. Folder 1: "CV sent an email on this subject matter less than 3 minutes after I hung up with JD. Hung up @ 5:17PM and CV's email was sent @ 5:20PM." |

**Critical finding:** CV's two missed calls ***bookend*** the 66-minute whistle-blow. CV tried to reach D'Amato at 3:25 PM (before the JD call), then emailed at 5:20 PM (three minutes after it ended) on the same subject. D'Amato wrote in Folder 1: "I actually thought he was recording me or conferenced me in with CV." The Verizon timeline proves real-time coordination between JD and CV during what D'Amato was told was a confidential call.

**The Wehby call is independently significant:** Folder 1 documents that D'Amato told both CV and JD about how HP "treats Mark Wehby (Procurement Manager)"—"HP would comment every day on Mark's language, speech, math, enunciation of words, just a total abuse of power and harassment." D'Amato called Wehby for 12 minutes immediately before the whistle-blow, consistent with confirming HP's ongoing conduct before escalating to the President.

### B. June 16, 2021 — The Tringali Conference Call

| Time | Number / Party | Duration | Significance |
|---|---|---|---|
| **9:30 AM** | **D'Amato → 973.530.2800 (Tringali conference line)** | **22 min** | Tringali's own conference line. Email Jun 15: "(973) 530-2800, Code 115#." D'Amato confirmed: "Great speaking with you today!" **During this 22-minute call, Tringali told D'Amato: "RSF wants to work it out." D'Amato submitted his Red Line by the Jul. 2 deadline. RSF terminated 25 days later.** |

This call occurred the day after the 64-day gap begins in the CV–HP WhatsApp messages (June 15, 2021). Tringali is the "Joe" referenced in the July 27, 2021 WhatsApp messages: "Everybody is in front

of their computers waiting for Joe to send the email." The same attorney who spent 22 minutes assuring D'Amato that RSF "wants to work it out" was simultaneously coordinating the termination his clients were planning.

**C. February 16, 2021 — Whistle Blow #1 (Partial Confirmation)**

Folder 1 states: "JDGS called CV on his mobile # @ 5:45pm after hours for 34 Minutes." CV's number (313.460.4101) appears across multiple account lines on this date. The specific 34-minute afternoon call requires isolation from the multi-line data. Analysis is ongoing.

**D. Evidentiary Standard**

Verizon call detail records are third-party business records maintained in the ordinary course of business, admissible under Federal Rule of Evidence 803(6). They independently corroborate the Folder 1 and Folder 4 narratives with no litigation motive. Where Mr. D'Amato wrote "4:11PM for 66 Minutes," the carrier record confirms 4:11 PM, 66 minutes, to the exact phone number. This level of corroboration is dispositive of reliability.

## VIII. THE PATTERN: THREE ATTORNEYS, ONE RESULT

| Who | When | What They Had | What They Did |
|---|---|---|---|
| **Tringali (opposing)** | Aug. 25, 2021 | Original binders via FedEx from Caruso (tracking 774623491130; signed by "J.TINGALE") | Told Court "no evidence has been forthcoming" while possessing 517 pages |
| **Lowenstein ($150K)** | 2017–2021, Oct. 2021–2023 | Physical binders + electronic copies from D'Amato after Caruso suspension | Never filed. Couldn't locate binders at transfer: "Refresh my recollection" |
| **Caruso ($50K)** | Apr.–Oct. 2021, 2023–2026 | Original binders from D'Amato (1st stint) + reprinted binders from Lowenstein (2nd stint) + PDFs on USB | Never opened. macOS use count: NULL on all four. $50K paid for review never performed. |
| **D'Amato (pro se)** | Always | Original author of all 517 pages | **Filing now with the Motion to Amend.** |

**These materials were prepared in real time, not for litigation. They predate the filing of the original complaint. They contain contemporaneous documentary evidence supporting every claim Plaintiff seeks to add. The failure to introduce this evidence into the record was not Plaintiff's choice—it was the systematic failure of three successive legal professionals who were paid $200,000 to review materials they never opened.**

The 517 pages speak for themselves. The question is no longer whether evidence exists to support Plaintiff's claims. The question is why it has taken four-and-a-half years for this evidence to reach the Court.