UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

JD GLOBAL SALES, INC., et al. v. JEM D INTERNATIONAL PARTNERS, LP, et al.

Civil Action No. 2:21-cv-19943-MEF-ADS

# Declaration supporting the motion to amend

## Personal participation and summary chronology

**1.** I am James D’Amato. I submit this declaration in support of my motion for leave to file an amended complaint. I distinguish my recollection of conversations and events from descriptions of written records. Where I describe my understanding or intention, I identify it as such.

1A. For the Court's convenience, I summarize the sequence of events in date order; the cited paragraphs provide additional detail retained in this shorter declaration.

(a) My first contact with James DiMenna, commonly called Jim DiMenna, about RSF was in 2013. RSF's recruitment of me began in March 2014, including a proposed call with Carlos Visconti, and I met with them in April 2014.

(b) On April 22, 2014, Carlos sent me a nine-page employment package, which I rejected as a whole. I instead accepted the SunFed offer, which I signed on May 9, 2014 (¶11).

(c) DiMenna and Carlos renewed the discussions when I met them at the October 2014 Produce Marketing Association (PMA) meeting (¶12). [REDACTED] I then met DiMenna at the Newark Marriott in New Jersey on November 13, 2014.

(d) I signed the two-page Agreement for Services, dated November 19, 2014 and exchanged on November 26, 2014, which I understood as a bridge to explore a longer-term relationship (¶¶14, 14A).

(e) I began working with RSF in December 2014 [REDACTED] Carlos asked for a sales forecast within days; [REDACTED]

(f) On February 28, 2015, I met with DiMenna and Carlos at the Southeast Produce Council (SEPC) show in Florida and presented two alternatives; we reached a verbal agreement on the second, commission-based alternative, with the career-long and buyout protections I describe (¶21).

(g) I then obtained new retail customers, including Walmart [REDACTED]

(h) On January 15, 2016, DiMenna and Carlos met with me to review compensation (¶23A). On March 4, 2016, at SEPC, I recall meeting with the RSF ownership group about the commission arrangement (¶24).

(i) On April 27, 2016, Carlos and I met in Virginia [REDACTED]

(j) [REDACTED]

(k) On May 27, 2016, I sent Carlos my final-position iMessage and we spoke by telephone; I recall Carlos agreeing to the personal buyout undertaking (¶¶43, 44, 45, 46).

(l) On June 2, 2016, RSF made the first retroactive commission payment to JDGS, which I accepted on the condition described in paragraph 52 (¶¶49, 52). I accepted the lower 0.85% rate only together with the continuing term and buyout protections I describe (¶¶30, 35, 44).

(m) RSF terminated the relationship by letter dated July 27, 2021 (¶128).

**2.** I personally participated in the negotiations described here and performed the services I discuss. In the oral discussions, I remember speaking about my own working career and the conditions on which I would commit my efforts to Red Sun Farms, which I refer to as RSF.

**3.** I do not recall JD Global Sales, Inc., or JDGS, being named in those oral discussions. I used JDGS to receive and account for compensation. [REDACTED] I distinguish those records from my recollection of what was promised to me about my working future. The promises I describe about a career-long relationship without a fixed term and a buyout if RSF wanted me out were made to me personally. When I referred to a business divorce, I was describing the promised exit arrangement for ending that relationship with me.

**4.** In my everyday business communications, I generally used the Red Sun Farms name and rarely used JDGS. Before incorporating JDGS, I had used jdglobalsales@aol.com as my personal email address. My use of that email name therefore predated the corporation. [REDACTED] I distinguish those records from the personal career-long commitment and buyout promises I recall Carlos making to me.

**4A.** My understanding was that the later commission agreement I sought needed to be with Jem D International Partners LP, which I understood to be the entity contracting with each customer. I distinguish that understanding from the entities named in the written agreements and drafts described below.

**4B.** During the later commission-agreement negotiations, I told Jim DiMenna that I required Jem D International Partners LP to be included because I understood it to be the entity doing business as Red Sun Farms and holding the customer vendor numbers. DiMenna told me that the Michigan entity would always survive, but agreed to include Partners LP. [REDACTED] I did

not request that Partners LP be made a party to the initial 2014 bridge agreement. I understood that initial arrangement as an opportunity to see whether I could help RSF, as described in paragraph 14A.

4C. I use the names Jim DiMenna, Carlos Visconti and Steve Macchio for the people with whom I dealt, without treating the Red Sun Farms name or email domain as proof of which legal entity each represented in every communication. [REDACTED] DiMenna's November 1, 2017 signature says President and CEO of Red Sun Farms [REDACTED] The March 29, 2018 letter discussed in paragraph 69 identifies DiMenna as President and Visconti as CEO of Jem D International (Michigan) Inc. [REDACTED] I distinguish those dated descriptions from an assumption that any one title or entity affiliation applies throughout the relationship.

