UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

**JD GLOBAL SALES, INC., et al., Plaintiffs,**
**v.**
**JEM D INTERNATIONAL PARTNERS, LP; JEM D INTERNATIONAL (MICHIGAN) INC.; JIM DIMENNA; CARLOS VISCONTI, et al., Defendants.**

**Civil Action No. 2:21-cv-19943-MEF-ADS**

# PUBLIC FILING (REDACTED)

**Submitted for filing on the public docket**

**Response to Text Order of October 26, 2026 (D.E. 178)**

Enclosed, in order: (1) letter responding to D.E. 178; (2) public redline, Amended Complaint (D.E. 38) v. proposed Second Amended Complaint as filed at D.E. 177-2 (L. Civ. R. 15.1(a)(2)); (3) Certificate of Service. The Motion to Seal is submitted separately under its own cover. The unredacted redline is submitted separately under its own SEALED cover.

**IDENTIFICATION OF THE ELECTRONIC ORIGINAL**

A_LETTER_AND_PUBLIC_REDLINE_DE178.pdf

Document pages: 90 (excluding this cover) File size: 378,275 bytes

Document date: October 28, 2026

**SHA-256 of the PDF identified above**

e887c53d2f49abc6ee7721e603a55cf5
a82130e72e15ab8ba36a082b47563632

Read the two hash lines consecutively as one 64-character value. This hash identifies the electronic PDF, not this cover sheet or a paper printout.

CLERK
U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY
RECEIVED
2026 OCT 28 A 11: 23

**Submitted by James D'Amato, Pro Se, individually**
233 Rock Road #101, Glen Rock, NJ 07452
(201) 280-1109 | jim@jdglobalsales.com

Cover prepared October 28, 2026. Delivery date and time: ____________________

**CLERK RECEIPT / DATE STAMP**

Received by / intake reference (if provided): ____________________________

Please stamp a duplicate cover for the submitter. A receipt stamp acknowledges delivery only; it is not a ruling on sealing, timeliness, acceptance for filing, or service.

James D'Amato, Pro Se
233 Rock Road #101
Glen Rock, New Jersey 07452
(201) 280-1109 | jim@jdglobalsales.com

October 28, 2026

**VIA HAND DELIVERY**

Hon. Alex D. Silagi, U.S.M.J.
United States District Court for the District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07102

**Re: JD Global Sales, Inc., et al. v. Jem D International Partners, LP, et al.**
**Civil Action No. 2:21-cv-19943-MEF-ADS**
**Response to Text Order of October 26, 2026 (D.E. 178)**

Dear Judge Silagi:

I am the individual plaintiff, proceeding pro se. In response to the Court's October 26, 2026 Text Order (D.E. 178), I submit (1) the redline required by Local Civil Rule 15.1(a)(2) and (2) a motion to maintain under seal the unredacted versions of my October 2026 motion papers. I also explain the sequence of my October 18–19 submissions, which I believe accounts for the appearance that the same papers were filed both under seal and publicly.

**1. Redline under L. Civ. R. 15.1(a)(2)**

Enclosed is a redline comparing the proposed Second Amended Complaint to the Amended Complaint (D.E. 38). It presents the full proposed pleading in reading order: material to be deleted from D.E. 38 is bracketed and struck through, and material to be added is underlined. The public redline is prepared from the redacted proposed pleading at D.E. 177-2. A redline prepared from the unredacted proposed pleading is being hand delivered to the Clerk's Office for filing under seal. I apologize for not providing the comparison in this form initially; the comparison at D.E. 177-3 presented the changes in numbered blocks rather than within the proposed pleading.

**2. The October 18–19 submissions**

The papers at D.E. 176 and D.E. 177 are not the same papers. They are the unredacted and redacted versions of the same motion:

- On Sunday, October 18, 2026, the deadline set by D.E. 174, I submitted through the Court's ADS system redacted versions of my motion papers, declaration, proposed Second Amended Complaint, and comparison to D.E. 38. The ADS confirmation (7:57 p.m.) lists each document as "Redacted." These papers are docketed at D.E. 177, dated October 18 and entered October 22, 2026.
- The redacted passages contain, or may contain, material that Defendants produced and designated under the Discovery Confidentiality Order (D.E. 62). Paragraph 9 of D.E. 62 provides that any document designated "Confidential" that is filed with the Court "shall be filed under seal, in accordance with Local Civil Rule 5.3." Because ADS does not accept sealed documents or documents restricted by a confidentiality order, I did not include the unredacted versions in the ADS submission.
- The same evening (8:10 p.m.), I emailed the Clerk's Office explaining the redactions, requesting instructions for submitting the unredacted versions under seal and for providing them to defense counsel, and listing the SHA-256 hash values of the four unredacted documents so that the later sealed copies could be confirmed identical.
- On Monday, October 19, 2026, the unredacted versions were submitted under seal by hand delivery to the Clerk's Office, which stamped each of the four cover sheets received at 2:10 p.m. Each cover sheet identified its document and the same SHA-256 hash value listed in my October 18 email. The unredacted papers appear on the docket as sealed entries D.E. 176 (dated October 19, entered October 20) and D.E. 179 (dated October 19, entered October 27).

Because the sealed entry was entered on October 20 and the redacted entry on October 22, the docket shows the sealed filing first. In fact, the redacted public version was submitted first, by design, and the unredacted version followed under seal. I intended D.E. 177 to remain public in its redacted form and the unredacted papers to remain sealed. I did not intend to place any of Defendants' designated material on the public docket, and I do not ask the Court to seal D.E. 177.

**3. Motion to seal**

My motion to seal, with a supporting declaration, index and proposed order, is submitted with this letter. It asks that D.E. 176, D.E. 179 and the unredacted redline remain sealed, with the redacted versions remaining on the public docket.

I appreciate the Court's attention and will provide anything further the Court requires.

Respectfully submitted,

Signature: [signature]
James D'Amato, Pro Se

cc: Joseph H. Tringali, Esq., counsel for Defendants (via ECF; sealed redline by email)

Enclosures: (1) Redline, public version; (2) Notice of Motion to Seal; (3) Declaration of James D'Amato with Index; (4) Proposed Order. Unredacted redline hand delivered separately for filing under seal.

**REDLINE PURSUANT TO L. CIV. R. 15.1(a)(2)**

Comparison of the proposed Second Amended Complaint (D.E. 177-2) to the Amended Complaint (D.E. 38). Material to be deleted is ~~[bracketed and struck through]~~. Material to be added is underlined. Unmarked text appears in both pleadings. Bracketed notations reading [REDACTED] are part of the proposed pleading as publicly filed at D.E. 177-2.

**[~~Karim G. Kaspar Craig Dashiell LOWENSTEIN SANDLER LLP One Lowenstein Drive Roseland, New Jersey 07068 (T): (973) 597-2370 (F): (973) 597-2400 kkaspar@lowenstein.com cdashiell@lowenstein.com Attorneys for Plaintiffs~~] UNITED STATES DISTRICT COURT /**

**[~~UNITED STATES DISTRICT COURT~~] FOR THE DISTRICT OF NEW JERSEY**

JD GLOBAL SALES, INC. **[~~and JAMES D'AMATO,~~]**

(existing corporate plaintiff; not represented by James) and JAMES D'AMATO,

Plaintiffs, v. JEM D INTERNATIONAL PARTNERS, **[~~LP, JEM D. INTERNATIONAL (MICHIGAN) INC., HAROLD PAIVARINTA, JIM DIMENNA, CARLOS VISCONTI, and ABC COMPANIES 1-10, representing the fictitious names of entities that do business as RED SUN FARMS whose identities are unknown, Defendants.~~]**

LP; JEM D INTERNATIONAL (MICHIGAN) INC.; JEM-D INTERNATIONAL INC. (proposed general-partner defendant); HAROLD PAIVARINTA (proposed R12 addition following dismissal); ROBERTO SALDAÑA CASTILLO (proposed R12 addition); JIM DIMENNA; CARLOS VISCONTI; WALMART INC.; DON FOX; BRAULIO VALDES; ALDI INC.; BILL DUESENBERG; and ABC COMPANIES 1-10, Defendants.

**[Civil Action No. 2:21-cv-19943]**

**Civil Action No. 2:21-cv-19943-MEF-ADS — PROPOSED SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

**[Document Electronically Filed] THE PARTIES (adapted from D.E.38 ¶¶2–8)**

[Plaintiffs JD Global Sales, Inc. ("JD Global") and James D'Amato ("Mr. D'Amato," together with JD Global, "Plaintiffs"), by way of Complaint against Defendants Jem D International Partners, LP ("Jem D International"), Jem D. International (Michigan) Inc. ("Jem D. Michigan," together, with Jem D International, "Red Sun Farms"), Harold Paivarinta ("Mr. Paivarinta"), Jim DiMenna ("Mr. DiMenna"), and Carlos Visconti ("Mr. Visconti," together, with Red Sun Farms, Mr. Paivarinta and Mr. DiMenna, "Defendants"), allege as follows:]

**[NATURE OF THE ACTION]**

[1. This is an action by Plaintiffs to recover: (i) commissions that Red Sun Farms—an international produce grower, shipper, and wholesaler—promised to pay JD Global for sales consulting services rendered pursuant to a lifetime employment agreement; (ii) punitive damages for Defendants terminating JD Global's arrangement with Red Sun Farms without cause after Mr. D'Amato reported ethical concerns about a Red Sun Farms executive and questioned the company's handling of key customer accounts with Aldi and Walmart; and (iii) damages and injunctive relief for Red Sun Farms' unauthorized use of Plaintiffs' proprietary information after Defendants prematurely ended JD Global's relationship with Red Sun Farms.]

**[PARTIES]**

[2. Plaintiff JD Global is a corporation organized under the laws of New Jersey with a principal place of business at]

P1. Plaintiff JD Global Sales, Inc. ("JD Global") is a New Jersey corporation. On November 11, 2021, its principal place of business was 20 Berry Place, Glen Rock, New Jersey, where James directed and managed the company. Its mailing address was 233 Rock Road #101, Glen Rock, New Jersey 07452.

[3. Plaintiff Mr. D'Amato is an individual who resides in Glen Rock, New Jersey. Mr. D'Amato founded JD Global and remains the company's sole principal.] P2. Plaintiff James D'Amato is an individual residing in Glen Rock, NJ. When this action commenced on November 11, 2021, he was a United States citizen whose permanent home was New Jersey, and he was a United States citizen whose permanent home was New Jersey on October 1, 2026. He founded JD Global and is its sole principal. He proposes the individual claims in his own capacity. He does not appear for JD Global or assert its claims pro se. JD Global Sales, Inc. may appear only through licensed counsel (D.E.154). Paragraphs labeled "Corporate claim identified for directions" describe claims of JD Global, including those pleaded in D.E.38, so that the Court may give the directions requested in the accompanying motion concerning JD Global's existing claims and any corporate amendment presented through counsel. They are not asserted in this pleading by James D'Amato or on JD Global's behalf. Their inclusion does not make any claim pending and is not represented as preserving, reviving, tolling or relating back any claim.

[4. On information and belief, Defendant Jem D International (a limited partnership organized under the laws of Canada with a principal place of business at 2400 Graham Side Road, Kingsville, ON N9Y 2E5), and Defendant Jem D Michigan (a corporation organized under the laws of Michigan with a principal place of business at 27915 Northline Road, Taylor, Michigan 48180) are two of several affiliated entities that form a business collective known as Red Sun Farms. At all times relevant herein, each affiliated entity within Red Sun Farms,

including Jem D International and Jem D Michigan, has held itself out as "d/b/a Red Sun Farms," including in 2020 before the United States Court of International Trade. On information and belief, none of Jem D International's partners—or, to the extent any of Jem D International's partners is an unincorporated entity, its respective members, partners, or interest holders—are New Jersey citizens.]

[5. On information and belief, Defendant Mr. Paivarinta is an individual residing in Canada. Mr. Paivarinta is Red Sun Farms' Director of Sales for North America.]

[6. On information and belief, Defendant Mr. DiMenna is an individual residing in Canada or Florida. Mr. DiMenna is Red Sun Farms' President.]

[7. On information and belief, Defendant Mr. Visconti is an individual residing in Michigan. Mr. Visconti is Red Sun Farms' Chief Executive Officer.]

[8. Defendants ABC Companies 1-10 are the remaining entities encompassed within and operating as Red Sun Farms, whose identities are unknown to JD Global at this time. On information and belief, none of the ABC Companies— or, to the extent any of the ABC Companies is an unincorporated entity, its respective members, partners, or interest holders—are New Jersey citizens.]

**[JURSIDICTION AND VENUE]**

[9. The amount in controversy in this Complaint exceeds the sum of $75,000, exclusive of interest and costs, and Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) (action between a citizen of New Jersey and citizens of foreign States).]

[10. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the Complaint took place in this District.]

[11. The Court has personal jurisdiction over Defendants pursuant to N.J.S.A. 2A:61A-1 et seq. and under the common law because Red Sun Farms solicited the services of JD Global, a New Jersey sales representative that maintains]

P3. Defendant Jem D International Partners, LP (the LP) and Defendant Jem D International (Michigan) Inc. (Michigan) are distinct entities. Defendants' Answer, D.E.71 paragraph 4, states that both use the Red Sun Farms trade name; paragraph 13 identifies the LP's customer business. James alleges alternative principal and recipient roles as specifically described below. A common trade name, domain or signature does not alone resolve which entity acted in a particular transaction. The reviewed Michigan annual-report collection contains no assumed-name certificate; that bounded absence is not an allegation that Michigan never used the name or that defendants' stated use was necessarily false.

P4. Harold Paivarinta is a proposed defendant on R12 following his earlier dismissal. In D.E.71 paragraph 5, defendants identified him as Senior Director of Sales and Business Development for Jem D International, the LP identified in paragraph 4 of that Answer. That dated admission does not establish every earlier employment capacity. James seeks to add him for his own acts described in R12.3-R12.3C, not because of title alone. D.E.69-70 and the required express leave request are addressed in the accompanying motion; this paragraph does not restore him or revive CEPA automatically.

P5. Defendant Jim DiMenna is identified in D.E.71 paragraph 6 as president of Michigan and the LP. The capacity in which he made a particular statement remains transaction-specific.

P6. Defendant Carlos Visconti is identified in D.E.71 paragraph 7 as chief operating officer of Michigan and the LP. Operational Red Sun Farms titles and the separate general-

partner officer record are not treated as proof of a statutory office in every affiliate. His alleged acts and representations remain separately identified.

P7. ABC Companies 1-10 refer only to genuinely unidentified actors whose relevant conduct may be established. James continues to evaluate the potential roles of the affiliates disclosed in D.E.30 and other officers and owners, including Steve Macchio, to determine whether discovery supports a claim against a particular person or entity. Those candidates, except for defendants expressly named elsewhere in this proposed pleading, are not named as defendants by this paragraph. James does not label disclosed entities or known individuals unknown merely because their responsibilities remain disputed.

P8. Walmart Inc. is included as the proposed Walmart-side retailer defendant. [REDACTED] The proposed corporate identity and citizenship allegation appears in J2A. Confirmation of the exact acting entity and relevant dates, service identity and basis for attributing the challenged conduct to the proposed entity remain subject to unresolved exact-entity, relevant-date, service-identity and conduct-attribution requirements and are not inferred from the Walmart brand alone.

P9. Don Fox participated in the Walmart business relationship. [REDACTED] Fox is a proposed defendant on R12, not automatically on every theory or on R18.

P10. Braulio Valdes participated in Walmart produce communications. [REDACTED] These operational roles do not establish an uninterrupted identical remit, knowledge of every private compensation term, or improper conduct by themselves. He is a proposed defendant on R12 and R18, subject to their stated conduct and capacity holds.

P11. Aldi Inc. is included as the proposed Aldi-side retailer defendant. [REDACTED] These records support identifying the ALDI-side participant in that dated supplier relationship;

they do not establish the acting entity for every later challenged act, citizenship, service or New Jersey jurisdictional contacts. The separate information-and-belief citizenship allegation appears in J2B and remains subject to the entity/date checks stated there. The supplier agreement is not James's separate compensation agreement, and no corporate label is an admission of an alleged restraint or interference.

P12. [REDACTED] He is a proposed defendant on R11, R13 and R18, subject to their stated conduct, knowledge and capacity holds.

P13. The proposed new general-partner defendant is JEM-D International Inc., a separate Ontario corporation, not Michigan and not the LP itself. D.E.30 discloses it in the ownership chain. [REDACTED] That is a party's filed account, not a finding by this Court or proof of every later corporate event. These dated records support a particular general-partner theory rather than an inference of liability from shared branding alone.

P14. In the alternative, to the extent the LP is found to have incurred the obligations alleged in R01-R03 or R09-R10 while JEM-D International Inc. was its general partner, James seeks relief against that general partner to the extent the governing partnership law makes it responsible for those LP obligations. R17 follows that route only insofar as a qualifying obligation and a separate basis for accounting are established. This is not an allegation that the general partner itself spoke every promise, signed the disputed guaranty, owned every asset or committed every statutory tort. James gives notice under Rule 44.1 that the Ontario partnership-law consequences of the pleaded general-partner relationship may be at issue, including section 8 of Ontario's Limited Partnerships Act read with section 10(1) of its Partnerships Act. Choice of law, relevant-date status, the scope of liability, jurisdiction and service require determination; no liability is sought merely because of a shareholder interest.