4D. My Red Sun Farms-branded business card identified me as "Jim D'Amato" and "Senior Account Manager." It listed my business contact address as 233 Rock Road #101, Glen Rock, New Jersey 07452, and my email address as jdamato@redsunfarms.com. The Rock Road address was my mailbox location. I worked from my greenhouse office at 20 Berry Place, Glen Rock, New Jersey.

4E. My usual practice was to give my business card to buyers when I attended meetings at their headquarters. I recall handing my business card to everyone present at our meeting in Doral, Florida, including Don Fox and Braulio Valdes, with whom I dealt at Walmart. I also recall first handing my business card to Bill Duesenberg, with whom I dealt at ALDI, at ALDI headquarters after Lisa Netzel departed. These are my personal recollections of handing over my card.

4F. To the best of my recollection, from 2015 through 2021, I participated in all video calls, including Microsoft Teams and Zoom calls, from my greenhouse office in New Jersey.

4G. [REDACTED] My account of where I participated is based on my recollection stated in paragraph 4F, not on location data in the attendance record. [REDACTED]

### Recruitment and the personal undertaking

**11.** The SunFed opportunity was also part of this history. The retained SunFed offer is dated May 7, 2014, bears my signature dated May 9, 2014 and Mark Cassius's signature dated May 12, 2014, and was sent to me by Cassius on May 12, 2014 from mcassius@sunfed.net. It offered a Business Development Manager position, $175,000 annual salary, a potential annual sales incentive of up to 25% of base salary and benefits. It allowed brokerage activity subject to conditions, including that SunFed's interests had priority. I regarded SunFed as the better alternative when I later evaluated RSF's long-term opportunity. The document does not itself establish when I left SunFed or precisely which later statement caused that decision.

**12.** I recall running into Jim DiMenna and Carlos Visconti at the October 2014 PMA meeting. They said, in substance, that they were waiting for me to join RSF and needed my expertise. That renewed the discussions after the earlier unsuccessful effort to obtain my services. They wanted me to represent RSF and understood that I brought established knowledge, experience and customer-development ability. This is my recollection, not a verbatim quotation, and I distinguish that renewed recruitment from the specific later oral promises described below.

**14.** The initial signed Agreement for Services is dated November 19, 2014 and names Jem D International (Michigan) Inc., defined as JDIM, and JD Global Sales, defined as JDGS. DiMenna sent the signed scan to my JDGS address on November 26, 2014, copying Carlos and Steve from their redsunfarms.com addresses. The scan bears a company signature over DiMenna's printed name and my signature dated November 26, 2014. Clause 1 states: “JDGS will be engaged to

provide sales and marketing services for JDIM as prescribed by the Chief Operating Officer of JDIM and JDIM in their sole discretion." The agreement provides for $140,000 minimum annual base compensation, potential bonus and specified expenses and benefits. Clause 2 permits either JDIM or JDGS to terminate on 30 days' prior notice. The scan also contains a handwritten notation at the commencement-date provision. I do not describe this writing as containing the career-long duration or enterprise-value buyout undertaking that I recall from later conversations.

**14A.** I recall explaining when discussions resumed in October 2014 that the initial arrangement was a bridge to explore whether I could help RSF and whether we should pursue a longer-term relationship. If we decided to pursue that relationship, my position was that we would need a new agreement addressing it. Had any communication during the 2015–2016 negotiations presented the agreement we were negotiating as a modification of the November 2014 agreement, I would have adamantly rejected that characterization. My position was that we were negotiating a new agreement, not merely modifying the 2014 agreement.

**21.** I recall meeting with Jim DiMenna and Carlos Visconti on February 28, 2015. I explained that my commitment depended on a career-long relationship, protection against termination without the misconduct basis discussed, and a buyout if they wanted me to leave. I used marriage and divorce language to describe the business relationship. I recall asking both men to confirm our understanding through handshakes twice, and that both agreed. I recall embezzlement being discussed as an example of misconduct. This is the substance I remember, not a verbatim transcript of each man's separate words. The original complaint at D.E.1, paragraphs 21–23, described the two alternatives I presented: continuing under the initial agreement and focusing on the revised sales forecast, or replacing that arrangement with commission-based work to obtain new retail customers, continuing until I chose to retire and requiring a buyout if RSF

ended the relationship first. That earlier pleading described these proposals in terms of JDGS. I preserve that wording distinction alongside my personal recollection here.

**22.** Following the February 28, 2015 handshake meeting, my primary goal was to secure large retail customers for RSF. My work also included customer onboarding, product packaging, retail-ready box design, customer pricing, product-development coordination, supplier communications, and assisting with procurement of all items RSF did not grow. These examples are illustrative, not a complete description of my work or contributions.