P15. Michigan and the LP are alleged as alternative principals, not as interchangeable names for a single legal person. The November 19, 2014 services agreement names Michigan and JDGS and expressly describes Michigan as providing sales and marketing services for the LP dba Red Sun Farms. [REDACTED] References to Red Sun Farms in the paragraphs identifying corporate claims are retained for comparison with D.E.38, but are not a proposed separate trade-name defendant. Their attribution is limited to the supported entity and act, with the P14 general-partner route only in its specified counts. No known affiliate is added to every count through that shorthand. Harold Paivarinta is expressly proposed for addition on R12 under the accompanying notice paragraph 3A, brief Section III and proposed order A6. The prior dismissal remains acknowledged; neither this attribution paragraph nor caption visibility restores him.

P16. Roberto Saldaña Castillo is proposed as an additional defendant on R12 only for the alleged acts identified in R12.3D, not from ownership or title alone. His citizenship, domicile and residence, the basis for personal jurisdiction, and the proper method of service, including any applicable service-abroad requirements, remain to be established. No citizenship, location, agency authority or liability is inferred merely from the Red Sun Farms name.

**JURISDICTION AND VENUE**

J1. James invokes federal-question jurisdiction under 28 U.S.C. § 1331 for the proposed federal counts R05, R07 and R11, subject to their claim-specific statutory and factual requirements, and supplemental jurisdiction under 28 U.S.C. § 1367 over related state-law claims. Their inclusion does not adjudicate a federal claim's sufficiency, title, antitrust injury or the copyright prerequisite.

J2. Diversity under 28 U.S.C. § 1332 remains an alternative jurisdictional basis requiring complete party-specific citizenship and the amount in controversy. Residence, a business address, a brand, or an LP/LLC's place of formation is not substituted for the required citizenship inquiry. The separate information-and-belief allegations for Walmart Inc. and ALDI Inc. appear in J2A-J2B; no other proposed new party's citizenship or complete diversity is inferred from them. In their July 31, 2023 Answer, D.E.71 paragraph 4, the answering defendants stated that Jem D International (Michigan) Inc. was organized under Michigan law with its principal place of business in [~~this State, and regularly interacted with JD Global within the forum, including by negotiating and forming multiple contracts with JD Global that resulted in significant revenues for Red Sun Farms pursuant to long-term relationships between the parties. Pursuant to those contracts, Red Sun Farms received revenues from nationally-known retail chains, wholesalers, and supermarkets that have operations within this State. On information and belief, Red Sun Farms is registered and/or authorized to conduct business in the State of New Jersey and derives substantial revenue in interstate and/or international commerce from business conducted in this State. Additionally, the individual Defendants named herein personally and willfully directed Red Sun Farms' past and ongoing actions, including the unlawful conduct set forth in this Complaint. Specifically, Defendants' retaliation against, and wrongful termination of, JD Global and breach of Red Sun Farms' current contract with JD Global relates to their contacts with this State and relationship with JD Global, and has caused, and continues to cause, damage to JD Global in this State.~~] Pharr, Texas, and that none of Jem D International Partners, LP's partners, members or interest holders were New Jersey citizens. James relies on those dated statements without treating them as a determination of complete diversity or as addressing any proposed

new defendant. James's own citizenship is alleged in P2; that allegation does not establish complete diversity among the proposed parties.

**[FACTS COMMON TO ALL COUNTS]**

[12. JD Global is a sales contractor that specializes in selling produce to retail suppliers. JD Global has a single employee and principal, Mr. D'Amato. At all times relevant herein, JD Global and Mr. D'Amato have operated from New Jersey.]

[13. Red Sun Farms is a business-to-business produce supplier that maintains greenhouses throughout North America. Red Sun Farms' clients are groceries and other retailers that sell produce directly to customers. Red Sun Farms maintains distribution centers and growing facilities in the United States.]

**[Red Sun Farms hires JD Global]**

[14. In 2013, Messrs. DiMenna and Visconti, top executives at Red Sun Farms, entered into talks with Mr. D'Amato about retaining JD Global's services. Messrs. DiMenna and Visconti had several rounds of discussions with Mr. D'Amato, representing JD Global, over the phone and through email, but the parties could not come to terms on an agreement, which resulted in Mr. D'Amato rejecting an employment offer for JD Global from Red Sun Farms.]

[15. On November 13, 2014, after Mr. D'Amato rejected Red Sun Farms' employment offer, Mr. DiMenna, representing Red Sun Farms, flew to New Jersey to meet with Mr. D'Amato in-person about the parties working together. The meeting took place at a Marriott hotel near Newark Airport, and the parties discussed the value JD Global could bring to Red Sun Farms, as well as Red Sun Farms' desire to retain JD Global's services.]

[16. After that meeting, the parties continued their dialogue over the phone, and shortly thereafter reached an oral understanding about JD Global's employment, with Messrs. DiMenna

and Visconti representing to Mr. D'Amato that they had authority to bind Red Sun Farms and obtain employment for JD Global. The parties agreed that JD Global would sell Red Sun Farms' produce on a trial basis as an independent contractor, and that the parties would mutually explore a more permanent relationship if JD Global was satisfied that Red Sun Farms could satisfy customers' expected service levels, and if Red Sun Farms was pleased with the volume of sales that JD Global generated.]

[17. On November 26, 2014, the parties reduced their agreement to writing, and JD Global executed an Agreement for Services (the "Agreement") with Red Sun Farms — specifically, the Jem D Michigan entity within Red Sun Farms.]

[18. Under Paragraph 2 of the Agreement, the parties "agree[d] to review [JD Global's] performance . . . semi-annually," with each party reserving the right to terminate the Agreement on 30 days' notice to the other party. The Agreement set JD Global's compensation at $140,000 per year, with the opportunity to earn an incentive bonus of up to 25% of that compensation.]

[19. After JD Global signed the Agreement, Mr. D'Amato was issued a "@redsunfarms.com" email address. Mr. D'Amato's direct reports at Red Sun Farms were Messrs. DiMenna and Visconti.]

[20. In December 2014, at Red Sun Farms' request, Mr. D'Amato provided Red Sun Farms with a forecast of the number of cases of Red Sun Farms' produce JD Global anticipated being able to sell through the end of 2015.]

[21. In February 2015, after having an opportunity to assess Red Sun Farms' distribution capabilities, Mr. D'Amato revised JD Global's sales forecast down. Mr. D'Amato also began working to streamline certain structural inefficiencies he identified in Red Sun Farms' reporting and distribution processes that impacted Red Sun Farms' ability to satisfy customer orders.]

**[Red Sun Farms and JD Global Enter Into the Commission Agreement]**

[22. On February 28, 2015, Mr. D'Amato, on behalf of JD Global, met with Messrs. DiMenna and Visconti at a Southeast Produce Council trade show in Florida to discuss JD Global's revised sales forecast. During that meeting, Messrs. DiMenna and Visconti asked Mr. D'Amato to shift JD Global's focus from internal company operations to developing new business for Red Sun Farms, specifically, bringing in new large retail clients. Messrs. DiMenna and Visconti expressed that they were receiving pressure to show company growth, and that Red Sun Farms' salesforce was not performing at expected levels.]

[23. During that meeting, Mr. D'Amato offered Messrs. DiMenna and Visconti two proposals for JD Global's continued work on behalf of Red Sun Farms. For one scenario, Mr. D'Amato proposed that JD Global continue under the terms of its Agreement and focus on meeting its revised sales forecast numbers. In the alternative, Mr. D'Amato proposed that the parties abandon their initial Agreement and that JD Global work to retain new customers for Red Sun Farms. Under this latter arrangement, Mr. D'Amato proposed that JD Global would be paid a commission on every case of produce Red Sun Farms sold to those new customers instead of receiving a base salary and without Red Sun Farms having to pay for JD Global's expenses or healthcare, and that this arrangement would continue until Mr. D'Amato chose to retire from working with Red Sun Farms and would be terminable only for cause (the "Commission Agreement"). Mr. D'Amato also stated that given the proposed "marriage" between the parties, if Red Sun Farms terminated JD Global without cause prior to JD Global withdrawing from the relationship, Red Sun Farms would have to buy out JD Global for the duration of the Commission Agreement.]

[24. Mr. D'Amato made clear during the meeting that JD Global would not devote its efforts to engaging new retail clients on Red Sun Farms' behalf unless Red Sun Farms elected to proceed under Commission Agreement.]

[25. Historically, in the produce industry, obtaining new retail business is one of the most difficult things to do, given that retailers usually become entrenched with a given supplier. This was compounded because the "Jem D" companies operating under the Red Sun Farms umbrella historically had been suppliers, not growers, in the industry, and thus there was a stigma in the market that entities affiliated with Red Sun Farms did not own their own product—meaning increased costs and risk for potential customers. Accordingly, JD Global would have to devote significant time and effort to building a relationship with a retailer sufficient to entice it away from its existing supplier relationships.]

[26. Mr. D'Amato also informed Messrs. DiMenna and Visconti that if Red Sun Farms did not accept the Commission Agreement, JD Global would have to look for work outside its existing Agreement to supplement its income. Messrs. DiMenna and Visconti were aware at the time Red Sun Farms hired JD Global that it was working to sell produce on behalf of several other companies and generating tens of thousands of dollars annually from those arrangements. At or around the time the parties entered into the Commission Agreement, JD Global had received an offer to become more involved in one of those operations.]

[27. Messrs. DiMenna and Visconti unequivocally told Mr. D'Amato that Red Sun Farms would proceed with the terms of the Commission Agreement, to be effective as of January 1, 2016, and that they would supply JD Global with whatever it needed to bring in large retail clients for Red Sun Farms. Thus, the parties formed a binding agreement, whereby JD Global would devote 100% of its time to developing new business for Red Sun Farms with large

retailers. In exchange, Red Sun Farms would pay JD Global a sales commission for as long as Red Sun Farms sold produce to any customer JD Global obtained for Red Sun Farms after February 27, 2015 up until Mr. D'Amato chose to retire from working with Red Sun Farms, or until Red Sun Farms stopped selling produce to that customer, whichever came first, with this arrangement only being terminable for cause.]

[28. The parties agreed that JD Global would operate under the original Agreement's payment terms through the end of 2015 for accounting purposes. Messrs. DiMenna and Visconti informed Mr. D'Amato that they would draw up paperwork to memorialize the deal structure of the Commission Agreement, the same way they had done for the prior Agreement.]

[29. JD Global wound down its existing arrangements with other suppliers and forewent other employment opportunities as a result of the Commission Agreement.]

[30. From March to August 2015, JD Global obtained new major retail accounts for Red Sun Farms with Walmart, Aldi, Ahold, Fresh Market, John Cerasulo, and BJ's Wholesale Club, thereby honoring its promises under the Commission Agreement to obtain large retail clients for Red Sun Farms, and generating tens of millions of dollars of revenue for Red Sun Farms.]

[31. On January 15, 2016, Messrs. DiMenna and Visconti held a review process meeting for JD Global. Mr. D'Amato attended that meeting on behalf of JD Global. During the meeting, Messrs. DiMenna and Visconti attempted to offer JD Global a base salary increase from the parties' original Agreement. Mr. D'Amato reminded them that the parties had entered into the Commission Agreement the past year, and, after a few hours of discussions, Messrs. DiMenna and Visconti ratified the Commission Agreement. Specifically, Messrs. DiMenna and Visconti accepted that JD Global would be paid on a per case or percentage of sales basis for produce Red Sun Farms sold to customers that JD Global obtained for Red Sun Farms for as long as Red Sun

Farms continued to sell to that customer, and that this arrangement would continue until JD Global ended its relationship with Red Sun Farms, terminable only for cause.]

[32. Messrs. DiMenna and Visconti reiterated that they would draw up paperwork to memorialize the Commission Agreement, and asked Mr. D'Amato to facilitate face-to-face introductions with the retail clients JD Global had obtained for Red Sun Farms and to visit a distribution facility in Pharr, Texas. Mr. D'Amato complied with these requests, flying to Red Sun Farms' distribution center four days after the meeting, and later making introductions to Aldi and Walmart.]

[33. On March 4, 2016, Mr. D'Amato met with Red Sun Farms' ownership group to discuss the specific commission JD Global would be paid under the Commission Agreement. Based on the lifetime duration of the Commission Agreement and in exchange for the protection from termination that the Commission Agreement offered, Mr. D'Amato proposed to Red Sun Farms ownership that JD Global be paid 1% of delivered Canadian dollars per case (exclusive of freight costs Red Sun Farms charged for that produce)—well below market average for commission arrangements in the produce industry, which typically range from 2% to 10% and also are based on the total cost of the produce a supplier delivers.]

[34. Red Sun Farms countered JD Global's proposal with a 0.85% commission rate based on the cost of produce Red Sun Farms sold, "freight on board Pharr, Texas," and in U.S. dollars.]

[35. On April 27, 2016, Mr. Visconti invited Mr. D'Amato to meet in Dublin, Virginia to further discuss JD Global's work for Red Sun Farms and the 0.85% commission structure for the Commission Agreement. During that meeting, Mr. D'Amato reiterated that if JD Global was going to accept a below market commission (and indeed, one that was significantly lower than the already discounted 1% rate that Mr. D'Amato proposed to Red Sun Farms) that it would be a

lifetime employment arrangement, that JD Global could not be terminated without cause, and that there would be no cap on the commissions JD Global would receive. Mr. Visconti accepted and ratified these terms and the Commission Agreement for a second time, and also agreed to supply JD Global with the day-to-day sales and administrative staff necessary to support JD Global. Mr. Visconti asked Mr. D'Amato to draft an agreement memorializing the Commission Agreement.]

[36. The next day, on April 28, 2016, Mr. Visconti emailed Mr. D'Amato a summary of various points of the Commission Agreement to enable JD Global to start receiving payment under the Commission Agreement. At that time, year to date, JD Global had not received any payments from Red Sun Farms for the accounts it generated for Red Sun Farms and other work it provided to Red Sun Farms.]

**[Red Sun Farms Pressures JD Global to Limit the Term of the Commission Agreement]**

[37. On May 12, 2016, JD Global sent Red Sun Farms a draft agreement memorializing the terms of the Commission Agreement, including its perpetual duration and nontermination protections. Later that month, Red Sun Farms sent back revisions proposing, among other things, to limit the Commission Agreement's term to three years. JD Global rejected that provision as it had been promised lifetime employment by Red Sun Farms' top executives on multiple occasions. Red Sun Farms continued to withhold commission payments from JD Global during this time.]

[38. Mr. DiMenna told Mr. D'Amato months later, in person during a Produce Marketing Association conference in Orlando, Florida, that Red Sun Farms' payment freeze was a negotiation tactic deployed by Mr. Visconti to see if financial pressure would cause JD Global to

limit the term of the Commission Agreement. Mr. Visconti's attempts to shorten the Commission Agreement were contrary to the multiple oral understandings the parties had reached.]

[39. On June 1, 2016, Mr. D'Amato informed Mr. Visconti that JD Global would only sign an agreement that accurately memorialized the Commission Agreement (i.e., the draft terms JD Global sent to Red Sun Farms on May 12, 2016 concerning duration and termination protections). The next day, June 2, 2016, Red Sun Farms made a retroactive payment to JD Global for commissions it was owed at the 0.85% rate, and promised Mr. D'Amato that a signed agreement would be forthcoming.]

[40. However, all that followed were continued attempts by Red Sun Farms to induce JD Global to retract the Commission Agreement and agree to an arrangement of shorter duration.]

[41. In October 2017, Mr. D'Amato met with representatives of Red Sun Farms in Anaheim, California, including Messrs. DiMenna and Visconti and Roberto Saldana Castillo, one of the principal owners of Red Sun Farms, to discuss the parties' inability to reduce the Commission Agreement to writing. At the conclusion of that meeting, Mr. Castillo directed Messrs. DiMenna and Visconti to provide JD Global with another draft of the Commission Agreement. Messrs. DiMenna and Visconti promised Mr. D'Amato that a draft would be forthcoming that would be acceptable to JD Global.]

[42. The parties continued to work together under the Commission Agreement without incident, until October 2018 when Mr. Visconti discussed removing JD Global from the Walmart account.]

[43. During a trade show in Florida that month, Mr. Visconti and Mr. D'Amato met with a Walmart vegetable buyer. Mr. Visconti and the Walmart representative had a conversation in Spanish away from Red Sun Farm's booth at the trade show, without Mr. D'Amato.]