**23A.** On January 15, 2016, I attended a review meeting with Jim DiMenna and Carlos Visconti. They offered an increase in base compensation under the November 2014 agreement. I reminded them of the commission arrangement we had discussed and agreed upon in February 2015. I recall that, after several hours of discussion, they agreed that compensation would be on a per-case or percentage-of-sales basis for sales to customers I obtained, continuing for as long as RSF sold to those customers, and told me that paperwork would be prepared to memorialize the arrangement we had discussed in February 2015. As I recall, JDGS was not mentioned in that discussion; the discussion concerned me personally, and JDGS was only the vehicle through which I received payment. This is my recollection of that discussion. D.E.38, paragraphs 31–32, previously described the meeting and promised paperwork, but characterized my attendance and the commission arrangement in terms of JD Global.

24. I also recall a meeting on March 4, 2016 at SEPC, before the April 27, 2016 meeting described below, to discuss the commission arrangement with the RSF ownership group. Jamie Mastronardi was present. I recall that RSF proposed ten cents per case. I said that I would examine the appropriate commission structure and get back to Carlos. I explained that the commission rate, the duties I would perform, the customers covered, and the duration of the

arrangement were interrelated. This is the substance I recall, not a verbatim transcript or a statement that everyone present accepted each term. RSF did not assign me an incumbent customer account; I recall obtaining new customers for RSF. I also recall explaining that, at ten cents per case, my ongoing role would be limited to offering advice when asked, rather than performing any account operations.

**28.** [REDACTED] This was an internal exchange, not a statement made to me in that email. [REDACTED]

**29.** On April 23, 2016, Carlos sent an iMessage that the ownership group had agreed on a proposal for me and requested a face-to-face meeting in Virginia. In the following scheduling exchange, I referred to our two previous face-to-face discussions and asked about the proposal. Carlos described it as fair and good and wrote: "You will not be disappointed." We arranged the meeting described in the next paragraph. I distinguish an agreed company proposal from my acceptance of that proposal.

**30.** Before our April 27, 2016 in-person meeting, I sent Carlos an iMessage proposing a commission of 1% of the delivered customer price. I recall that, at the meeting, Carlos presented a commission of 0.85% calculated after deducting freight. I regarded the resulting compensation as approximately 40% lower than my proposal; that is my estimate of the economic difference, not a statement that the two percentages alone differ by 40%. I told Carlos that the lower compensation would correspond to part-time services and a career-long relationship. I also said that, if RSF wanted me out, the business-divorce settlement would need to compensate me at a full industry commission rate for all my services and include the enterprise value attributable to my contributions. I compared that to a marriage in which, on divorce, each partner receives what that partner deserves from the marriage, and said that divorces are expensive. This is the

substance I recall expressing, not a verbatim transcript or a fixed percentage division of enterprise value. My willingness to accept lower compensation was tied to those duration and exit protections. I understood them to concern my own working future, and they were important to my decision to continue developing and serving customer accounts, including Aldi and Walmart. My later May 12, 2016 iMessage comparison of eighteen cents and eleven cents is quoted in paragraph 32, with its Canadian-dollar and U.S.-funds context. The 0.85% rate was acceptable to me only with the perpetual term and buyout protections; I did not accept that rate independently of those protections.

**31.** [REDACTED] I did not accept the April 28, 2016 email as an agreed statement of all terms. I recall telling Carlos not to send those points to Steve as the agreed draft because I would send my own draft.

## Negotiations and the contrary written record

**32.** On May 12, 2016, I sent Carlos an iMessage that I was emailing an agreement covering what I said we had agreed in principle. In the same message I wrote: "Let's agree on this document first then finalize the % or per box rate." I explained that my earlier calculation used Canadian-dollar sales in Famous and compared it with the U.S.-funds counteroffer, writing: "Net result is $.18 compared to $.11." I also objected to customer-loss risk and the positive-sales limitation, described the value I believed I brought through Temkin and Ahold, and said I was confident we could compromise on an agreeable rate or other options. This was my contemporaneous comparison, not a verified calculation for all sales. The message expressly left rate finalization open.

**34.** [REDACTED]

**35.** [REDACTED] I personally made the edits in that draft, including the comments we have reviewed. [REDACTED] I intended those comments and my proposed continuing-duration language to be read together, not as an unconditional acceptance of the termination provision I was asking to change. [REDACTED] My account of May 27, 2016 below concerns the personal buyout undertaking I recall Carlos agreeing to and the condition on which I accepted the June 2, 2016 payment, not the first proposal of that lower percentage. By continuing duration, I mean the perpetual arrangement I understood us to have agreed upon, together with the exit protections I describe. My agreement to the percentage was tied to that duration; it was not my acceptance of a shorter fixed term.

**36.** I rejected the proposed right to terminate on six months' written notice. [REDACTED] I distinguish my rejection and proposed replacement from whether the other side accepted all my proposed terms.

**38.** [REDACTED] That is the version I identify as the draft referred to in my May 27, 2016 message to Carlos. It was my closest written account at that point, not a complete record of every oral undertaking. I recorded terms I understood we had agreed orally in my agreement edits or later emails. I do not mean that every proposed edit was accepted by the other side.

**39.** [REDACTED] I am not identifying V3 as a written enterprise-value buyout formula.

**39B.** [REDACTED] I refer to those drafts as evidence of the negotiations, not as a statement that every proposed term was accepted or that a final writing was signed.