[~~44. After the conversation, Mr. Visconti told Mr. D'Amato that the Walmart buyer would not continue to do business with Red Sun Farms if Mr. D'Amato remained on the account, for personal reasons.~~]

[~~45. Mr. D'Amato, Mr. Visconti, and Mr. DiMenna later convened a call, with Mr. D'Amato stating that he would need to receive 100% of his commission on the Walmart sales even if Red Sun Farms removed him from managing that account, and that the Commission Agreement would need to be amended to reflect this arrangement. Red Sun Farms decided to leave Mr. D'Amato in place as the Walmart account manager.~~]

[~~46. And while Red Sun Farms eventually confirmed, in writing in 2021 that the Commission Agreement had an indefinite duration, it continued, however, in various draft agreements sent to JD Global, to attempt to repudiate the non-termination provisions of the Commission Agreement that its executives had previously accepted.~~]

**[~~JD Global Develops a Proprietary Vendor Management Program~~]**

[~~47. Towards the end of 2015, JD Global developed a proprietary Vendor Management Inventory sales modeling system for predicting and servicing Red Sun Farms' customers' needs (the "VMI Model").~~]

[~~48. Mr. D'Amato created the model for JD Global out of necessity because Aldi had sent Red Sun Farms purchase orders on short notice that the company was unable to satisfy. Rather than continuing to scramble to find produce to satisfy Aldi's demands (and ultimately failing), thereby threatening Red Sun Farms' relationship with Aldi, JD Global believed that Red Sun Farms needed to anticipate its customer's needs so that sufficient produce was available to satisfy its purchase orders. There was no existing system in place to accomplish this task, so Mr. D'Amato created one.~~]

[49. The VMI Model was based in Microsoft Excel, and the spreadsheet JD Global created to implement the model relied on formulas to calculate customers' future produce needs based on historical ordering, supply chain availability, and truck lane optimization. The VMI Model updated itself every day, and based on the outputs it generated, Red Sun Farms' sales coordinators could direct Red Sun Farms when and where to deliver produce, as well as what quantity and type of produce should be delivered.]

[50. Mr. D'Amato pitched JD Global's VMI Model to Aldi, and Aldi agreed to let JD Global mange Aldi's inventory using the model. JD Global tweaked the VMI Model over the next six years.]

[51. Mr. D'Amato trained the Red Sun Farms sales representatives and coordinators JD Global worked with on how to utilize the VMI Model and input the correct data points.]

[52. Utilizing the VMI Model, JD Global was able to fill Aldi purchase orders at a rate well above the service levels Aldi received from its other suppliers. Red Sun Farms also used the VMI Model for predictive ordering for Walmart, even though Walmart managed its own inventory.]

[53. Because the VMI Model allowed Red Sun Farms to service Aldi at rates above that provided by Red Sun Farms' competitors, Aldi awarded Red Sun Farms additional yearly contracts.]

**[Mr. D'Amato Questions Red Sun Farms Business Practices]**

[54. As part of Walmart's arrangement with Red Sun Farms, Walmart required Red Sun Farms to put Product Traceability Initiative ("PTI") labels on all crates of produce that Red Sun Farms sold to Walmart.]

[55. PTI labels are used, among other things, to track where produce originated and establish a clear supply chain for given produce.]

[56. In or around 2017 or 2018, Walmart began requiring that Red Sun Farms require that a pack date be included on its PTI labels. The pack date refers to the date that the produce in question was packaged for retail sale.]

[57. After Walmart implemented this requirement, Ernesto Sanabria, Red Sun Farms' Director of Operations, contacted Mr. D'Amato to discuss the appropriate pack date for Red Sun Farms' produce.]

[58. During his discussion with Mr. Sanabria, Mr. D'Amato stated that the PTI label date should reflect the date that Red Sun Farms harvested and processed its produce. Mr. Sanabria replied that Mr. Visconti did not want to list that date because Walmart would take issue with the length of time between certain produce being shipped from Mexico and arriving at Walmart's warehouse, and would potentially reject produce on arrival for being out of specification for age.]

[59. Mr. D'Amato responded that accurate information should be provided on the label so as to not mislead the customer.]

[60. Later in 2019, during a meeting with Walmart at the Agricola El Rosal growing facility Red Sun Farms maintains in Michoacan, Mexico, Mr. D'Amato toured the packing line and warehouse with representatives from Walmart and Red Sun Farms. Mr. Visconti was present during this tour.]

[61. During the tour, the Walmart food safety representative inquired why the PTI labels on the produce crates at the facility did not have a pack date. Mr. D'Amato referred the Walmart employee's question to Mr. Visconti, who replied that he would look into it.]

[62. After the tour that same day, Mr. Visconti informed Mr. D'Amato that pack dates were not added to Red Sun Farms PTI labels for produce processed at the Agricola facility until that produce was ready to be shipped from Red Sun Farms' warehouse in Pharr, Texas. The pack date for the produce was then made to be the date the produce was shipped from the Pharr facility.]

[63. Mr. D'Amato believed this practice defrauded Walmart, and told Mr. Visconti that the pack date should reflect when produce was processed at Red Sun Farms' growing operations, not when it was ready to be shipped. Mr. D'Amato asked Mr. Visconti to address this issue immediately. Mr. Visconti did not say anything in response; he appeared angry and walked away.]

[64. Beginning in December 2020, Red Sun Farms began downgrading the produce supply sent to Aldi and Walmart such that it was no longer satisfying Aldi's and Walmart's purchase orders to acceptable customer expectations. Mr. D'Amato warned Red Sun Farms that it would lose business if it did not maintain Aldi's and Walmart's expected service levels, and asked for assistance, on multiple occasions, with fulfilling Aldi's and Walmart's purchase orders.]

[65. Despite, this, Red Sun Farms did nothing to raise the service levels for Aldi or Walmart. Eventually, Aldi awarded certain business for summer 2021 and winter 2022 to other suppliers, resulting in a loss of sales to Red Sun Farms and sales commissions to JD Global. Walmart also removed several items from Red Sun Farms' supply contract for 2021.]

[66. In addition, Mr. D'Amato learned that Red Sun Farms had been routinely supplying Aldi and Walmart with produce from outside vendors to satisfy Aldi's and Walmart's produce demand. This violated Red Sun Farms' supply agreements with Aldi and Walmart—which

required Red Sun Farms to supply Aldi and Walmart with only Red Sun Farms-gown products, save for exceptions such as when those retailers' increased their demand due to a sale offering. When Mr. D'Amato raised this issue with Mr. Visconti and Mr. Paivarinta and questioned the origin of the produce Red Sun Farms was sending to Aldi and Walmart, he received no reply.]

**[Mr. D'Amato Reports the Hostile Work Environment a Red Sun Farms Executive Created on Virtual Sales Calls]**

[67. In early 2020, Red Sun Farms began requiring its sales personnel to participate in extended virtual sales calls on MS Teams run by Mr. Paivarinta, who serves as Director of Sales for North America. The stated purpose of the calls, in addition to discussing items of business, was to foster relationships amongst employees who were now isolated at home as a result of the COVID-19 pandemic.]

[68. JD Global remained an independent contractor of Red Sun Farms and thus Mr. D'Amato had no obligation to attend company meetings as this was never negotiated as part of any agreement between Red Sun Farms and JD Global. Nor had Mr. D'Amato ever reported to Mr. Paivarinta. Nonetheless, as a showing of good faith, Mr. D'Amato participated in Mr. Paivarinta's sales calls on behalf of JD Global.]

[69. The majority of the participants on the sales call, except for Mr. D'Amato, were hired by Mr. Paivarinta and reported directly to him. Mr. Paivarinta abused this position of power over those sales employees. During sales calls, Mr. Paivarinta repeatedly used sexual profanity and made other vulgar comments that Mr. D'Amato found offensive.]

[70. Mr. Paivarinta also bullied and badgered the other call participants. Mr. Paivarinta would specifically single out Mark Wehby, a Red Sun Farms procurement manager, for verbal abuse, making fun of Mr. Wehby's intellect and the way he pronounced words. Mr. Paivarinta

also made fun of other sales employees, such as Ray Mason and Tom Coufel for their weight and supposed drinking, and Rob Jackson and Mr. D'Amato for being bald. Mr. Paivarinta also singled Kyle Moynaham out for abuse, making fun of his marriage and him being vegan.]

[71. Mr. Paivarinta also generally dismissed what younger sales staff had to say during the sales calls because they supposedly lacked experience. Kevin Pedriera, as the most junior sales person on the calls, received the brunt of the abuse Mr. Paivarinta directed towards the junior sales staff.]

[72. Mr. D'Amato believed that Mr. Paivarinta's conduct crossed the line for appropriate workplace behavior in violation of anti-discrimination laws, and also violated Red Sun Farms' Code of Conduct. On the few occasions when Red Sun Farms' management attended the calls, Mr. Paivarinta conducted himself differently by "cleaning up" his act. When, however, it was the core sales team without management, Mr. Paivarinta reverted back to his offensive conduct.]

[73. Mr. D'Amato felt disgusted by Mr. Paivarinta's conduct on the sales calls and distressed to witness the abuse his colleagues suffered, and felt uncomfortable participating in Mr. Paivarinta's sales calls.]

[74. Because of Mr. Paivarinta's conduct, as of February 10, 2021, Mr. D'Amato stopped attending the sales calls and instead relied on briefings from the sales coordinators, Nicole Solis, Allison Gray, and Mr. Pedriera, that he worked closely with at Red Sun Farms and who regularly participated in those calls. Ms. Solis, Ms. Gray, and Mr. Pedriera were the sales coordinators for Red Sun Farms' Aldi and Walmart accounts, and would answer Mr. Paivarinta's questions about those customers. If they were ever unable to do so, they would bring in Mr. D'Amato. Ms. Solis, Ms. Gray, and Mr. Pedriera also provided Mr. D'Amato with daily recaps of the sales calls.]

[75. Mr. D'Amato subsequently had conversations with other sales call participants about the way Mr. Paivarinta handled the sales calls. They shared Mr. D'Amato's opinion that Mr. Paivarinta's conduct crossed the line, and expressed that they did not like the way Mr. Paivarinta treated them.]

[76. Mr. Paivarinta, however, demanded that Mr. D'Amato resume attending his sales calls.]

[77. On February 16, 2021, Mr. D'Amato had a conversation with Mr. Visconti about Mr. Paivarinta's conduct and the impact it had on Mr. D'Amato and the virtual workplace in general, as well as the reasons Mr. D'Amato was relying on briefings instead of personally attending Mr. Paivarinta's sales calls.]

[78. Mr. D'Amato also expressed concerns that the increased friction between himself and Mr. Paivarinta could impact JD Global's employment with Red Sun Farms. Mr. Paivarinta had previously gotten into a dispute with a former Red Sun Farms Sales Director, Ugo Dicarlo, after Mr. Dicarlco complained about the way Mr. Paivarinta treated him. Mr. Paivarinta's interactions with Mr. Dicarlo reached the point where Mr. Dicarlo refused to go into the office. The end result was that Red Sun Farms terminated Mr. Dicarlo. Mr. D'Amato did not want the same thing to happen to JD Global.]

[79. During Mr. D'Amato's call with Mr. Visconti, Mr. Visconti did not promise to take any action to correct or address the issues Mr. D'Amato raised about Mr. Paivarinta's conduct, and attributed Mr. Paivarinta's actions to the way Mr. Paivarinta generally conducted himself. Instead, the parties discussed Mr. D'Amato being excused from the calls and only being added in if his specific input was needed on sales items.]

[80. The sales team subsequently dialed Mr. D'Amato into sales calls in this manner several times, including on February 17 and March 3, 2021. Mr. D'Amato otherwise relied on briefings and made independent inquiries of other Red Sun Farms employees to inform himself about the company's supply chain, sales, and distribution needs.]

[81. On March 26, 2021, Mr. Paivarinta sent Mr. D'Amato an email demanding that he permanently rejoin the sales calls.]

[82. Later that same day, Mr. D'Amato called company President, Mr. DiMenna, to reiterate his concerns about Mr. Paivarinta's conduct on the sales call, the impact it had on him personally, and the potential adverse consequences his dispute with Mr. Paivarinta might have on JD Global's employment with Red Sun Farms. Mr. D'Amato asked Mr. DiMenna to intervene with Mr. Visconti or Mr. Paivarinta to correct the issue, and told Mr. DiMenna that he was no longer attending the calls because it was affecting him emotionally.]

[83. Like Mr. Visconti, Mr. DiMenna attributed Mr. Paivarinta's conduct to his personality, and told Mr. D'Amato not to worry.]

**[Mr. D'Amato Raises Concerns About Payments Red Sun Farms Owed to Aldi]**

[84. In May 2021, Mr. D'Amato conducted a historical review of Red Sun Farms' sales to Aldi.]

[85. Based on his analysis, Mr. D'Amato realized that Red Sun Farms had increased the prices Aldi paid Red Sun Farms by 9.5% from June 2019 to August 4, 2019 to help offset a duty the Federal Government had imposed on the import of tomatoes from Mexico.]

[86. At Red Sun Farms' request, Mr. D'Amato had persuaded Aldi to increase the price it paid Red Sun Farms for tomatoes on the basis of the strong relationship JD Global developed with Aldi and the value that the VMI Model gave to Aldi. Red Sun Farms, however did not

~~notify Mr. D'Amato when the Suspension Agreement on the importation of tomatoes from Mexico had been settled and Red Sun Farms was reimbursed for the duty payments it made. Red Sun Farms did not reimburse Aldi for any of the increased payments it made to offset that duty, resulting in Aldi overpaying Red Sun Farms by hundreds of thousands of dollars.~~]

[~~87. When Mr. D'Amato realized this discrepancy, he asked around the industry and learned that other suppliers had reimbursed their customers. Mr. D'Amato then asked Mr. Visconti and Steve Macchio, Red Sun Farms' Chief Financial Officer, to reimburse Aldi for the overpayment. They did not respond favorably to the request.~~]

**[~~Red Sun Farms Unlawfully Terminates JD Global's Employment~~]**

[~~88. On information and belief, in 2021, Aldi notified Red Sun Farms that it would resume managing its own inventory instead of relying on JD Global's VMI Model.~~]

[~~89. On information and belief, Red Sun Farms determined that Aldi's decision meant that Red Sun Farms no longer needed JD Global to facilitate that customer relationship.~~]

[~~90. On July 27, 2021, Mr. D'Amato received notice from Red Sun Farms' counsel that Red Sun Farms was immediately terminating JD Global's employment, purportedly for cause.~~]

[~~91. Later that day, Mr. D'Amato sent Red Sun Farms a notice demanding that it immediately delete all excel and other proprietary files JD Global provided to the company while employed as an independent contractor, which Red Sun Farms continued to host on MS Teams.~~]

**[~~COUNT I~~]**

**[~~(Breach of Contract – Against Red Sun Farms)~~]**

[~~92. Plaintiffs repeat, reallege, and incorporate by reference all of the allegations in the preceding paragraphs as if set forth here at length.~~]

[93. The Commission Agreement is a valid, enforceable, and binding contract supported by the mutual exchange of promises between Red Sun Farms and JD Global, in which Red Sun Farms has continuing obligations.]

[94. The Commission Agreement was formed by an exchange of oral promises on February 28, 2015 between Red Sun Farms executives Messrs. DiMenna and Visconti, and Mr. D'Amato, on the other hand. Per the agreement, Red Sun Farms promised JD Global lifetime employment (measured by Mr. D'Amato's desire to continue working with the company), commission payments on sales to new retail customers generated by JD Global, and protection from termination without cause. JD Global promised to devote all its efforts to obtaining new large retail clients for Red Sun Farms.]

[95. JD Global honored and performed its promises under the Commission Agreement. JD Global obtained new major retail accounts for Red Sun Farms.]

[96. JD Global also made various concessions in exchange for the security of lifetime employment that the Commission Agreement offered.]

[97. In addition to agreeing to a below-market commission rate, JD Global forewent payment under the Commission Agreement from January 2016 to June 2016, to invest in the structure of that deal.]

[98. During JD Global's dealings with Reds Sun Farms, Red Sun Farms executives twice ratified the Commission Agreement by further verbal acceptances.]

[99. On July 27, 2021, Red Sun Farms purported to terminate JD Global in violation of the Commission Agreement.]

[~~100. Red Sun Farms' grounds for terminating JD Global were pretextual. Red Sun Farms did not have actual cause to terminate JD Global, and JD Global was ready, willing, and able to work for Red Sun Farms.~~]

[~~101. As a result of Red Sun Farms' breach of the Commission Agreement, JD Global was damaged in an amount to be proven at trial.~~]

**[~~COUNT II~~]**

**[~~(Breach of the Implied Covenant of Good Faith and Fair Dealing – Against Red Sun Farms)~~]**

[~~102. Plaintiffs repeat, reallege, and incorporate by reference all of the allegations in the preceding paragraphs as if set forth here at length.~~]

[~~103. The Commission Agreement is a valid, enforceable, and binding contract supported by the mutual exchange of promises between Red Sun Farms and JD Global, in which Red Sun Farms has continuing obligations.~~]

[~~104. JD Global honored and performed its promises under the Commission Agreement.~~]

[~~105. The Commission Agreement contains~~]

J2A. On information and belief, Walmart Inc., formerly Wal-Mart Stores, Inc., is incorporated in Delaware and has its principal place of business in Bentonville, Arkansas.

J2B. On information and belief, ALDI Inc. is incorporated in Illinois and has its principal place of business in Batavia, Illinois. These allegations remain subject to confirmation of the exact proposed entities and the legally relevant dates. They do not establish the citizenship of the individual buyers or the proposed general-partner defendant, complete diversity, attribution of a particular act to the named corporation, personal jurisdiction or service.

J3. James alleges that a substantial part of the negotiations, his work and the claimed injury occurred in New Jersey, where he operated, and invokes 28 U.S.C. § 1391(b). The defendants who filed D.E.71 admitted that Jem D International Partners, LP is registered and/or authorized to do business in New Jersey (paragraph 11) and that Jim DiMenna met James in New Jersey on or about November 13, 2014 (paragraph 15). Those admissions do not establish venue or personal jurisdiction as to any proposed new defendant, which depends on defendant-specific allegations of the kind described in J4.