40. [REDACTED] My reply about the changed term followed that transmission. My May 26, 2016 reply and Steve’s internal report of my objection appear in paragraphs 41–42.

**41.** [REDACTED] I objected to replacing the duration protection I had sought with the proposed three-year term.

42. [REDACTED] The reference to Jim in that quoted sentence is to me, James D'Amato. [REDACTED]

**43.** I recall a telephone conversation with Carlos on May 27, 2016 lasting approximately thirty minutes. During that conversation, I reminded him of the business-divorce buyout undertaking. I said that accepting the lower 0.85% commission rate meant accepting less than I had proposed, and that a later buyout would therefore need to account for the broader services and value I was providing.

**44.** My recollection is that, during the May 27, 2016 conversation, Carlos agreed to honor the personal buyout undertaking I described if RSF terminated me, in exchange for my accepting the lower 0.85% rate. During our May 27, 2016 call, I recall Carlos telling me that he would sign V3 and send it to me, but would not include the buyout undertaking in V3. He said, in substance, that he was not worried about those terms because he did not expect to terminate me. This is my recollection of what he said, not a quotation taken from a recording.

**45.** The personal buyout I describe included the value attributable to all my services—including obtaining new customers and supplier or vendor numbers, retailer-development, packaging, new-product and growing-program work and the HALO and product-synergy benefits I describe below—together with attributable enterprise value through settlement. This is the scope of the exit undertaking I recall, not merely a request for unpaid day-to-day commissions. We did not fix a dollar amount or calculation formula. I use Lidl here as an example of the scope of services I am describing; I am not saying that I specifically named Lidl during the May 27, 2016 call. By

settlement, I mean settlement of the business divorce, not simply the date on which RSF stopped using my services. I recall describing the revenue attributable to all my services as part of that broader value, not only the sales on which the routine commission was calculated.

**45A.** I recall that our verbal agreement on May 27, 2016 provided that commissions would remain payable after termination until we settled the business divorce. Termination began the separation; it did not end the agreed compensation before settlement.

**45B.** During the May 27, 2016 call, I explained that, if RSF terminated the relationship and wanted a buyout, determining that buyout would require a full accounting of the services performed and the attributable enterprise value JDA/JDGS created through settlement. I recall Carlos agreeing to the buyout undertaking I described. We did not fix a dollar amount or calculation formula.

**45C.** I used 'marriage' and 'business divorce' to describe the continuing business commitment and the agreed process for ending it. My understanding was that RSF could not end its compensation obligations merely by terminating my services. I recall that commissions would continue through settlement and that a buyout would account for the services and attributable enterprise value described above. Those protections were a condition of my accepting the lower 0.85% rate.

**46.** When I called and no one answered, my usual practice was to hang up without leaving voicemail because the missed call would be visible. That is my recollection of my calling practice. On May 27, 2016, my retained iMessage export records "Tried your line twice today" at 5:37:55 p.m. EDT. The retained Verizon billing record lists an incoming call at 5:43 p.m. from

the number identified in Carlos's email signature, billed for 30 minutes. My iMessage export records "I thought about it overnight" and the following message at 5:44:50 p.m. EDT:

*I have made many concessions on the agreement and we were in all agreement of all items and then the curve ball of term. I don't agree with the new terms only on the agreed upon version I sent to Steve. That term totally undermines all of our face to face discussions and agreement . That new posture really causes me for concern of face to face agreement and then a complete turn. Please advise what the group decides so I know where I stand. I have not been paid since December and need to get paid and resolve my standing long term. We can talk all day but I am only willing to sign the version that we all agreed upon. I am a man of my word and consider you as well to honor our agreement*

I recall sending this written position a few minutes into my May 27, 2016 telephone conversation with Carlos and asking him to read it. The personal buyout commitment I recall him making came later in that same call, after I sent the iMessage. I recall that Carlos agreed to that position and to the personal oral buyout undertaking described above. My position remained the terms reflected in V3 together with the oral buyout undertaking, without my agreement to procurement-loss deductions. I did not receive a separate written reply to the iMessage. My statement that we had agreed expressed my position; the same message asked what the group decided. Sending it does not tell me which other executives received it. My account of Carlos's oral response comes from my recollection, not from treating my own message as his written acceptance.

47. [REDACTED] Neither email was addressed to me. The reference to Jim in Carlos's quoted description of the conversation is to me, James D'Amato, not the recipient Jim DiMenna.

[REDACTED] My own written position is reproduced in paragraph 46. It was not included in this internal exchange between Carlos and Jim DiMenna.

**48.** [REDACTED] These statements were part of their internal exchange; they were not addressed to me and do not expressly describe the personal oral buyout undertaking I recall Carlos making.