J4. The proposed forum-contact basis must be stated for each defendant, including the particular purposeful contacts and their relation to the asserted claim. James does not rely on the Sales Representatives' Rights Act as an automatic personal-jurisdiction grant or on conduct of one affiliate as the conduct of all. The unresolved party-specific contacts and service questions concerning jurisdiction must be addressed before a filing version is selected.

J4A. James's Red Sun Farms-branded business card identified him as Jim D'Amato, Senior Account Manager, and listed his business contact address as 233 Rock Road #101, Glen Rock, New Jersey 07452, with jdamato@redsunfarms.com. The Rock Road address was his mailbox location. He worked from his greenhouse office at 20 Berry Place, Glen Rock, New Jersey. The branding and title do not by themselves identify the legal entity represented.

J4B. James recalls handing his business card to everyone present at a meeting at Walmart's office in Doral, Florida, including Don Fox and Braulio Valdes, with whom he dealt at Walmart. He also recalls first handing his card to Bill Duesenberg, with whom he dealt at ALDI, at ALDI headquarters after Lisa Netzel departed. These deliveries are alleged from James's personal recollection, not independently verified acknowledgments. No exact delivery date is alleged here.

J4C. To the best of his recollection, from 2015 through 2021, James participated in all video calls, including Microsoft Teams and Zoom calls, from his greenhouse office in New Jersey. [REDACTED] His account of his location rests on his qualified recollection, not location data in those records. These facts do not establish attendance at every invited meeting, another participant's knowledge of his location, or each defendant's suit-related New Jersey contacts by themselves. Declaration ¶¶4D–4G; [REDACTED]

J4D. [REDACTED] These records are offered as particular retailer contacts, not proof of attendance at each meeting, completed address correction, Fox's or Valdes's receipt of the completed contact form, knowledge of James's physical location, or wrongful purpose. [REDACTED]

**Common allegations**

1. James D'Amato personally participated in the negotiations and performed the customer-development and operational work described below. He alleges that the original undertaking included protections concerning his own working career and the conditions on which he would commit his efforts. He alleges that the career-long commitment without a fixed term and the promised business-divorce buyout were undertakings to him personally, distinct from the commission payments made to JDGS. He seeks enforcement of his own rights, if established, not a transfer of JD Global Sales, Inc.'s rights based on his ownership or performance.

2. James used JDGS to receive and account for compensation. He acknowledges that the written agreements named JDGS, the payments went to JDGS, and D.E. 38 principally allocated the compensation and business claims to JDGS. He does not recall JDGS being named in the oral

discussions at issue. The personal undertaking he alleges must be evaluated alongside, not in place of, those corporate documents and earlier allegations.

3. James negotiated with Jim DiMenna and Carlos Visconti in their roles with the business known as Red Sun Farms. He has not seen an email domain or email signature identifying either man as communicating on behalf of Jem D International (Michigan) Inc. [REDACTED] James distinguishes that written designation from what was said to him during the oral negotiations.

3A. James understood Carlos Visconti to be authorized to resolve the negotiations conducted under the Red Sun Farms name, including the duration and exit terms James discussed with him. Carlos presented proposed terms, discussed James's objections and arranged payment. [REDACTED] James's account of Carlos's oral acceptance is stated separately. [REDACTED]

4. James understood that any agreement he accepted needed to be with Jem D International Partners LP, which he understood to be the entity contracting with each customer. He recalls telling Jim DiMenna during the later commission-agreement negotiations that he required Partners LP to be included for that reason. He recalls DiMenna responding that the Michigan entity would always survive but agreeing to include Partners LP. [REDACTED] He did not request its inclusion in the initial 2014 bridge agreement. [REDACTED]

4A. [REDACTED] These are different entities. [REDACTED] James offers this copy as evidence of the proposed written terms, not as an executed counterpart. This description is limited to that copy and does not resolve whether another signed counterpart exists or whether the parties reached the oral agreement James describes and then performed under it.

5. James recalls meeting with Jim DiMenna and Carlos Visconti on February 28, 2015 and explaining that his commitment depended on a career-long relationship, protection against

termination without the discussed misconduct basis, and a buyout if they wanted him to leave. He recalls using marriage-and-divorce language, requesting confirming handshakes twice, and both men agreeing. Embezzlement was discussed as an example of misconduct. This describes the substance he recalls, not a verbatim transcript or the formation of a legal partnership.

6. Following that meeting, James's primary goal was securing large retail customers for RSF. His work also included onboarding, product packaging, retail-ready box design, customer pricing, product-development coordination, supplier communications, and assisting procurement of items RSF did not grow. These are illustrative, not exhaustive, activities. They are not pleaded as proof that James alone performed every business function or personally owned every resulting receivable.

7. [REDACTED] James performed this work with other personnel; a proposal is not alleged to have been completed merely because he worked on it.

7A. James recalls bringing his Eurofresh experience and prior relationship with Kees Rodenburg to the Aldi Roma grab-and-go project. He describes developing product and packaging proposals, coordinating suppliers and RSF personnel, addressing sizing and shelf-life requirements, and managing the work needed to launch and support customer programs. He also states that he managed RSF's Aldi PTP tender and contract submissions from 2015 until termination, gathering required information from departments, verifying it, compiling it and completing submissions even when limited prefill was available. These examples distinguish development work, customer awards, proposals and completed activity. The later Temkin defect investigation and the $38,000 company recovery James recalls are one part of the packaging history, not its measure of value or his personal damages. [REDACTED] These examples do not

allege that every activity fell outside JDGS's compensated scope or that performing the work made every resulting business right James's personal property.

7B. [REDACTED]

7C. James identifies the mini-sweet-pepper program as another service contribution. He asked Carlos in March 2016 to develop RSF-grown supply for ALDI and recalls their telling Lisa Netzel that RSF would grow the item. [REDACTED]

7D. James's work also included addressing Aldi freight losses and developing pricing adjustments. He recalls initiating that effort after Juan Lund showed him a substantial loss, without an RSF request, and negotiating with Aldi's Grant Buma a plan to recover it over the next several quarters. [REDACTED] The internal exchange is not treated as Grant's acceptance or proof of realized recovery. [REDACTED] James relies on this work as a service contribution; no audited recovery, profit or personal-loss amount is alleged here.

8. [REDACTED] James recalls again discussing duration and exit protection with Carlos Visconti on April 27, 2016. His willingness to accept reduced compensation was tied to those protections. [REDACTED]

8A. [REDACTED] This is an approximate average, not a fixed per-case rate. [REDACTED]

9. [REDACTED] James DiMenna's filed declaration likewise acknowledges that James's May 19, 2016 proposal "entirely eliminated, by strike-out" the proposed provision allowing termination without cause on six months' written notice. D.E.17-2 ¶6, pp.4–5 (PageID131–132). DiMenna separately disputes that agreement was reached on James's proposed duration terms. Id. ¶¶6–7. The sequence supports James's rejection of that termination right, not the proposition

that all management proposals were accepted or that management necessarily accepted his replacement language.

10. [REDACTED] James identifies it as his closest written account at that stage, not a complete record of all oral undertakings. [REDACTED]

10A. [REDACTED] James relies on his separately alleged personal undertaking, not on omission of these corporate terms.

10B. James's position is that the 0.85% commission compensated JDGS for the defined sales and marketing services, not for every service he ultimately performed for RSF. [REDACTED] James states that he also performed day-to-day operational work and other services beyond JDGS's agreed scope. He distinguishes that additional work from the services covered by the commission and relies on the specific services described below to explain the broader contributions covered by the personal buyout undertaking he recalls. [REDACTED]

10C. James relies on these examples to explain the work and contributions he says the personal exit undertaking described in paragraph 11 was intended to protect. The examples preceding May 27, 2016 describe the relationship and services already being discussed; the later examples describe his continuing performance. His asserted personal right rests on the undertaking he recalls, including Carlos Visconti's alleged agreement during that call, not merely on the fact that James personally performed services. [REDACTED] James does not seek to recover JDGS's commissions again in his own name or to treat all services, customer revenue, or enterprise value as his personal property.

11. James recalls a May 27, 2016 telephone conversation with Carlos Visconti lasting approximately thirty minutes. A few minutes into the call, James recalls sending Carlos a text setting out his position and asking him to read it. The personal buyout commitment James recalls

came afterward in the same call. James recalls Carlos agreeing to his position and to a personal buyout if RSF terminated him, covering value attributable to his broader services and attributable enterprise value through settlement of the business divorce, in exchange for accepting the lower 0.85% rate. He recalls Carlos saying, in substance, that he was not worried about those terms because he did not expect to terminate James, while declining to put the buyout undertaking in writing. [REDACTED] No dollar amount or calculation formula was fixed. Lidl is James's present example of service scope, not a customer he says he necessarily named during that call.

11A. James alleges that the personal exit undertaking covered the value attributable to his broader services and attributable enterprise value, including retailer-development work, products, packaging and related programs and their HALO and product-synergy benefits. He attributes part of RSF's acquisition of Lidl business and benefits across other retailers to that work. This is an asserted contribution and scope of the alleged buyout, not an allegation that all RSF revenue or enterprise value belongs to him, a fixed buyout formula, or a claim that every later sale resulted solely from his services. No Lidl revenue total is adopted here.

12. [REDACTED] James recalls sending it during the call, before the oral acceptance described above. He relies on Carlos's recalled oral response, not on the text itself as Carlos's written acceptance. [REDACTED]

13. [REDACTED] James says he accepted that payment in reliance on the personal buyout undertaking he recalls Carlos agreeing to on May 27 and continued working on that basis. Defendants instead attribute the payment to modification of the earlier corporate agreement. The payment establishes corporate payment, not conclusive adoption of every disputed term or a personal payee.

13A. [REDACTED] This later correction must not be described as still wholly unpaid merely because the original deduction was disputed. [REDACTED] The record does not independently establish receiving-bank settlement, a personal payee, acceptance of every disputed duration or buyout term, or satisfaction of the separately alleged exit undertaking. Any selected personal loss theory must identify its own supported injury and account for the corporate payments without duplicating the correction component.

14. [REDACTED] James explains that his purpose in the later written exchanges was to record and protect the verbal agreements he describes, not to abandon them. Although he accepted some drafting changes, he continued to object to provisions that, in his view, did not reflect those agreements. [REDACTED] Continued negotiations and proposed call scheduling are acknowledged; they are not pleaded as a completed replacement or a record of an unremembered call.

15. The March 29, 2018 company letter expressly disputed the indefinite or nonterminable arrangement and characterized the compensation as an interim modification. James disputes that position. [REDACTED]

15A. [REDACTED] The notice described James's asserted role; it did not state a commission rate or buyout formula or expressly name JDGS as the agreement's holder. James's RSF address and signature also support the competing interpretation that he was describing his supplier-side responsibilities.

15B. [REDACTED] James's conditions were submitted for approval, not established as an executed amendment. The internal buyer attribution is not direct buyer testimony, and a change in contact is not equated with an immediate end to compensation.

15C. [REDACTED] James does not allege that the writing expressly recites every 2016 term or that every recipient accepted it. This is his stated interpretation, not an independent finding of assent or agency authority.

16. James alleges that the lower commission rate, duration and exit protections, and division of services were interrelated parts of the arrangement he describes. He understood that RSF would provide adequate day-to-day sales and administrative support, allowing his RSF role to remain part-time and leaving time for other projects. He alleges that the demands of his actual RSF work restricted that capacity and that, in reliance on the arrangement, he declined some opportunities and limited participation in others. He does not allege that he abandoned all outside activity.

16A. [REDACTED] The drafts' wording is described; no draft is pleaded as an executed agreement, and legal effect is reserved.

He recalls declining to pursue discussions with Jason Bucko about Mastronardi during approximately 2016–2018 because he was committed long term to RSF. Separately, he recalls declining later verbal offers conveyed by Ken Green and Dino Dilaubo to work with Westmoreland because of his commitment to RSF; those approaches were distinct from an earlier interview before his RSF work that did not result in a position. [REDACTED]

[REDACTED] His account of that connection is based on his recollection. SunFed belongs to the earlier recruitment and employment history, not an opportunity rejected because of a later promise. Individual career decisions and JDGS's business relationships remain distinct, and no guaranteed outside earnings or fixed loss amount is alleged here.

17. [REDACTED] His account of Carlos's agreement to that protection rests on the May 27, 2016 conversation he recalls, not on Carlos's failure to dispute the later email. [REDACTED]

17E. The recurring meetings James regularly attended were the twice-weekly Commodity Planning Meetings (CPM); the March 2021 dispute concerned the daily 9:30 a.m. and 4:00 p.m. sales calls. [REDACTED]

17A. [REDACTED]

17B. [REDACTED] This documents direct participation without supplying the full terms of the call, proving acceptance of the redline or resolving whether James was acting personally, for JDGS, or in both capacities. [REDACTED]

17C. [REDACTED] This was development work and a disputed opportunity, not an established award or an admission of bad faith.

17D. [REDACTED] It is not rewritten here as a statement that every lost sale belonged to him personally. The reports and competing explanations do not by themselves establish each actual loss, its cause or its amount.

18. James received the July 27, 2021 immediate termination communication. The later September 15 communication reported commissions through August 26 and payment went to JDGS. James says he did not execute a release or agree that this payment settled all claims, but did not directly challenge that calculation at the time. He seeks no duplicative recovery for sums already paid. He alleges that no separate payment he understood as the promised buyout was made.

18A. The termination carrier was sent directly to James. The attached letter addressed him by name and identified JDGS in the address block; its reference line named both. It said that "your contract and relationship" was terminated and directed him to return equipment and refrain from specified contacts. At the same time, it described the agreement and compensation as JDGS's, referred to equipment received during JDGS's relationship with RSF, and expressly

rejected the July 2, 2021 proposed revisions. Its reference line named Michigan, while its opening identified Partners LP as counsel's client. James relies on the personally directed language as context for his asserted undertaking and injury, not as an admission transferring every corporate payment or guarantee right to him. The July2 acknowledgment of receipt of his redline is not pleaded as acceptance.

19. The personal-right account differs from the earlier corporate pleadings. D.E.1 paragraph 22 expressly described buying out JD Global for the agreement's duration; D.E.38 likewise pleaded corporate buyout rights. Those passages are not recast as an express personal enterprise-value promise. James does not rewrite that history, allege that he first learned his own conversations in 2026, or treat personal participation as conclusive ownership. Which undertaking was made, to whom, by which principal and with which enforcement rights remains central to the proposed alternatives. Any recovery must distinguish his loss from JDGS's and credit compensation already paid.

19A. [REDACTED] James does not allege that these sources alone prove buyer knowledge of all compensation terms or a single scheme causing all later losses. Any selected theory must identify the particular undertaking, actor and nonduplicative injury asserted by the claimant bringing it.

19B. James alleges that his broader retailer-development work included Ahold and other retailer relationships for which JDGS did not receive compensation. The earlier complaint, D.E.38¶¶107–109, identifies Ahold, Fresh Market and John Cerasulo and alleges the onboarding, removal and later-sales history; those allegations are not treated as established merely because filed. D.E.71¶¶107–108 denies the Ahold/onboarding allegations, while ¶109 admits that JDGS did not receive compensation for sales to Fresh Market or John Cerasulo, disputes the

Commission Agreement and otherwise leaves allegations to proof. That limited admission does not establish an amount owed, James's personal entitlement, responsibility for every sale or the scope of the alleged personal buyout. Direct unpaid-account claims, indirect HALO benefits and the personal exit claim require separate allocation and credit for payments already made.

19C. The present request for compensation records and reconciliation covers January 1, 2016 through termination, by customer and period. If a continuing post-termination commission obligation to James or JDGS is established, James would seek updated records covering the same categories through the settlement date to calculate the amounts due to the proper claimant. That later accounting period is distinct from the duration of any continuing right and does not assume that a perpetual obligation has already been established. It distinguishes customers whose sales generated payments to JDGS from additional customers for which an entitlement to compensation is asserted and must be established. The relevant comparison includes RSF's FOB and freight-pricing instructions, quoted and accepted prices, actual invoiced revenue and adjustments, collections where required by the compensation terms, transportation costs actually paid, deductions used in the commission base, and commissions calculated and paid. A budget-to-actual difference alone is not alleged to be a breach; the governing compensation terms and permitted deductions must be identified. Previously paid commissions, expense payments and correction credits remain credited. This scope does not assert a new standalone accounting count, a commission on every RSF sale, an entitlement to every freight margin, or transfer JDGS's receivables to James.

19D. [REDACTED] The specific opportunity, its conditions, RSF's decisions, the resulting loss and the proper claimant require identification from the supporting records. The projected retailer sales are not themselves alleged as James's personal damages.

**R01 — Breach of the alleged personal undertaking; intended-beneficiary alternative**

R01.SCOPE. James D'Amato proposes the separately alleged personal career/exit undertaking and intended-beneficiary alternative. JD Global Sales, Inc.'s corporate contract and commission rights remain for JD Global through licensed counsel, as stated in P2. Proposed defendants: Jem D International (Michigan) Inc. and Jem D International Partners, LP as alternative principals; JEM-D International Inc. only through the qualifying LP-obligation route in P14. Carlos Visconti and Jim DiMenna are not added as personal guarantors.