**49.** On June 1, 2016, I sent Carlos an iMessage: "Did u ask Steve to run report and process" followed by "I have not seen anything". Carlos replied: "He is working on it, he should have it ready tomorrow." On June 2, 2016, Steve emailed me the January–April commission calculation, copying Carlos, and said the amount would be wired that day and that backup information could be provided the following week. Later that day, Steve emailed the wire confirmation and payment details. Payment was made to JDGS.

**49A.** From January 1, 2016 until the first retroactive commission payment on June 2, 2016, I continued performing services without receiving commission payments. During that period, my family had no other income to rely on. This was the financial context in which I repeatedly requested payment and continued negotiating the long-term compensation and termination protections described above. I continued doing that work because I was relying on the continuing relationship and buyout protection I describe. This continued work without commission payment lasted more than five months, into the sixth month. I regarded it as part of my commitment to the arrangement and buyout protections I recall Carlos agreeing to; it did not mean that I agreed the amounts were not owed.

**52.** I accepted the June 2, 2016 payment to JDGS on the condition I had communicated to Carlos and understood he had agreed to on May 27, 2016: that the personal buyout undertaking would

be honored. I continued working. I understood the retroactive payment at the lower rate to implement the arrangement I had accepted with that protection, not to abandon the duration and exit protection I had stated. This describes my understanding and conduct; the payment document itself does not record every oral term.

**53.** After the May 27, 2016 call and June 2, 2016 payment, I told a few close friends and family about the buyout undertaking. They were familiar with the prolonged payment dispute. Their knowledge came from what I told them, not from hearing Carlos make the promise.

**55.** [REDACTED] My account of the broader buyout undertaking is not limited to that commissioned-customer list. I did not receive Lidl-specific commissions, and I have not received a separate payment that I understood to be the promised buyout.

**57.** After May 27, 2016 and the retroactive payment, I tried to keep the agreement discussions in writing. I recall verbal discussions being brief. [REDACTED]

**58.** [REDACTED] I was not a listed recipient of Steve's email. [REDACTED]

**59A.** [REDACTED]

**63.** On November 1, 2017, DiMenna emailed proposed additional terms. He wrote that the company was happy with my work and contributions, offered a continuous arrangement for Walmart and Aldi while I remained actively involved, and proposed three years' notice rather than a fixed expiry date, together with exclusivity and conditions for new accounts. He described unanimous ownership approval of that offer and asked whether I agreed so lawyers could draft it. The copied recipients included Roberto Saldaña and Luis Manuel Saldaña, alongside RSF addresses. This was another company proposal awaiting my agreement; it was not a signed writing confirming every term I had sought.

**64.** In a November 2, 2017 email, I again described the relationship as a career-long annuity and linked rate and duration. My November 2, 2017 email summarized the aspects of our agreement relevant to the proposal then under discussion. I was explaining why that proposal did not reflect what Carlos Visconti and I had agreed during our April and May 2016 discussions. I did not intend that email to list every term we had discussed or agreed upon. Later that day I asked the recipients to disregard the message and said I was trying to recall it because it had been sent in error from a previous cut-and-paste email. I recall Jim DiMenna asking me to retract the email. My intention was to address the accidental transmission, not to state that my account of the discussions was false. That account of his request and my intention is my recollection. The original email referred to February 27, 2015, whereas my present recollection identifies February 28, 2015. I do not alter the historical email to remove that discrepancy.

**69.** In a March 29, 2018 letter addressed to me as President of JD Global Sales, Inc., Jem D International (Michigan) Inc. disputed my account of the oral agreement and described its December 19, 2017 proposal as its "final offer." The letter's signature block names Carlos Visconti as CEO and Jim DiMenna as President. It stated: "We have acted in good faith to pay you on the new commission basis that we agreed to, during what we thought was an interim period, as a modification to our prior written agreement, pending our finalizing a new written contract. That agreement, as you know, is terminable on thirty (30) days' notice." I disagree with that characterization of our arrangement. [REDACTED]

69A. [REDACTED]

72. The May 25, 2018 letter from James K. Cowan, Jr. of CowanPerry PC, acting as counsel for Jem D International (Michigan) Inc., to my attorney, Karim G. Kaspar, stated that Jem D would continue paying JDGS under the agreed commission structure then in place. The same letter

disputed agreement on duration, termination, dispute resolution and the scope of goods and customers. It stated that the company intended to negotiate directly and that any tentative agreement reached would then be reduced to writing, reviewed by counsel and executed before taking effect. The letter acknowledged the commission arrangement but rejected the broader oral-agreement position I asserted.

**73.** I did not later agree, orally or in writing, to cancel, replace or narrow the buyout undertaking I describe. RSF continued to propose different terms, but I did not agree to give up that undertaking.

## Customer services and communications

**85.** [REDACTED] I was describing the visibility I believed those accounts could provide, not reporting that every later customer or sale resulted from them. Obtaining ALDI and Walmart business within months of each other put the RSF brand before customers of both retailers. I believed that visibility began benefiting RSF as soon as the products were in those stores.