20. James incorporates paragraphs 1-19 insofar as they describe the undertaking, negotiation, performance and termination. He alleges, in the alternative, that Michigan or the LP, through the identified representatives acting for the particular principal, undertook the personal duration and exit protections described above in exchange for his commitment and performance. [REDACTED] James does not claim to remember Michigan being identified as the oral promisor. Neither the LP's business role nor the proposed, unsigned guaranty by itself proves its assent to the disputed terms. Whether one, both, or neither undertook the alleged obligation depends on the transaction-specific facts, not the Red Sun Farms label. JEM-D International Inc. is included only on the derivative general-partner route in P14. No personal guaranty by an officer or liability of every affiliate is alleged through this paragraph.

21. James performed the described services and continued performing following the reduced-compensation negotiations. He alleges that he expressly conditioned his acceptance of the lower 0.85% commission rate on the buyout protections he described to Carlos. He recalls Carlos agreeing to that undertaking during their May 27, 2016 call. James also recalls an agreement that commissions would remain payable after termination until settlement of the business divorce. He alleges that the July 27, 2021 termination without honoring the agreed exit

protection breached his own enforceable right. He distinguishes the alleged continuing-commission obligation from the buyout accounting and valuation, without seeking duplicate recovery of the same loss or treating JDGS's commission receivables as automatically his own. [REDACTED] His claim does not depend on assuming every unsigned proposal became a contract.

22. Alternatively, if the undertaking was made with JDGS, James alleges that the working-career and exit provisions were intended for his personal enforcement rather than merely incidental to his shareholding. He seeks only the protection and nonduplicative loss attributable to that intended benefit. The guaranty and corporate commission receivable are not transferred by this allegation.

22C. [Corporate claim identified for directions — not asserted in this pleading (see P2)] Without transferring any corporate right to Mr. D'Amato, this paragraph identifies JD Global Sales, Inc.'s claim for breach of the Commission Agreement to which it was a party. That claim is that Red Sun Farms breached that agreement by terminating the arrangement without cause and depriving JD Global of the commissions due to it, causing JD Global's own damages. This paragraph describes the allegations pleaded at D.E. 38 ¶¶92–101 and the relief at D.E. 38 Prayer A. It is identified as the corporate counterpart to the personal undertaking in paragraphs 20–22; recovery is limited to JD Global's own nonduplicative loss, with credit for amounts already paid and no double recovery as between JD Global and Mr. D'Amato. Defendant: Red Sun Farms, as named in D.E. 38.

**R02 — Implied covenant**

R02.SCOPE. James D'Amato proceeds only on his own enforceable contractual right. JD Global Sales, Inc.'s corporate contractual right remains for JD Global through licensed counsel,

as stated in P2. Proposed defendants: Jem D International (Michigan) Inc. and Jem D International Partners, LP as alternative obligors, and JEM-D International Inc. only through P14's limited general-partner route. Each claimant's benefit and loss must remain separate, without duplicate recovery.

23. [REDACTED] He does not characterize disputed motive as an admission.

24. James alleges that this conduct frustrated the agreed benefit during performance, separately from the ultimate refusal to honor express exit protection. He seeks the legally available, nonduplicative loss to his own contractual interest. The claim does not create a duration term contrary to the contract established or convert ordinary business disagreement into bad faith by itself.

24C. [Corporate claim identified for directions — not asserted in this pleading (see P2)] This paragraph identifies JD Global Sales, Inc.'s claim that the Commission Agreement contained an implied covenant of good faith and fair dealing [that Red Sun Farms was required to adhere to in performing its contractual duties. Specifically, the Commission Agreement contains an implied covenant by Red Sun Farms that Red Sun Farms would not take any action to deprive] which Red Sun Farms breached, depriving JD Global of the benefit of its bargain [or preclude JD Global from realizing the intended purpose of the Commission Agreement.] and causing JD Global's own damages. This paragraph describes the allegations of D.E. 38 ¶¶102–111 and Prayer B, identified as the corporate counterpart to paragraphs 23–24; recovery limited to JD Global's own nonduplicative loss; no double recovery. Defendant: Red Sun Farms.

[106. Red Sun Farms breached the covenant of good faith and fair dealing by refusing, in bad faith, and with malicious intent to harm JD Global, to memorialize the Commission Agreement pursuant to the multiple oral agreements Red Sun Farms' executives reached with

~~Mr. D'Amato about the termination protections and lifetime duration afforded to JD Global under the Commission Agreement.~~]

[~~107. Red Sun Farms also breached the covenant of good faith and fair dealing by refusing to compensate JD Global for sales Red Sun Farms made to Ahold, Fresh Market, and John Cerasulo—clients that were first onboarded by JD Global and that generated tens of millions of dollars in revenues for the company. JD Global was the point of contact that obtained vendor numbers for each of those companies, which allowed Red Sun Farms to quote those companies prices on produce.~~]

[~~108. Specifically, in July 2015, Red Sun Farms informed JD Global that it was removing JD Global from the Ahold account because of a supposed sales realignment, and assigned another account manager to handle the account.~~]

[~~109. As for Fresh Market and John Cerasulo, after JD Global obtained vendor numbers for those clients, Red Sun Farms and the companies took a break from discussing their potential supply relationship. Red Sun Farms later independently resumed talks with those companies without JD Global, and eventually both Fresh Market and John Cerasulo began buying produce from~~]

**R03 — Promissory estoppel, alternatively**

R03.SCOPE. James D'Amato proposes his own promise-induced reliance; JD Global Sales, Inc.'s distinct business reliance remains for JD Global through licensed counsel, as stated in P2. Proposed defendants: Jem D International (Michigan) Inc. and Jem D International Partners, LP as alternative principals, and JEM-D International Inc. only through P14's qualifying LP-obligation route. Officer participation does not itself allege a personal promise by an officer to pay.

25. If the alleged undertaking is not enforceable as a contract, James alleges that the identified representatives, acting for Michigan or the LP in the alternative as supported by the particular transaction, made the particular career-duration and exit promises in paragraphs 5,8 and11 to obtain his personal commitment, expecting reliance. The P14 general-partner route is included only if a qualifying LP obligation is established; it is not a separate invented promise by the general partner.

26. James alleges that, in reasonable reliance on the particular promises identified above, he continued his commitment to RSF, declined later opportunities and limited his participation in other ventures as described in paragraph 16, causing substantial personal detriment. Each asserted loss is tied to the promise he says preceded and induced the particular decision. He seeks the legally recoverable loss attributable to his own reliance, without treating a proposed salary, hoped-for business income or the difference between commission rates as an established loss. JDGS's business losses are not automatically his personal losses. Compensation attributable to the same loss must be credited, and he does not seek duplicate recovery. [REDACTED]

26C. [Corporate claim identified for directions — not asserted in this pleading (see P2)] This paragraph identifies JD Global Sales, Inc.'s promissory/equitable estoppel claim: that it reasonably and foreseeably relied to its detriment on Red Sun Farms's promises and is entitled to the economic benefits promised to and withheld from it. This paragraph describes the allegations of D.E. 38 ¶¶112–118 and Prayer C, identified as the corporate counterpart to paragraphs 25–26; recovery limited to JD Global's own nonduplicative loss; no double recovery. Defendant: Red Sun Farms.

## R04 — CEPA conditional candidate

R04.SCOPE. James D'Amato is the only proposed claimant; JD Global Sales, Inc. is not a CEPA claimant. Proposed defendants are Jem D International (Michigan) Inc. and Jem D International Partners, LP only on a supported covered-relationship basis, Carlos Visconti for his own supported control/termination acts, and Jim DiMenna only for his own supported knowledge and decision acts. Harold Paivarinta is not added to this count. The prior dismissal and the specific coverage, protected-report, knowledge and causation requirements in this count remain unresolved; inclusion is conditional, not automatic revival.

R04.1. James asserts this proposed theory on the basis of his own working relationship, not a CEPA right belonging to JDGS. He relies on the actual direction of his work, sustained operational participation and economic relationship described in the common allegations. [REDACTED] The corporate contracting and payment record is not omitted or treated as immaterial.

R04.2. James identifies his own reports and objections separately from management's later internal communications. [REDACTED] That message is not alleged to prove every earlier pleaded concern about sexual remarks, packing dates, duty refunds or product origin. Each proposed protected report must retain its own date, recipient, subject and factual basis; ordinary allocation or compensation disputes are not relabeled as protected activity merely because followed by termination. See accompanying Declaration paragraphs 118–121.

R04.3. Subject to the unresolved legal and source requirements stated in this count, James's proposed claim is that a particular defendant responsible for the protected working relationship took retaliatory action because of a specified report or objection protected by CEPA, causing his own compensable loss. This proposed causal account must address the competing

meeting-participation and business-performance explanations and identify the decisionmaker's knowledge. It does not rest on timing or hostile language alone, and any award must avoid duplication with compensation or other damages awarded on another theory.

**R05 — Federal trade secret conditional candidate**

R05.SCOPE. JD Global Sales, Inc. is the proposed claimant for company-owned secrets, through licensed counsel, as stated in P2. James D'Amato is included only for a separately supported qualifying personal ownership or license interest. Current defendant candidates are Jem D International (Michigan) Inc. and Jem D International Partners, LP, limited to the supported improper act. No officer, buyer or affiliate is included merely because it had access. Final allocation remains held for the identified secret, right-holder, secrecy, permission and challenged acquisition, use or disclosure.

R05.1. [REDACTED] It is not a claim to own vendor-managed inventory generally, ordinary spreadsheet operations, Aldi's pre-existing spreadsheet or customer-supplied data. [REDACTED]

R05.2. The corporate and personal rights are not presumed identical. The filed complaint described development for JDGS; James's July 2021 demand described JDGS property. [REDACTED] This conditional count would assert only the particular claimant's supported ownership or qualifying licensed interest in identified information used for the interstate produce operation, against a defendant whose improper acquisition, disclosure or use is supported.

R05.3. James contests continued use beyond the permission he says accompanied the working relationship. [REDACTED] The theory requires the specific protected component, the limits of permitted access, the challenged defendant's act and resulting injury to be identified

together. Prior authorized team/customer use and any later phase-out or replacement evidence must remain in the analysis.

R05.4-C. [Corporate claim identified for directions — not asserted in this pleading (see P2)] [REDACTED] July 2021 demand describing the files as JD Global property [REDACTED] This paragraph describes the corporate dimension of D.E. 38 Count VIII as a federal trade-secret theory; recovery limited to JD Global's own nonduplicative loss; no double recovery with the personal R05 or with R06/R16. Defendant: Red Sun Farms.

**R06 — New Jersey trade secret conditional candidate**

R06.SCOPE. JD Global Sales, Inc.'s corporate information rights remain for JD Global through licensed counsel, as stated in P2; James D'Amato is included only for separately supported personal rights. Current defendant candidates are Jem D International (Michigan) Inc. and Jem D International Partners, LP, limited to the specifically supported misappropriating actor. The exact information, qualifying right and improper act must be matched separately under this statute; final allocation, timing and displacement remain held.

R06.1. This proposed state-law count concerns the same bounded information and alleged acts identified in R05, but requires its own applicable-law, claimant and statutory analysis. It does not enlarge the secret to all services, all customer information or every file James touched. The claimant seeks relief only for an adequately supported acquisition, disclosure or use that qualifies as misappropriation under the New Jersey statute.

R06.2. Any recovery must address the actual loss or benefit attributable to the alleged misuse without duplicating R05 or overlapping contract, restitution or property recovery. The parties' prior working permission and disputed allocation of rights remain material; neither James's personal authorship nor RSF's custody alone resolves them.

R06.3-C. [Corporate claim identified for directions — not asserted in this pleading (see P2)] This paragraph identifies JD Global Sales, Inc.'s New Jersey Trade Secrets Act claim on the same corporate ownership of the identified information, subject to the Act's definitions, timing and displacement analysis. This paragraph describes the corporate dimension of D.E. 38 Count VIII under state law; recovery limited to JD Global's own nonduplicative loss; no double recovery with R05.4-C or R16.4-C. Defendant: Red Sun Farms.

**R07 — Copyright conditional candidate**

R07.SCOPE. No final claimant or defendant is cleared. The claimant would be James D'Amato OR JD Global Sales, Inc., according to the particular work and supported right; the corporate route requires licensed counsel, as stated in P2. A defendant must be the actual infringing user tied to that work and act, not an all-RSF or buyer-wide designation. The work/version, authorship/transfer, expression, permission, registration/refusal and other work-specific intellectual-property prerequisites remain unresolved.

R07.1. The proposed subject is any specifically identified original expression in the VMI work for which the chosen claimant can establish rights, not the forecasting method, operational ideas, customer facts or formulas as such. The April 28, 2021 Canadian certificate for the titled Vendor Managed Inventory Excel Model names James D'Amato in its owner and author fields. Its accompanying April 27 payment receipt lists JD Global Sales and James D'Amato. These are different fields on different pages, not interchangeable title determinations. James's personal-title position must be reconciled with the July 27, 2021 JDGS-property demand and the corporate positions in D.E.38; neither ownership of equipment or copies nor creation attribution alone resolves ownership of the particular exclusive right.

R07.2. [REDACTED] The proposed copyright subject is only supported original expression within a specifically identified version, not those functional methods as such or every Walmart Tracker component. The Office refused registration on July 13, 2021 and upheld refusal on February 28, 2022 for VMI Model and Vendor Managed Inventory Excel Model, without questioning independent creation for its analysis but finding insufficient protectable expression. That adverse determination must be confronted rather than replaced with a generalized claim to the entire useful system.

R07.3. Counsel's D.E.23-1 declaration reports sending the §411 notice and JDGS complaint on February 22, 2022; the notice names James as applicant while asserting JDGS's rights. D.E.33 records withdrawal without prejudice to seeking amendment, and D.E.38 contains no copyright count. This is a conditional new pleading route, not a currently surviving copyright claim. Section 411(a) provides a potential refusal route when its application, deposit, fee and notice conditions are met; neither the reported historical sending nor Canadian registration alone decides those conditions for the proposed claimant and complaint, U.S.-work classification, validity, timing or available remedies.

R07.4. [REDACTED] These facts supply particular attribution and custody leads, not conclusive infringement. [REDACTED] A supported protected component, claimant's exclusive right, responsible defendant's act, date and disputed permission must be joined. Customer-side VMI sheets, shipping-order changes, retention and a later save are not automatically use or infringement of the asserted workbook.

**R08 — Sales Representatives Rights Act conditional candidate**

R08.SCOPE. JD Global Sales, Inc. is the primary proposed claimant for corporate commissions, through licensed counsel, as stated in P2. James D'Amato's personal alternative

remains only if a separate qualifying personal statutory relationship is supported. Proposed defendants are Jem D International (Michigan) Inc. and Jem D International Partners, LP as qualifying statutory principals; JEM-D International Inc. is not automatically added. Earned unpaid commissions, payment credits and the statutory relationship must be distinguished from a disputed personal buyout.

27. Under the direct personal-undertaking alternative, James alleges, in the alternative, that Michigan or the LP engaged him to solicit produce orders for commission compensation and that he performed the customer-attainment and coordination work described above. [REDACTED] He seeks determination of his claimed personal statutory status on the actual contracting relationship, not solely on his doing the work or an intended-beneficiary label.

28. This count concerns commissions legally earned and unpaid when due, including qualifying orders before the end of services whose acceptance, delivery or payment occurred later, if the statute applies. It does not treat all subsequent sales, a buyout or enterprise value as statutory commissions. [REDACTED]

28C. [Corporate claim identified for directions — not asserted in this pleading (see P2)] This paragraph identifies JD Global Sales, Inc.'s claim under the New Jersey Sales Representatives' Rights Act. That claim is that JD Global was the sales representative under the agreement, as the written and payment records reflect, that Red Sun Farms agreed to pay and then refused to pay commissions due to JD Global, and that JD Global is entitled to the unpaid commissions together with the statutory treble-damages remedy. This paragraph describes the allegations of D.E. 38 ¶¶139–148 and Prayer E, including treble damages, identified as the corporate counterpart to the personal statutory-status theory in paragraphs 27–28; recovery limited to JD Global's own nonduplicative earned-and-unpaid commissions, credited and

reconciled with the payment and reported coverage through August 26; no double recovery. Defendant: Red Sun Farms.

**R09 — Unjust enrichment, alternatively**

R09.SCOPE. JD Global Sales, Inc.'s corporate services and benefits remain for JD Global through licensed counsel, as stated in P2. James D'Amato is included only for a distinct personally compensable benefit. Proposed defendants are Jem D International (Michigan) Inc. and Jem D International Partners, LP as alternative recipients, with JEM-D International Inc. only through P14's qualifying LP-obligation route. Other named RSF recipients remain conditional leads, not additional defendants on this count without their own supported service, receipt/use and payment connection.

29. [REDACTED] Personal entitlement and the proper recipient remain to be established; a claim against any recipient requires that recipient's particular benefit and the circumstances supporting the expectation of payment, not a group label. Michigan and the LP are the supported alternative recipient candidates: the former is identified in the compensation documents and the latter in the customer-sales business. The general partner is included only through P14's qualifying LP-obligation route, not on an assumption that it personally received all services.