**85A.** I believe the visibility created by my ALDI and Walmart work, together with the products, packaging and programs I helped develop, contributed to RSF obtaining Lidl and benefiting in other retailer relationships. This is what I mean by the HALO effect and product synergies. I include that broader value in my account of the personal buyout undertaking. I am not saying that I observed every retailer's purchasing decision or that every later sale resulted solely from my work.

**85B.** In December 2016, at the New York Produce Show, a Lidl representative approached Jim DiMenna and me. I recall asking why he was speaking with us and suggesting that it was because RSF's products were in ALDI's Southeast stores, where Lidl was establishing its U.S.

presence. He immediately agreed that this was the main reason. I am describing the substance of the exchange, not quoting his exact words. Afterward, I warned Jim DiMenna that selling to Lidl could harm my long-term goal of making RSF ALDI’s leading greenhouse supplier. From my industry experience, ALDI and Lidl were fierce competitors with very similar retail models, including similar products, packaging and retail-ready boxes. My work developing and implementing the ALDI items included those product, packaging and retail-ready-box attributes. I understood that this work helped position RSF to serve Lidl as well. This encounter and the compatibility of those offerings are specific examples of what I mean by the HALO effect and product synergies.

85C. [REDACTED]

85D. I recall discussing my goal of making RSF ALDI's leading greenhouse supplier both in writing and verbally. I recall Lisa Netzel [REDACTED] being aligned with that goal. As described in paragraph 85B, I warned Jim DiMenna that selling to Lidl could harm that goal. I understood the potential conflict with Lidl to include the exclusive ALDI channel described here. After Lisa departed, I recall Bill Duesenberg [REDACTED] continuing that opportunity and describing the entire East Coast and more than $100 million in potential business if RSF committed to ALDI. This is my recollection of those conversations, not a verbatim quotation verified against a recording or a written ALDI commitment. I do not supply an exact conversation date that I cannot independently recall. That recalled opportunity is distinct from the amount and time period of my own April 18, 2018 projection.

85E. [REDACTED] I do not offer a calculated loss figure here. The distinction between JDGS's commissions and any separately asserted personal right remains as stated in paragraph 86A.

**86A.** I also performed retailer-development work involving Ahold and other retailers for which JDGS received no compensation. That direct work is separate from the indirect HALO benefit described above. This does not mean that JDGS went unpaid for the ALDI, Walmart and Save-A-Lot business on which it received compensation. In describing my personal buyout, I include the broader value I say I contributed; I do not mean that commissions owed to JDGS become payable to me personally merely because I performed the work.

**96B.** [REDACTED]

**96C.** I recall that Carlos and I together told Lisa Netzel of ALDI that RSF was going to grow mini sweet peppers. I do not independently recall the date. [REDACTED]

96D. [REDACTED]

**96E.** [REDACTED]

101. [REDACTED] I recall the urgency coming from a Florida division purchase order received on a Friday afternoon for approximately 2,000 cases of tomatoes on the vine, with delivery requested within two or three days. I considered that lead time unworkable for the RSF supply chain from Mexico through Texas. I warned that we risked losing the ALDI business if the process continued and proposed managing inventory and replenishment to make it workable. I do not presently identify the exact date of that order. I recall regarding vendor-managed inventory (VMI) as the only practical option for restoring the service levels needed to keep the existing Aldi business.

107. The account tools were used with other people. [REDACTED] I recall creating my VMI model on my own MacBook Pro and upgrading or rebuilding it each year beginning in 2015. I kept the file in my SharePoint/Teams folder, which I called the Jim D'Amato Team Folder. My

understanding was that access to that folder was restricted to selected sales coordinators working on Aldi or Walmart. [REDACTED] Those instructions do not identify the folder permissions of every recipient.

108. [REDACTED] Separately, I recall attending a top-to-top meeting with RSF and Aldi in 2018 at which blueberries and avocados were not discussed. My recollection is that RSF met with Bill about those products without me on the afternoon before our scheduled joint meeting. I regarded that separate contact as circumventing my role with the customer.

109. [REDACTED] I understood the coordination requirements as part of the non-circumvention protection that I say was agreed in our verbal discussions [REDACTED]. [REDACTED]

110. [REDACTED]

111A. I recall Carlos Visconti telling me verbally that he had interviewed Lorena Molina, whom I understood to be a Walmart buyer, and her husband concerning potential employment with RSF.

111B. I recall Carlos Visconti telling me verbally that what he described as RSF's offer did not meet expectations and that Lorena was upset. I cannot now distinguish from memory whether he meant an actual job offer or compensation discussed during the interviews.

112. [REDACTED] I distinguish my proposed conditions from an acceptance by the other side. These written references to JDGS are part of the record alongside my account of personal career and exit protection. [REDACTED] I do not describe Carlos's question as unanimous acceptance or omit Steve's objection.

112A. [REDACTED]

113. [REDACTED] I was not a recipient of that exchange. This is Jim DiMenna's account of the buyer's request, not a statement the buyer made directly to me.