**[REDACTED]**

30. James alleges inequitable retention of the uncompensated benefit if the promised protections are denied, to the extent he establishes personal entitlement to that benefit. He seeks the legally recoverable value after credit for payments attributable to the same services or benefit, without counting gross retailer revenue as automatic restitution or recovering JDGS's loss a second time. This is the non-IP services alternative, not a relabeled misappropriation claim.

30C. [Corporate claim identified for directions — not asserted in this pleading (see P2)] This paragraph identifies JD Global Sales, Inc.'s unjust-enrichment claim: that it conferred a benefit on Red Sun Farms from January 1, 2016 forward for which it was not appropriately compensated and whose retention is inequitable. This paragraph describes the corporate dimension of D.E. 38 ¶¶160–171 and Prayer G, identified as the corporate counterpart to the personal R09; recovery limited to JD Global's own nonduplicative value after credit for payments already made; no double recovery with 32C or the personal theories. Defendant: Red Sun Farms.

**R10 — Quantum meruit, alternatively**

R10.SCOPE. JD Global Sales, Inc.'s services remain for JD Global through licensed counsel, as stated in P2. James D'Amato is included only for separately supported personal services and payment expectation. Proposed defendants are Jem D International (Michigan) Inc. and Jem D International Partners, LP as alternative accepting recipients, with JEM-D International Inc. only through P14's limited route, not as a presumed recipient of every service. Further RSF recipient leads are not automatically included. Actual acceptance, reasonable unpaid value, contract coverage and credits remain required.

31. [REDACTED] For this count, Michigan and the LP are the alternative accepting recipients described in P15 and paragraph 29; the GP is included only through P14, not presumed to have received every service itself. He does not base this claim on RSF having designed or prescribed those projects, and he does not allege that none of his work was compensated.

32. If neither the alleged undertaking nor another enforceable contract governs those same services, he seeks the reasonable unpaid value for which he proves personal entitlement, supported by evidence of the actual services and their reasonable value, after credit for payments

attributable to the same services and without duplicate recovery. The negotiated commission rate does not by itself establish reasonable value. James preserves a percentage-of-revenue valuation if supported by evidence and legally available; no particular percentage, revenue base or duration is asserted as established at this stage.

32C. [Corporate claim identified for directions — not asserted in this pleading (see P2)] This paragraph identifies JD Global Sales, Inc.'s quantum-meruit claim for the reasonable value of services it rendered and that Red Sun Farms knowingly accepted and used, where no enforceable contract governs the same services. This paragraph describes the corporate dimension of D.E. 38 ¶¶160–171 and Prayer G (quantum meruit), identified as the corporate counterpart to the personal R10; recovery limited to JD Global's own nonduplicative reasonable value after credit; no double recovery with 30C or the personal theories. Defendant: Red Sun Farms.

**R11 — Sherman Act conditional candidate**

R11.SCOPE. No final claimant is cleared. JD Global Sales, Inc. is the primary proposed claimant only if its own qualifying competition-related injury is supported, through licensed counsel, as stated in P2; James D'Amato is not selected merely because commissions were lost. Aldi Inc. and Bill Duesenberg are conditional defendant candidates. No additional RSF participant is selected without a specific supported agreement and act. The agreement, independent participants, competitive analysis, antitrust injury and causal route remain unresolved for this conditional antitrust theory.

R11.0. This count retains Aldi Inc. and Bill Duesenberg as conditional proposed new defendants. No additional RSF participant is selected absent a specific supported agreement and act. It does not attribute the reported supplier commitments to Duesenberg personally or infer an

agreement from his title or customer role. The particular agreement participants, conduct, market and injury holds remain explicit.

R11.1. [REDACTED] These are reported accounts, not the suppliers' own commitments or direct evidence that every supplier agreed with the others. The report does not identify Bill Duesenberg as its source, and no particular legal entity is identified from the nickname alone.

R11.2. [REDACTED] The unnamed competitor in the April source is not identified as Lidl by that source alone. [REDACTED] This supports a particular negotiation and dispute, not an established agreement among competing suppliers.

R11.3. [REDACTED] These distinct sources document buyer criticism and James's contemporaneous concern; neither is represented as an admission by Buma that a boycott caused the decline or as an executed supplier agreement.

R11.4. [REDACTED] It reports information from Jamie and Bill, not the suppliers' contracts. The stated division counts concern Aldi's allocations, not national market shares. The later named suppliers are not automatically identified as March's three, and the repeated November 1 account is not independent confirmation of their assent. [REDACTED]

R11.5. The proposed count challenges a supported restraint involving identified independent economic actors, not unilateral customer preferences, parallel decisions alone or ordinary coordination within one enterprise. The particular participants, commitments, implementation, dates, product and geographic scope, interstate-commerce nexus and competition-reducing effects require factual support. [REDACTED] No per-se label, separate seeds theory, supplier-wide defendant addition, market share or foreclosure percentage is supplied in this count. Legitimate commercial explanations and evidence inconsistent with the asserted restraint remain part of the assessment.

R11.6. The proper claimant must identify its own injury caused by the competition-reducing aspect of the supported restraint. JDGS's corporate compensation interest and a separately supported personal interest of James are not interchangeable. [REDACTED] A potential exclusion theory—that Aldi restricted access because RSF refused a supported anti-Lidl condition—is distinct from an internal RSF decision to decline an opportunity or a demand for gains from joining the challenged restriction. [REDACTED] An intertwined-injury theory remains available for assessment if the evidence shows injury to the claimant was a means of achieving broader anticompetitive ends. Lost commissions or buyout expectations alone do not establish that route. No final claimant, automatic treble award or new damages total is cleared.

**R12 — Walmart interference conditional candidate**

R12.SCOPE. JD Global Sales, Inc.'s corporate account and commission expectancy remains for JD Global through licensed counsel, as stated in P2. James D'Amato is included only for a distinct supported personal expectancy. Proposed defendants are Harold Paivarinta, Roberto Saldaña Castillo, Walmart Inc., Don Fox and Braulio Valdes. Harold's and Roberto's proposed additions are limited to R12; this does not automatically revive CEPA or add either man to R14/R18. For each defendant, the particular expectancy, capacity, wrongful act, knowledge and causal loss still require support for those requirements as stated in this count.

R12.0. This count names Walmart Inc., Don Fox, Braulio Valdes and Roberto Saldaña Castillo as proposed new defendants and Harold Paivarinta as a proposed defendant to be added following his prior dismissal. Harold's and Roberto's inclusion is limited to R12; neither is automatically added to every count. The alleged interference must concern an identified relationship or expectancy held by the proper claimant and conduct by a defendant in the legally

required outsider capacity. Their commercial roles are not pleaded as improper acts; the specific act, knowledge and causal loss remain subject to the stated interference requirements.

R12.1. James alleges that his work obtaining and servicing Walmart business supported a reasonable expectation of continuing participation and compensation under the undertaking described in the common allegations. [REDACTED] This conditional theory must identify whether the protected relationship or expectancy belongs to JDGS, James individually, or distinct rights of each, and the particular defendant alleged to be an outsider to that relationship. It does not convert personal buyer relationships into ownership of every corporate commission.

R12.2. [REDACTED] This sequence supports a dispute about the role and its protections, not a statement that all conditions were accepted, that commissions stopped then, or that an internal report supplies the buyer's exact testimony.

R12.2A. James recalls that, at the October 2018 trade show, Carlos Visconti returned to where Jim DiMenna and James were talking and told James that Braulio Valdes wanted him off the Walmart account. As James recalls Carlos's report, if James remained on the account, Red Sun Farms would not grow and might decline. James recalls the message's meaning as being that the business was not safe if he remained. He did not hear the private conversation between Carlos and Braulio and does not present his recollection of Carlos's report as Braulio's exact words or as firsthand knowledge of that conversation. D.E.38 paragraph 44 characterized Carlos's report as a refusal to continue business. James's present recollection is the narrower no-growth/possible-decline account stated in Declaration ¶113A; the earlier pleading is not silently adopted as his present recollection.

R12.3. [REDACTED] Fox's earlier agreement to speak is not treated as agreement to the later request, and BCC alone is not treated as Carlos's assent. The retained chain does not disclose the call's full substance or establish Fox's compliance.

**R12.3A. [REDACTED]**

**R12.3B. [REDACTED]**

R12.3C. [REDACTED] That is an inference to be tested against the particular protected expectancy and loss, not direct proof of the private call's contents. [REDACTED] James does not allege complete exclusion from all Walmart communications from April 16 onward or that rescheduling alone was a tort.

R12.3D. Roberto Saldaña Castillo is, as James understands, the majority owner of the Red Sun Farms entities. [REDACTED] The oral agreements James describes, including the May 27, 2016 buyout undertaking, were made before Roberto acquired a controlling interest in Red Sun Farms. On information and belief, [the reason talks resumed between Red Sun Farms and those companies was because of the relationship JD Global built in the first instance and because JD Global was able to obtain vendor numbers for those companies, which facilitated further discussions between the companies and Red Sun Farms. Red Sun Farms, however, refused to recognize JD Global's contributions in procuring vendor numbers for those companies, and did not compensate JD Global under the Commission Agreement for sales Red Sun Farms made to Fresh Market or John Cerasulo.] James alleges that Roberto, after acquiring that interest, withheld approval of written agreements memorializing those terms and later approved the decision to terminate James. James has not yet been able to confirm Roberto's role through documents and identifies these allegations as likely to have evidentiary support after a reasonable opportunity for discovery. [REDACTED] Roberto is proposed as a defendant on R12 only,

subject to the same conduct, capacity, knowledge, causation, jurisdiction and service requirements stated for Harold Paivarinta. The ownership approval described in Declaration ¶63 concerned a company proposal that, in James's view, did not reflect the terms agreed in 2016.

[110. Red Sun Farms further breached the covenant of good faith and fair dealing by directing JD Global in 2018, to work towards becoming Aldi's primary supplier. Based on this instruction, JD Global invested time cultivating the relationship with Aldi, and eventually obtained a meeting between Red Sun Farms and Aldi, where Aldi offered Red Sun Farms an exclusive sales opportunity for the eastern region of the United States. Red Sun Farms, however, refused the offer, and thereafter Aldi reduced the volume of produce it purchased from Red Sun Farms, including by removing Red Sun Farms from supplying its stores in the eastern region of the United States. This drastically decreased JD Global's commissions. Had Red Sun Farms not directed JD Global to work towards becoming Aldi's primary supplier, JD Global would have worked to secure other sales opportunities with Aldi.]

[111. As a direct and proximate result of Defendants' actions and conduct, JD Global was denied the employment security afforded by Commission Agreement, forewent the opportunity to obtain alternative employment prior to entering into the Commission Agreement, and was not appropriately compensated under the Commission Agreement. JD Global has suffered substantial damages, in an amount to be proven at trial.]

**[COUNT III]**

**[(Promissory/Equitable Estoppel – Against Red Sun Farms)]**

[112. Plaintiffs repeat, reallege, and incorporate by reference all of the allegations in the preceding paragraphs as if set forth here at length.]

[~~113. Mr. D'Amato presented Messrs. Visconti and DiMenna with the terms for Red Sun Farms to engage JD Global under the Commission Agreement.~~]

[~~114. At various times, including on February 28, 2015, January 15, 2016, April 27, 2016, Messrs. Visconti and DiMenna, represented that Red Sun Farms would supply JD Global with lifetime employment (measured by when Mr. D'Amato chose to retire from working for Red Sun Farms), commission payments on accounts JD Global obtained for Red Sun Farms during the term JD Global worked for Red Sun Farms, and protections from being terminated without cause, so long as JD Global obtained large retail clients for Red Sun Farms.~~]

[~~115. Messrs. Visconti and DiMenna were acting in their capacity as officers of Red Sun Farms when they made those representations to Mr. D'Amato.~~]

[~~116. Red Sun Farms made those representations to JD Global with the reasonable expectation that JD Global would rely on them.~~]

[~~117. JD Global reasonably relied on Red Sun Farms' representations to its detriment because it forewent other employment opportunities based on the promise of lifetime employment, agreed to a below market-rate for its commission payments, agreed to pay its own out-of-pocket and healthcare costs, and invested all of its time in developing and maintaining large retail accounts for Red Sun Farms.~~]

[~~118. As a result of Red Sun Farms' representations, JD Global has been damaged, and will continue to be damaged, in an amount to be proved at trial.~~]

**[~~COUNT IV~~]**

**[~~(Violation of the Conscientious Employee Protection Act - Against all Defendants)~~]**

[~~119. Plaintiffs repeat, reallege, and incorporate by reference all of the allegations in the preceding paragraphs as if set forth here at length.~~]

[120. JD Global is a one-person entity with Mr. D'Amato acting as its sole principal and representative. As JD Global's sole principal and representative, Mr. D'Amato alone is responsible for carrying out JD Global's business. Mr. D'Amato, among other things, oversees JD Global's day-to-day operations, manages JD Global's financials and client relationships, and enters into contractual agreements on JD Global's behalf.]

[121. Under the Commission Agreement, Red Sun Farms hired JD Global as an independent contractor until such time Mr. D'Amato chose to retire from working with Red Sun Farms. Pursuant to this arrangement, Mr. D'Amato (as JD Global's sole principal and representative), among other things, developed new business for Red Sun Farms with large retail customers, obtained new major retail accounts for Red Sun Farms, developed the VMI sales modeling system for predicting and servicing Red Sun Farm's customers' needs, and attended and participated in sales and business calls, networking events, and other Red Sun Farms meetings. Mr. D'Amato's services on behalf Red Sun Farms were an integral part of Red Sun Farms' business.]

[122. In exchange for the skilled services Mr. D'Amato provided under the Commission Agreement, Red Sun Farms paid JD Global a sales commission for produce Red Sun Farms sold to customers Mr. D'Amato obtained for Red Sun Farms. This payment arrangement began on February 28, 2015 and was supposed to continue until Mr. D'Amato chose to retire from working with Red Sun Farms, or until Red Sun Farms stopped selling produce to the customer or customers Mr. D'Amato obtained, whichever came first.]

[123. Because JD Global forwent other employment opportunities to work on behalf of Red Sun Farms, Mr. D'Amato was economically dependent on Red Sun Farms. Mr. D'Amato also carried out specific actions requested by Red Sun Farms, including facilitating introductions

between Red Sun Farms executives and key client contacts, and visiting Red Sun Farms growing operations to familiarize himself with Red Sun Farms' capabilities.]

[124. Mr. D'Amato, as JD Global's sole principal and representative, who acted on JD Global's behalf to carry out its obligations under the Commission Agreement, is protected under New Jersey's Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq. ("CEPA").]

[125. While working for Red Sun Farms, Mr. D'Amato participated in Red Sun Farms' sales calls run by Mr. Paivarinta on behalf of JD Global.]

[126. During those calls, Mr. Paivarinta berated Red Sun Farms employees on the grounds of their speech and intelligence, used sexual remarks and other vulgar language, and bullied sales employees, thereby creating a hostile work environment for Mr. D'Amato.]

[127. Mr. D'Amato found Mr. Paivarinta's conduct to be offensive and experienced emotional distress as a result of Mr. Paivarinta berating and bullying Red Sun Farms employees during sales calls to the point where he found it unbearable to participate in Mr. Paivarinta's sales calls. Mr. D'Amato stopped attending sales calls because of Mr. Paivarinta's conduct.]

[128. Mr. D'Amato reported Mr. Paivarinta's conduct and the hostile work environment Mr. Paivarinta created to his direct reports at Red Sun Farms—i.e., Messrs. DiMenna and Visconti—on February 16 and March 26, 2021.]

[129. Messrs. DiMenna and Visconti are part of Red Sun Farms' executive team, and, on information and belief, they shared Mr. D'Amato's reports about Mr. Paivarinta's conduct with other members of Red Sun Farms' management. Neither Messrs. DiMenna and Visconti nor any other person at Red Sun Farms with authority over Mr. Paivarinta did anything to correct Mr. Paivarinta' behavior.]

[130. On information and belief, Messrs. DiMenna and Visconti or other members of Red Sun Farms management informed Mr. Paivarinta that Mr. D'Amato had complained about Mr. Paivarinta's behavior.]

[131. On information and belief, Mr. Paivarinta retaliated against Mr. D'Amato as a result of Mr. D'Amato's complaints against Mr. Paivarinta in violation of CEPA by lobbying Red Sun Farms' management to fire JD Global, under the pretext that Mr. D'Amato's absence from company sales calls was impacting the company's business.]

[132. On information and belief, Red Sun Farms' management, including Messrs. DiMenna and Visconti, sided with Mr. Paivarinta and participated in his efforts to retaliate against Mr. D'Amato in violation of CEPA by authorizing Red Sun Farms to terminate JD Global's employment.]

[133. On information and belief, Red Sun Farms' willingness to terminate its working relationship with JD Global was also influenced by Red Sun Farms' management's frustration that Mr. D'Amato questioned multiple Red Sun Farms business practices that he believed misled or harmed Red Sun Farms' customers, including Mr. D'Amato (i) reporting to Mr. Visconti that Red Sun Farms' practice of using shipping dates as pack dates on PTI labels was misleading, (ii) reporting to management that Red Sun Farms had an obligation to refund Aldi for increased payments it made to Red Sun Farms to offset the tomato duty, and (iii) demanding to know from management the source origin of produce Red Sun Farms sold to Aldi and Walmart due to Mr. D'Amato's concerns about Red Sun Farms misrepresenting the characteristics of that produce to Aldi and Walmart in breach of its supply agreements. Red Sun Farms' management's decision to fire Mr. D'Amato for raising concerns about its business practices violated CEPA.]