113A. At the October 2018 trade show, Carlos Visconti returned to where Jim DiMenna and I were talking and told me that Braulio Valdes wanted me off the Walmart account. As I recall, Carlos said that if I remained on the account, Red Sun Farms would not grow and might decline. I recall the message conveyed to me as being that the business was not safe if I remained on the account. I did not hear Carlos's private conversation with Braulio; I am recounting what Carlos told me and my recollection of its meaning.

**117A.** [REDACTED]

**118.** In my March 26, 2021 email to Carlos, copied to Jim DiMenna, I expressly referred to "buying me out of our agreement." To my recollection, Carlos did not dispute that reference. The email arose from our disagreement about daily sales-meeting participation. I explained the services I was providing and asked for written discussions if ownership wanted a sales employee fitting a different role. I do not say that I attended every daily sales meeting or that the email itself recorded Carlos's assent to every term of the buyout I describe. In that response, I explained that the coordinator could answer inventory questions using the VMI screen I had created, described account-specific communications and referred to work with Ernesto on a rejection process. I also described the effort involved in training coordinators.

**119.** Harold and Carlos said the daily meetings were needed for inventory, rejected product, staffing and coordination. My March 26, 2021 response disputed the fit of those requirements with my agreed services while offering to discuss solutions.

**120.** On March 26, 2021, I wrote Carlos, copying Jim DiMenna, about Harold's treatment of Mark and others. I referred to the earlier situation involving Ugo, spelled “Hugo” in my message, and raised the possibility of a complaint to U.S. authorities if an employee complained about similar treatment. I asked for written communications and proposed ways of addressing the working relationship. I distinguish what I reported and proposed from an adjudicated finding about Harold or my employment status.

120A. [REDACTED] I use that dated description for context, not as proof that the report's allegations occurred or that the same role continued in 2021; the description does not identify his precise legal employer.

**121.** [REDACTED] The forwarding record identifies that transmission; it does not tell me everything Steve read or what every member of management knew. [REDACTED] I do not describe that earlier draft as an investigation of the complaint I sent afterward.

## Termination and retained records

125. [REDACTED] The calendar and email document those communications; neither is a transcript or a statement by Bill directing my termination.

126. [REDACTED] Those records do not establish that the originally scheduled meeting occurred without me or supply a replacement time.

128. I received a letter dated July 27, 2021, signed by Joseph H. Tringali of Bendit Weinstock, P.A., and transmitted to my JDGS email address by Lucinda P. Lima, a legal assistant in that firm's Commercial Litigation Group. The letter addressed me by name and also identified JD Global Sales, Inc. It stated that “your contract and relationship with Red Sun Farms is hereby

terminated, effective immediately." The same letter described the agreement and commission structure as JDGS's and rejected my July 2, 2021 proposed revisions.

**131.** On July 27, 2021, I sent a response in the termination-letter email chain asking for the return and deletion of authored and copyrighted Excel and other files in my Microsoft Teams folder. I wrote that the files were created on JDGS equipment and were on RSF drives so other team members could access them. My message described them as "JDGS property" and said they were not to be used going forward. That was the wording I used in the demand. As of October 17, 2026, I have not received a reply or delivery of the property in response to my July 27, 2021 demand. This describes what I have received; it does not establish what may have been preserved elsewhere.

**132.** While I was working, a wipe notification appeared, and I then lost access. I went inside to my iMac and took it offline. Some RSF Outlook material remained on that computer, but it represented only a portion of my mailbox, not the complete mailbox. [REDACTED] I distinguish that report from what I personally observed. This account qualifies my description of the device wipe in paragraph 47 of my declaration at D.E.160; it does not establish destruction of all evidence on those devices or every recoverable copy. I did not retain a complete personal copy of my RSF mailbox. The partial Outlook material remaining on my iMac does not allow me to make a complete before-and-after comparison or determine the full extent of any loss. I cannot determine from that partial copy whether the complete mailbox was preserved elsewhere.

133. [REDACTED] I was not listed among the recipients of that message. This paragraph describes the produced record rather than a communication I claim to have received that day.

134. [REDACTED] I was not listed as a participant in that exchange. The exchange discusses RSF's work in ALDI's VMI process after my termination. It does not identify each workbook used or establish by itself that RSF continued using my particular model or a derivative of my VMI model.

**134A.** [REDACTED]

**135.** [REDACTED] I did not participate in that message. [REDACTED]

**136.** I considered the PO-loss deductions unfair from the outset and objected to the clause, including during my May 27, 2016 call with Carlos. [REDACTED] In response to my continued objections, RSF stopped making those deductions. That agreement to stop was not put in writing.

Stopping further deductions did not resolve repayment of the amounts already withheld. During the call [REDACTED], Steve told me that they all agreed the deductions had been unfair from the start. The documented $10,879.30 repayment to JD Global Sales followed on January 4, 2018 [REDACTED] Separately, the June 10, 2016 calculation had included a $1,944.99 correction. The voucher describes the amount as “Repay PO losses deducted 2016.” Its invoice number is 12-31-16A, but its invoice and posting date is December 31, 2017; the wire report is dated January 4, 2018. Those are different dates in the records, not a statement that the transfer occurred in 2016.