[134. Red Sun Farms sent Mr. D'Amato a letter dated July 27, 2021 immediately terminating its working relationship with JD Global on the pretext that Mr. D'Amato's absence from sales calls impacted the company's business.]

[135. At the time of termination, Mr. D'Amato continued to satisfy JD Global's obligations to Red Sun Farms, and remained willing to work for Red Sun Farms. Prior to termination, Mr. D'Amato made several proposals to address Red Sun Farms' purported desire for him to weigh in on certain sales topics without having to participate in Mr. Paivarinta's sales calls.]

[136. Red Sun Farms had no basis for terminating its working relationship with JD Global for cause, and instead, on information and belief, based its decision, in whole or in part, on Mr. Paivarinta's desire to terminate JD Global and Mr. D'Amato's employment for personal reasons and because Mr. D'Amato reported what he believed were Red Sun Farms' questionable business practices, in violation of CEPA.]

[137. JD Global's termination was unjustified and pretextual, and thus without cause.]

[138. As a result of JD Global's wrongful termination, Mr. D'Amato suffered emotional distress and other damages in an amount to be proven at trial, and is also entitled to an award of punitive damages.]

**[COUNT V]**

**[(Violation of New Jersey Sales Representatives' Rights Act – Against Red Sun Farms)]**

[139. Plaintiffs repeat, reallege, and incorporate by reference all of the allegations in the preceding paragraphs as if set forth here at length.]

[140. Under New Jersey's Sales Representatives' Rights Act, N.J.S.A. 2A:61A-1 et seq. (the "Act"), a principal is required to pay its sales representative all commissions and other

compensation owed within 30 days of terminating an agreement between the principal and the sales representative for soliciting orders.]

[141. Red Sun Farms is a principal and JD Global is a sales representative within the meaning of the Act, in that, under the Commission Agreement, Red Sun Farms contracted to have JD Global solicit orders for Red Sun Farms produce and agreed to pay JD Global a commission for its services.]

[142. Pursuant to the Commission Agreement, JD Global was entitled to be paid a 0.85% commission on produce sold to clients JD Global obtained for Red Sun Farms, with such commissions to be paid until Mr. D'Amato chose to retire from Red Sun Farms.]

[143. Red Sun Farms purported to terminate the Commission Agreement immediately on July 27, 2021.]

[144. Red Sun Farms' purported termination of the Commission Agreement was unjustified, pretextual, and without cause. At the time of termination, JD Global was ready, willing, and able to work for Red Sun Farms.]

[145. Pursuant to the Commission Agreement, JD Global demanded that Red Sun Farms pay it the commissions owed for the duration of the Commission Agreement.]

[146. Red Sun Farms has paid JD Global commissions up through August 26, 2021, but has refused to make any further commission payments owed to JD Global.]

[147. Red Sun Farms owes JD Global commission payments for the duration of the Commission Agreement.]

[148. Red Sun Farms' failure to pay JD Global the commissions it is owed under the Commission Agreement has damaged JD Global's business in an amount to be proven at trial,

and entitles JD Global to recover treble damages against Red Sun Farms for those unpaid commissions.]

**[COUNT VI]**

**[(Fraudulent Inducement – Against Red Sun Farms/Mr. Visconti/ Mr. DiMenna)]**

[149. Plaintiffs repeat, reallege, and incorporate by reference all of the allegations in the preceding paragraphs as if set forth here at length.]

[150. Red Sun Farms and Messrs. Visconti and DiMenna are liable for fraudulently inducing JD Global to accept the Commission Agreement and continue to work for Red Sun Farms at below market commission rate.]

[151. Messrs. Visconti and DiMenna, as company executives, had actual authority from Red Sun Farms, whether express or implied, to enter into the Commission Agreement, and provide assurances to Mr. D'Amato that Red Sun Farms would honor their promises to JD Global. At all relevant times, Messrs. Visconti and DiMenna were acting at the direction and control of Red Sun Farms. Alternatively, Red Sun Farms cloaked Messrs. Visconti and DiMenna with apparent authority, and JD Global reasonably relied on their authority as company officers.]

[152. On February 28, 2015, Messrs. Visconti and DiMenna promised Mr. D'Amato that Red Sun Farms would supply JD Global with lifetime employment on a commission basis in exchange for JD Global obtaining large retail clients for Red Sun Farms. Messrs. Visconti and DiMenna promised to make this arrangement effective on January 1, 2016.]

[153. Messrs. Visconti and DiMenna made these representations to Mr. D'Amato for the express purpose of inducing JD Global to obtain new large retail clients for Red Sun Farms.]

[154. These statements were false or, at best, half-truths. Messrs. Visconti and DiMenna knew that once Red Sun Farms had developed a relationship with the retailers that JD Global

~~obtained, Red Sun Farms had no intention of continuing to partner in good faith with JD Global. Messrs. Visconti and DiMenna knew that once JD Global invested the time to develop those customer relationships it would not walk away from Red Sun Farms, and that Red Sun Farms could continue to benefit from the relationship's JD Global developed while at the same time denying JD Global the job security they promised Mr. D'Amato in the Commission Agreement.~~]

[~~155. Mr. Visconti later ratified the Commission Agreement on April 27, 2016 and told Mr. D'Amato he would pay JD Global a 0.85% commission on sales JD Global generated in exchange for lifetime job security to JD Global under the Commission Agreement.~~]

[~~156. This statement was false. Mr. Visconti knew that by appeasing Mr. D'Amato's employment concerns he would get JD Global to continue to invest in Red Sun Farms, including by improving Red Sun Farms' infrastructure and strengthening Red Sun Farms' customer relationships, but that Red Sun Farms had no intention of honoring the duration or termination protections of the Commission Agreement.~~]

[~~157. Upon information and belief, Messrs. Visconti and DiMenna gave their false and misleading representations with the approval of Red Sun Farms, and for the company's benefit. Messrs. Visconti and DiMenna acted with scienter, knowing that Mr. D'Amato would rely on their statements and that their statements would impact the services JD Global delivered to Red Sun Farms. Messrs. Visconti and DiMenna thus repeatedly misled JD Global about the purported relationship between JD Global and Red Sun Farms.~~]

[~~158. JD Global reasonably relied on Messrs. Visconti and DiMenna's material misrepresentations and omissions to its detriment, based, in part, on the parties' prior course of dealing. When entering into the original Agreement, Messrs. Visconti and DiMenna had first reached an oral agreement with Mr. D'Amato about engaging JD Global, and then followed~~

through with delivering a written contract that memorialized the parties' deal, consistent with their promises. But for Messrs. Visconti and DiMenna's material representations and omissions, JD Global would not have agreed to devote all of its time and efforts to obtaining new large retail clients for Red Sun Farms or agreed to a below-market commission payment.]

[159. As a direct and proximate result of Messrs. Visconti and DiMenna's conduct, JD Global has suffered substantial harm and damages in an amount to be proven at trial, including the actual value of the services JD Global provided to Red Sun Farms, and all out-of-pocket costs JD Global incurred in connection with the Commission Agreement. Defendants' conduct also entitles JD Global to recover punitive damages.]

**[COUNT VII]**

**[(Unjust Enrichment/Quantum Meruit – Against Red Sun Farms)]**

[160. Plaintiffs repeat, reallege, and incorporate by reference all of the allegations in the preceding paragraphs as if set forth here at length.]

[161. Messrs. Visconti and DiMenna requested that JD Global obtain retail clients for Red Sun Farms on a commission basis.]

[162. JD Global rendered sales services to Red Sun Farms on a below market basis based on the Commission Agreement.]

[163. JD Global would not have agreed to the commission rate under the Commission Agreement had Messrs. Visconti and DiMenna represented that Red Sun Farms would only retain JD Global for a limited term.]

[164. JD Global would not have obtained large retail clients for Red Sun Farms and devoted its entire time to working for Red Sun Farms, and would have instead supplemented its income from Red Sun Farms with alternative employment (or sought alternative employment in

full) had Messrs. Visconti and DiMenna not promised to extend JD Global lifetime employment.]

[165. Red Sun Farms' failure to provide JD Global with the job security and duration of employment promised to it by the company's executives has conferred a substantial benefit on Red Sun Farms for which it has not compensated JD Global.]

[166. As a result of JD Global's work, Red Sun Farms obtained large retail customers that it previously had no relationship with that have generated nearly $500 million in revenue for the company.]

[167. In addition to Red Sun Farms obtaining sales services at a below market rate, Red Sun Farms also profited from work JD Global performed for the business for which JD Global was not appropriately compensated.]

[168. JD Global assisted Red Sun Farms in developing new product lines that were not sold prior to JD Global working for the company. JD Global researched, designed, and procured special packaging—the Grab-N-Go 1lb bag—that Red Sun Farms then used to package Roma tomatoes, mini cucumbers, and other items. JD Global also developed other product lines that Red Sun Farms never grew before: the 12/1lb Roma Bag Conventional and Organic, Roma 25lb Conventional and Organic, 12/1lb Mini Cucumber Conventional and Organic, 12/1lb Mini Sweet Peppers Conventional and Organic, 12/2ct Organic Bell Peppers, 10/12oz Medley Tomato Top Seal, and 10/14oz Long Sweet Peppers. These products generated significant revenues for Red Sun Farms.]

[169. JD Global also negotiated a freight loss recoupment with Aldi, after Red Sun Farms projected that it would lose $1.3 million for the fourth quarter of 2017 on its freight budget. The

~~net result of JD Global's efforts was a $1 million profit for Red Sun Farms instead of its predicted loss—a $2.3 million turnaround from the initial freight budget projections.~~]

[~~170. In addition, Red Sun Farms benefitted from a "halo effect" created by JD Global's work for Red Sun Farms. On information and belief, after learning that Walmart and Aldi were purchasing produce from Red Sun Farms, various retail and wholesale customers contacted Red Sun Farms about doing business. For example, in 2016 a Lidl representative approached Mr. D'Amato and Mr. DiMenna at a produce show in New York City and said that Lidl wanted to do business with Red Sun Farms because Red Sun Farms supplied produce to Aldi stores throughout the Southeast where Lidl was planning to open its first stores. JD Global secured the Aldi account for Red Sun Farms, which facilitated an introduction to Lidl, resulting in Lidl purchasing in excess of $100 million worth of produce from Red Sun Farms. JD Global did not receive any compensation for those sales.~~]

[~~171. As a direct and proximate result of this inequitable conduct, JD Global has been, and will continue to be, damaged in its business.~~]

**[~~COUNT VIII~~]**

**[~~(Misappropriation of Business Information – Against Red Sun Farms)~~]**

[~~172. Plaintiffs repeat, reallege, and incorporate by reference all of the allegations in the preceding paragraphs as if set forth here at length.~~]

[~~173. Mr. D'Amato developed a proprietary VMI Model for JD Global for forecasting customer sales needs and ensuring that proper produce supply was in place to meet that demand.~~]

[~~174. The presentation of, and formulas in, the VMI Model are highly specific and developed by Mr. D'Amato based on his decades of experience working in the produce sales industry.~~]

[175. Mr. D'Amato trained Red Sun Farms sales representatives and coordinators on how to populate the data fields in the VMI Model.]

[176. JD Global did not license Red Sun Farms to use or distribute copies of the VMI Model.]

[177. The day Red Sun Farms purported to unlawfully terminate JD Global's employment, Mr. D'Amato requested the return and destruction of all spreadsheets containing the VMI Model and other proprietary documents JD Global shared with Red Sun Farms that are hosted on Red Sun Farms' MS Teams platform.]

[178. To date, Red Sun Farms has not provided Mr. D'Amato with proof that it deleted all VMI Model spreadsheets in its system. Nor has it returned any of JD Global's proprietary documents.]

[179. On information and belief, Red Sun Farms continues to use JD Global's VMI Model and other proprietary documents in Canada for its own benefit to facilitate sales and inventory tracking for its other clients.]

[180. On information and belief, Red Sun Farms continues to use JD Global's VMI Model and other proprietary documents for its own benefit with clients abroad, including in Canada and Mexico, in direct competition with the services JD Global offers to produce purchasers.]

[181. As a direct and proximate cause of Red Sun Farms' use of this proprietary information, JD Global has suffered, and will continue to suffer, substantial damages and irreparable harm.]

**[PRAYER FOR RELIEF]**

[WHEREFORE, judgment should be entered in favor of Plaintiffs and against Defendants for one or more of the following forms of relief or some combination of them:]

[A. On Count I, an award of damages against Red Sun Farms in an amount sufficient to compensate JD Global for all losses it suffered and will continue to suffer as a result of Red Sun Farms prematurely terminating the Commission Agreement without cause and depriving JD Global of lifetime commission payments;]

[B. On Count II, an award of damages against Red Sun Farms in an amount sufficient to compensate JD Global for all losses it suffered and will continue to suffer as a result of Red Sun Farms depriving JD Global of the benefit of the bargain it struck under the Commission Agreement;]

[C. On Count III, an award of damages against Red Sun Farms in an amount sufficient to compensate JD Global for all losses it suffered and will continue to suffer as a result of Red Sun Farms breaching the promises it made to JD Global, including damages JD Global suffered as a result of relying on Red Sun Farms promises and damages sufficient to compensate JD Global for the economic benefits that Red Sun Farms promised to it and then withheld;]

[D. On Count IV, an award of damages against Defendants in an amount sufficient to compensate Mr. D'Amato for Defendants unlawfully retaliating against Mr. D'Amato and terminating JD Global without cause, including a punitive damages award;]

[E. On Count V, an award of damages against Red Sun Farms in an amount sufficient to compensate JD Global for the unpaid commissions it is owed under the Commission Agreement, including an award of treble damages for those unpaid commissions;]

[F. On Count VI, an award of damages]

R12.4. [REDACTED] The defendant's improper act, knowledge of the particular expectancy, outsider capacity, and causal loss remain to be established through discovery and are not pleaded as presently determined. Any recovery belongs to the holder of the injured right and is subject to payments, matched credits and no duplicate recovery. No automatic damages follow from every Walmart sale or from a personal disagreement.

**R13 — Aldi interference conditional candidate**

R13.SCOPE. JD Global Sales, Inc.'s corporate business expectancy remains for JD Global through licensed counsel, as stated in P2; James D'Amato is included only for a separately supported personal expectancy. Aldi Inc. and Bill Duesenberg are the conditional proposed defendants. The particular opportunity, knowledge, outsider capacity, improper act and causal injury must be identified, preserving the commercial explanations and distinguishing proposals, programs and transitions.

R13.0. This count names Aldi Inc. and Bill Duesenberg as proposed new defendants. The particular relationship allegedly interfered with, the holder of that right, outsider capacity, act, knowledge and causal injury remain subject to the stated interference requirements. The same commercial event is not automatically a corporate contract breach, personal tort and antitrust injury.

R13.1. James alleges that his Aldi development, bid, product and service work supported continuing business and compensation opportunities. [REDACTED] It does not itself establish assent to a legally exclusive channel or the recipient's knowledge of every disputed compensation or buyout term.

R13.2. [REDACTED] The response is not reduced to either a bare rejection with no alternatives or unqualified agreement to Aldi's request.

R13.3. [REDACTED] Scheduling and correspondence do not establish every meeting's attendance or content. [REDACTED]

R13.4. [REDACTED] These statements are kept distinct from direct customer confirmation and independently documented awards. No verified 100M award, guaranteed sales, causal loss total or Lidl-revenue measure is asserted here. [REDACTED]

R13.5. The conditional claim seeks compensation for intentional, improper interference by an identified outsider with the proper claimant's identified relationship or reasonably probable opportunity. The particular opportunity, the defendant and act, knowledge, outsider capacity, causation, and the injured right remain to be established through discovery and are not pleaded as presently determined. Capacity, price, quality, supply and relationship-management explanations remain material alternatives. A purchasing party's decision concerning its own relationship is not transformed into third-party interference by labeling it a back channel. Relief is limited to legally recoverable causal loss, with matched credits and no duplicate recovery; retailer sales are not automatically personal damages.

**R14 — Civil conspiracy conditional candidate**

R14.SCOPE. The proposed claimant is James D'Amato for injury to his own right, or JD Global Sales, Inc., through licensed counsel (as stated in P2), for corporate injury, according to the supported predicate tort; both are not selected by default. Carlos Visconti and Jim DiMenna are the proposed defendants. Steve Macchio, buyers and other affiliates are not added by their appearance in a coordination narrative. Final naming remains held for the specific predicate, tort agreement, capacity, acts and causal injury.

R14.1. [REDACTED] The actionable wrong must be the particular interference, or another separately supported predicate identified in this pleading, not merely the fact that the

business ended the relationship or that its personnel communicated with one another. The predicate wrong, the injured claimant, and the participants remain to be established through discovery and are not pleaded as presently determined.

R14.2. [REDACTED] It does not establish by itself that each participant knew of and agreed to a tortious objective. [REDACTED]

R14.3. For each selected participant, the completed count would identify the principal and capacity, supported agreement or knowing participation, act in furtherance, and causal injury to the proper claimant. James alleges lost participation and compensation opportunities, subject to the rights and causation issues in the underlying claim. Recovery would be limited to the resulting legally recoverable injury, with matched credits and no duplicate recovery under the underlying tort, contract or other theories.