137. Steve's September 15, 2021 email to my JDGS address states that RSF had calculated ALDI and Walmart commissions through August 26, 2021 and issued a wire for $32,186.57. It also mentions an earlier commission payment on or about August 15, 2021. Steve invoked the November 19, 2014 Agreement for Services and its thirty-day termination provision and described the new payment as my last commission payment under that agreement. That was the

position he communicated to me; it was not my acceptance of his description of the governing agreement. JDGS received the payment. I did not sign a release or tell RSF that the payment settled all my claims. I did not directly challenge Steve's calculation at that time. The retained September 16, 2021 forwarding email is addressed to Dominic V. Caruso, who later served as counsel in this action. This forwarding date does not establish that he was counsel of record in September 2021. My earlier recollection of an immediate forward to Lowenstein is not confirmed by that email.

## Capacity and earlier accounts

142. The original complaint, filed on November 11, 2021, at D.E.1 paragraph 22 described buying out JD Global for the duration of the Commission Agreement. The amended complaint, filed on August 31, 2022, at D.E.38 also describes the February 2015 discussions and buyout in terms of JDGS's rights. My account here concerns the personal career-long relationship and buyout protection I recall Carlos agreeing to, while acknowledging that the written drafts and commission payments named JDGS. I am not changing the historical wording of either pleading or saying that either expressly stated the personal enterprise-value undertaking I now describe.

**143.** [REDACTED]

**144.** Paragraph 38 of my March 18, 2026 declaration at D.E.160 begins: “In 2014, I brought that thirty-five-year body of proprietary knowledge to Red Sun Farms on the promise of a career-long agreement.” My point was that I already possessed substantial knowledge and brought it to RSF. After earlier unsuccessful attempts by RSF to obtain my services, RSF presented its opportunity as a long-term option in connection with my leaving what I regarded as a better option at

SunFed. My account of the specific February 28, 2015 meeting appears in paragraph 21 of this declaration.

**145.** My February 24, 2026 letter at D.E.149 described proposed personal oral-compensation claims concerning February 2015 and April 2016 and requested permission to seek amendment. That letter did not identify the May 27, 2016 telephone conversation described in paragraphs 43–44 of this declaration. I refer to the letter as a record of my earlier request, not as a complete account of the negotiations or an order allowing those claims.

146. My letter at D.E.152, dated February 21, 2026 and bearing a February 20, 2026 filed stamp, stated that evidence supporting the proposed claims had been in the record or in counsel's possession since 2021. That was a statement I made in the letter. I knew about the negotiations in which I participated when they occurred. My memories of those events, the dates on which I obtained particular corroborating records, and the history of my requests to change the pleading are distinct matters. I am not claiming that I first learned of the conversations in September or October 2026. Reviewing the records during discovery helped me reconstruct the sequence of events after the passage of many years.

**Counsel search and both former counsel files**

147. My efforts to obtain representation occurred in several periods: October 2021; discussions and follow-ups with Adam Derman beginning in January 2022 and continuing at intervals into 2023; renewed outreach in 2025; and another round from July through October 2026. These efforts included seeking referrals, contacting lawyers, participating in calls, supplying case materials, answering questions, and following up.

148. The responses varied. Some lawyers declined, some identified workload or fee limitations, and others expressed interest or requested further information. Informal discussions and assistance were distinct from an agreement to take over the case. Some fee arrangements discussed were financially unworkable for me. The dated examples describe separate efforts and their actual outcomes; I do not attribute every unsuccessful inquiry to the same reason.

149. In my discussions with prospective counsel, a recurring question was why the case had been pending for nearly five years and had accumulated so many docket entries. They raised concerns about the extensive back-and-forth reflected in that history. These were concerns communicated to me during my search for new counsel.

150. As of October 17, 2026, I have not secured replacement counsel who has agreed to enter an appearance for JD Global Sales, Inc. I am still seeking that representation.

151. If the Court grants the requested ninety-day period, I intend to continue seeking counsel for JD Global Sales, Inc. and to provide prospective counsel with the current pleadings, orders, and a concise summary of the case and its unresolved issues. I intend to report my actual efforts and their results at the proposed thirty- and sixty-day checkpoints. I cannot promise that a lawyer will accept the engagement within that period.

152. My concern remains that I cannot determine from the materials made available to me the complete record of what my prior counsel sent to and received from defense counsel, including the attachments and the scope of any agreements. I recognize that some communications have since been recovered in other forms, and that Mr. Caruso stated that the complete file was transferred. I ask for assistance in reconciling that disagreement through an orderly process.

153. My request for assistance concerns the case files of both Lowenstein Sandler and Mr. Caruso. I ask that any file-reconciliation process address each former counsel's files separately, including sent and received correspondence with defense counsel and the associated attachments.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: October 18, 2026

Signature:

James D’Amato