## R15 — Fraudulent inducement conditional candidate

R15.SCOPE. James D'Amato proposes a distinct personal representation, reliance and loss; JD Global Sales, Inc.'s legacy corporate fraud claim remains for JD Global through licensed counsel, as stated in P2. Proposed defendants are Carlos Visconti and Jim DiMenna for their own representations, and Jem D International (Michigan) Inc. and Jem D International Partners, LP only on supported attribution of the particular representation. JEM-D International Inc. and other affiliates are not automatically added. Speaker/time-specific particulars and the factual basis for intent remain unresolved for this count; the historical D.E.34 ruling is not proof of present personal ownership or intent.

F01. James identifies DiMenna and Visconti as the speakers at the February 28, 2015 discussion, and Visconti at the April 27 and May 27, 2016 discussions. The alleged

representations concern working duration, termination protection and the buyout, directed to secure James's commitment and agreement to the compensation arrangement.

F02. James alleges on information and belief that the identified representations were made without an intention to honor those protections, to induce the commitment and compensation concession described above. He alleges reliance and resulting personal detriment as in paragraphs 16 and25–26. Later nonperformance alone is not the asserted proof of earlier intent. The particular present factual basis for intent at each alleged representation remains subject to the unresolved speaker- and time-specific factual-basis requirements stated in R15.SCOPE; later breach is not supplied as the missing basis.

F03. Individual liability is proposed, subject to the adequate factual basis stated in R15.SCOPE and F02, for DiMenna's and Visconti's own representations and participation, not their titles or a personal guaranty. Michigan and the LP are alternative entity-attribution candidates only for the particular agency, authorization or adoption supported for the representation. The new general-partner defendant is not added to R15 automatically by P14, and no other affiliate becomes a fraud defendant from ownership or brand use. Relief is limited to available, nonduplicative personal loss; punitive or emotional-distress relief is not automatic.

F04-C. [Corporate claim identified for directions — not asserted in this pleading (see P2)] Without transferring any corporate right to Mr. D'Amato, this paragraph identifies JD Global Sales, Inc.'s fraudulent-inducement claim against Red Sun Farms, Mr. Visconti, and Mr. DiMenna [~~in an amount sufficient to compensate JD Global for all losses it suffered and will continue to suffer as a result of Defendants' fraudulent inducement, including an award of punitive damages;~~] — the defendants named on this count in D.E. 38 — for the representations that induced JD Global into the Commission Agreement, causing JD Global's own damages, with

compensatory and punitive relief as pleaded at D.E. 38 ¶¶149–159 and Prayer F. This paragraph describes the corporate fraudulent-inducement theory. In August 2022, D.E. 34 at pages 24–25 denied dismissal of JD Global's then-pleaded Count VI, accepting its adequately pleaded allegations at that stage rather than finding the disputed agreement or fraud proven. D.E. 155 at page 2 subsequently described the remaining fraudulent-inducement claim in D.E. 38 as JD Global's claim, not Mr. D'Amato's, and denied his then-request to amend. Neither historical ruling guarantees present preservation or permits Mr. D'Amato to prosecute a corporate claim; the proposed personal theory in F01–F03 does not transfer JD Global's claim to him. The procedural vehicle for this corporate claim requires the Court's directions requested in the accompanying motion; JD Global may present it only through licensed counsel. Recovery limited to JD Global's own nonduplicative loss; no double recovery as between JD Global and Mr. D'Amato.

[~~G. On Count VII, an award of damages against Red Sun Farms in an amount to be determined at trial, for the benefit JD Global conferred on Red Sun Farms from January 1, 2016 to the present and for which JD Global has not been appropriately compensated;~~]

[~~H. On Count VIII, an injunction requiring Red Sun Farms to turn over and destroy all proprietary information that JD Global provided to Defendants during the term JD Global was employed by Red Sun Farms, including JD Global's VMI Model, and damages compensating JD Global for Red Sun Farms' unauthorized use of JD Global's proprietary materials after Red Sun Farms unlawfully terminated JD Global's employment;~~]

[~~I. An award of costs of suit and attorneys' fees;~~]

[~~J. An award of~~]

## R16 — Conversion conditional candidate

R16.SCOPE. JD Global Sales, Inc.'s identified property and files remain for JD Global through licensed counsel, as stated in P2. James D'Amato is included only for a distinct supported personal possessory right. Current defendant candidates are Jem D International (Michigan) Inc. and Jem D International Partners, LP, tied to their specific act affecting that property. An IT or records individual is not added merely for handling or exporting files. Permission, preservation, competing rights, displacement/preemption, causal injury and duplication remain checks.

R16.1. [REDACTED] James's July 27, 2021 demand described the files as JDGS property created on JDGS equipment and placed on RSF drives for team access. It requested return and deletion and objected to future use. The demand is his asserted position, not a determination of title, receipt by every principal or the legal effect of revoking prior permission.

R16.2. [REDACTED] The proposed claim must identify what particular claimant right was excluded or impaired, by which defendant and act, rather than infer conversion from creation attribution or custody alone. Permitted operational copies, third-party contributions, record preservation and disputed use permission remain countercontext.

R16.3. Relief would be limited to the injury caused by a legally cognizable interference with the identified possessory right, with appropriate credits and no duplicate recovery for the same injury under contract, copyright, trade-secret or restitution theories. A commission debt, business opportunity or alleged service contribution is not relabeled as converted property merely to create another recovery. This module makes no finding that electronic information is categorically included or excluded from conversion under the governing law.

R16.4-C. [Corporate claim identified for directions — not asserted in this pleading (see P2)] This paragraph identifies JD Global Sales, Inc.'s claim to the identified proprietary information and files (including the VMI Model), that Red Sun Farms used or retained them without authorization after termination, for which damages for the unauthorized use and an injunction requiring the return and turn-over of JD Global's proprietary materials were sought in D.E. 38. This paragraph describes the corporate claim and the turn-over injunctive relief pleaded at D.E. 38 ¶¶172–181 and Prayer H. The destruction remedy in D.E. 38 Prayer H ("destroy") is reserved and is not described here as sought. Recovery limited to JD Global's own nonduplicative loss; no double recovery with R05.4-C/R06.3-C or the personal theories; copyright-preemption and NJTSA-displacement analysis reserved. Defendant: Red Sun Farms.

**R17 — Equitable accounting conditional candidate**

R17.SCOPE. JD Global Sales, Inc.'s corporate compensation right remains for JD Global through licensed counsel, as stated in P2. James D'Amato is included only for an established personal right requiring an accounting. Proposed defendants are Jem D International (Michigan) Inc. and Jem D International Partners, LP; JEM-D International Inc. is included only through a qualifying LP obligation under P14 plus an independent basis for accounting. No affiliate-wide entitlement is proposed. Accounting cannot create ownership; amounts owed, reported and paid and matched credits remain separate.

R17.1. The proposed request seeks a reconciliation for the holder of an established compensation right, using the customer, period and comparison categories stated in paragraph 19C. Amounts allegedly owed under the governing terms, amounts reported on commission statements and cash actually received are separate. The existing statements and calculations are to be reused and reconciled, not discarded and rebuilt or treated as an audited cash ledger.

R17.2. The comparison addresses the relationship among FOB and freight-pricing instructions, accepted and invoiced prices, revenue adjustments and relevant collections, transportation costs actually paid, deductions applied to the commission base, and compensation calculated and paid. The governing terms and assent to particular deductions remain disputed. A freight-price margin or budget-to-actual difference is not itself an unpaid commission, and a reported average lane-cost KPI is not raw carrier-invoice or payment proof. Matching cash to statements alone would not establish that the stated base, deductions or customer coverage were correct.

R17.3. The present period remains January 1, 2016 through termination, for customers whose sales generated JDGS commission payments and additional customer business for which entitlement is asserted and must be established. Updated records through settlement remain conditional on establishing a continuing compensation obligation, as paragraph 19C specifies; that records horizon does not adjudicate the duration of the right. Previously paid compensation, expense payments and correction credits must be matched to the relevant claimant, period, service and purpose. No already-repaid principal is sought again.

R17.4. If a separate equitable accounting is legally available and necessary, the proper claimant would seek a bounded account from Michigan or the LP insofar as that entity is responsible for the relevant records and obligation, or from the general partner only within the limited route in P14 and on a separately supported basis for accounting. That request requires its own supported relationship basis and explanation why ordinary damages and authorized discovery are inadequate. It does not create personal ownership of JDGS receivables, a fiduciary duty merely from a long business relationship, a right to every RSF sale, or a presumption that an

unexplained difference is fraud. No amount, rate, examiner appointment or immediate discovery order is requested through this conditional module.

**R18 — Aiding and abetting conditional candidate**

R18.SCOPE. The proposed claimant is James D'Amato OR JD Global Sales, Inc. according to ownership of the supported predicate-tort injury; JDGS requires licensed counsel (as stated in P2), and both claimants are not selected by default. Conditional proposed defendants are Aldi Inc., Bill Duesenberg, Walmart Inc. and Braulio Valdes. Don Fox and Harold Paivarinta are not added to this count from R12. Final naming remains held for the predicate, actual knowledge, substantial assistance and causal injury; ordinary assistance or email presence is not a substitute.

R18.0. This count names Aldi Inc., Bill Duesenberg, Walmart Inc. and Braulio Valdes as proposed new defendants. Don Fox is not added to R18 by inference from his selection on R12. The supported predicate tort, principal tortfeasor, each aider's actual knowledge, substantial assistance, claimant and causal injury must be separately identified; proposed party restoration does not supply those facts.

R18.1. This conditional theory addresses knowing, substantial assistance by an identified defendant to another actor's particular actionable tort, not an independent claim for helping end a business relationship. The predicate wrong, the principal tortfeasor, the defendant-aider, and the injured claimant remain to be established through discovery and are not pleaded as presently determined. The proposed route is the retailer-interference conduct in R12/R13, or a separately supported fraud route under R15; no predicate is selected in this count.

R18.2. [REDACTED] The completed allegation must explain what the proposed aider knew about the underlying wrong when assisting and what that defendant did to make it succeed.

Presence on an email, job title, social connection, knowledge of a dispute or routine implementation alone is not pleaded as sufficient assistance. [REDACTED]

R18.3. The proper claimant would seek only loss caused by the identified knowing assistance to the supported tort, with credits and no duplication of recovery for the same injury. Assistance by an insider is neither categorically immune nor automatically tortious. R14's conspiracy analysis is not mechanically imported into this separate claim; no outside-family aider is universally required, and the buyer defendants identified in R18.0 remain proposed additions, not adjudicated aiders or automatically liable customer actors.

**Common relief**

33. James seeks compensatory or alternative relief established under the selected personal theory, with appropriate credits and no double recovery between him and JDGS or among theories. Any statutory remedy, fee, punitive award, interest or equitable relief requires its independent legal basis. No amount or remedy is created simply by including it in a prayer. Jury-demand and dispute-resolution positions remain subject to the actual undertaking and applicable law.

33A. James seeks a supported valuation of the personal exit undertaking if he establishes that right, including the service contribution and attributable enterprise value he alleges it covered. He proposes using verified historical performance and evidence of benefits attributable to his work to inform that valuation. He does not equate gross retailer revenue with his personal damages, claim all RSF enterprise value, or add overlapping future-income and enterprise-value measures without adjustment. His account of protection through settlement is an alleged term, not an established legal endpoint. Corporate commissions, payments, other contributors, costs,

causation and the applicable valuation date and time horizon require separate treatment. No current revenue total, fixed formula or award is alleged here.

WHEREFORE, James D'Amato, solely in his individual capacity, proposes the following relief to the extent supported by the right and claim he may lawfully assert. Corporate claims identified for directions are not a pro se assertion by him of JDGS's rights. Where a prayer item below refers to the proper claimant, James requests that relief for himself only to the extent he establishes the right; as to any corresponding claim or relief of JD Global, including relief described in the identified corporate paragraphs, he requests only that the Court direct how it may be presented through licensed counsel. He requests express judicial directions concerning the permitted pleading form and treatment of JDGS's existing claims rather than assuming that a private reservation prevents supersession or dismissal:

PR-A. Contract / personal undertaking (R01; corporate claim identified at 22C): damages to the proper claimant for breach of the undertaking / Commission Agreement.

PR-B. Implied covenant (R02; corporate claim identified at 24C): damages for loss of the benefit of the bargain.

PR-C. Promissory/equitable estoppel (R03; corporate claim identified at 26C): reliance damages / promised economic benefit.

PR-D. CEPA (R04, personal only): remedies available under N.J.S.A. 34:19-5 to Mr. D'Amato, including punitive relief where available — subject to the reserved capacity/coverage determination.

PR-E. NJSRA (R08; corporate claim identified at 28C): unpaid earned commissions and the statutory treble-damages remedy to the proper claimant.

PR-F. Fraudulent inducement (R15; corporate claim identified at F04-C; with defendants limited by R15.SCOPE): compensatory and punitive damages to the proper claimant where legally available. D.E.34 is a historical ruling on the corporate pleading, not proof of fraud, personal claim ownership, or clearance of the present proposed count.

PR-G. Unjust enrichment / quantum meruit (R09/R10; corporate claims identified at 30C/32C): the value of the benefit conferred and the reasonable value of services, to the proper claimant.

PR-H. Proprietary information (R05/R06 trade secret; R16 conversion; corporate claims identified at R05.4-C/R06.3-C/R16.4-C): damages for unauthorized use and an injunction requiring RETURN/turn-over of the proprietary materials.

PR-I. Copyright (R07): remedies available under the Copyright Act, subject to the § 411 registration prerequisite and § 412 remedy limits — reserved.

PR-J. Antitrust / interference / conspiracy / aiding (R11/R12/R13/R14/R18): the damages legally recoverable by the proper claimant for the supported conduct, subject to the express unresolved element determinations; no treble or amount alleged absent support. Harold Paivarinta and Roberto Saldaña Castillo are included in this request only insofar as liability to the proper claimant is established on R12 and the Court authorizes their respective additions.

PR-K. Costs of suit and attorneys' fees where legally available; pre-judgment interest at the maximum legal rate; and

[K. Any] such other and further relief as the Court [may deem just and proper.] deems just and proper.

[Dated: August 31, 2022 By: s/ Karim G. Kaspar]

[Karim G. Kaspar]

[Craig Dashiell]

[LOWENSTEIN SANDLER LLP]

[One Lowenstein Drive]

[Roseland, New Jersey 07068]

[(T): (973) 597-2370]

[(F): (973) 597-2400]

[kkaspar@lowenstein.com]

[cdashiell@lowenstein.com]

[Attorneys for Plaintiffs]

**[JURY DEMAND]**

[Pursuant to Fed. R. Civ. P. 38, Plaintiffs hereby demand a trial by jury of any issue triable of right by a jury.]

**[CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2]**

[The undersigned certifies that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.]

[Dated: August 31, 2022 By: s/ Karim G. Kaspar]

[Karim G. Kaspar]

[Craig Dashiell]

[LOWENSTEIN SANDLER LLP]

[One Lowenstein Drive]

[Roseland, New Jersey 07068]

[(T): (973) 597-2370]

[(F): (973) 597-2400]

[~~kkaspar@lowenstein.com~~]

[~~edashiell@lowenstein.com~~]

[~~Attorneys for Plaintiffs~~]

PR-L. Equitable accounting (R17): a bounded account to the holder of an established compensation right, against the count-specific responsible entity and only upon the independent basis and ordinary-remedy inadequacy described in R17.4. The P14 general-partner route remains conditional; no immediate examiner appointment, discovery order, affiliate-wide account or personal ownership of JDGS receivables is requested by this cross-reference.

JURY DEMAND. James demands a trial by jury on all issues triable by jury on his properly asserted claims; any corporate demand must be presented through a permitted corporate pleading and counsel.

**Dated: October 18, 2026**

Signature:

**James D'Amato, individually**

**Address: 233 Rock Road #101, Glen Rock, NJ 07452**

**Telephone: (201) 280-1109**

**Email: jim@jdglobalsales.com**

James D'Amato, Pro Se
233 Rock Road #101
Glen Rock, New Jersey 07452
(201) 280-1109 | jim@jdglobalsales.com

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JD GLOBAL SALES, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>JEM D INTERNATIONAL PARTNERS, LP; JEM D INTERNATIONAL (MICHIGAN) INC.; JIM DIMENNA; CARLOS VISCONTI, et al.,<br><br>Defendants. | Civil Action No. 2:21-cv-19943-MEF-ADS<br><br>CERTIFICATE OF SERVICE |

I certify that on October 28, 2026:

1. I hand delivered the following to the Clerk's Office for filing, to be docketed on CM/ECF and noticed to counsel of record: letter responding to D.E. 178; public redline; Notice of Motion to Seal; Declaration and Index; and Proposed Order.

2. I hand delivered the unredacted redline to the Clerk's Office for filing under seal, and served it on counsel of record for Defendants outside of ECF, as required by the Clerk's notice at D.E. 179 and Fed. R. Civ. P. 5(b)(2), by email to Joseph H. Tringali, Esq., Bendit Weinstock, jhtringali@benditweinstock.com.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on October 28, 2026.

Signature:
James D'Amato, Pro Se